UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Clarence Fry, | : | Case No. 1:19 CV 2307 |
| | : | |
| Petitioner, | : | |
| | : | JUDGE PAMELA A. BARKER |
| vs. | : | |
| | : | |
| Tim Shoop, Warden, | : | **MEMORANDUM OF OPINION** |
| | : | **AND ORDER** |
| Respondent. | : | |

### INTRODUCTION

Petitioner Clarence Fry was convicted and sentenced to death in an Ohio state court for the aggravated murder of his former girlfriend, Tamela Hardison.  Fry has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentence.  (Doc. No. 21.)  Respondent Warden Tim Shoop has filed a return of writ to the petition.  (Doc. No. 24.)  And Fry has filed a traverse (Doc. No. 32), to which Respondent has replied (Doc. No. 37).  For the reasons stated below, Fry's petition is DENIED.

### FACTUAL HISTORY

The Ohio Supreme Court set forth the following facts underlying Fry's convictions:

I. Trial Evidence

*A. The State's Case*

{¶ 7} The state's case revealed that early on July 18, 2005, Fry and Hardison had an argument and a fight in the Akron apartment where they lived. Akron police officers Michael Rinn and Matthew Hackathorn arrived at 12:56 a.m., found Hardison injured and frightened, and arrested Fry.

{¶ 8} Hardison filed charges against Fry for assault and aggravated menacing, both first-degree misdemeanors, and also sought a criminal stalking protection order. Later that day, Hardison went to the emergency room at Akron City Hospital, where one arm was put in a cast and she was treated for pain and bruises. She told Donnell Juersivich, a victim-assistance advocate, that she intended to follow through with the charges against Fry.

{¶ 9} The same day, Fry was arraigned in Akron Municipal Court on charges of assault and aggravated menacing. His bond was set at $10,000, ten percent. Fry was already on probation for a domestic-violence conviction. He had signed rules of probation stating that any new conviction would be a probation violation and could result in reimposition of his previously suspended prison sentence.

{¶ 10} While he was in the Summit County jail, Fry made numerous phone calls, which were recorded by the jail. Before arraignment, Fry talked to his mother about the charges and whether his probation might be revoked. Fry asked his mother to call Hardison and tell her, "I go to court tomorrow. * * * If she would drop the charges, * * * I can get out on a signature bond." Fry mentioned that he was supposed to see his probation officer that Tuesday and worried that he might not be released on a signature bond. "I don't know what I'm going to do. * * * I will be jammed up big time," he said.

{¶ 11} After the arraignment, Fry asked his mother to call Hardison again and "tell her to call them people and squash that." Fry also mentioned that he was being evicted from his apartment.

{¶ 12} Fry talked to Hardison on the afternoon of July 18. He repeatedly asked Hardison to drop the charges so he could get out of jail. Before ending their call, Fry told Hardison, "You better quit fucking with me." He said, "You have got to talk to that lady * * * you tell her that them people coerced you into signing that thing."

{¶ 13} Later that day, Fry told Hardison again to get him out of jail. During this conversation, Fry said, "My record is so fucked up and violent." Fry told Hardison to say that "[t]he police scared [her] * * * into saying things." Hardison agreed to say, "The police scared me * * * because they had guns in my face." Fry said, "Good."

{¶ 14} In a call on July 21, Fry told Hardison that he had paperwork she signed saying that he had assaulted and threatened to kill her. He said, "I got two of them under my belt * * * toe tags." Fry explained that this comment meant that he had killed two people. Fry then told Hardison to "fix this, fix this." He said, "Those two signatures you put on there. You fix that. That is all I need you to do."

{¶ 15} Hardison's friend Robin Brooks testified that on some date after July 18, Hardison and Brooks went to the apartment and retrieved Hardison's clothes, a stereo,

2

a microwave, and some dishes. Brooks testified that Hardison did not take any male clothing or a TV from the apartment. Hardison left her property with a friend who owned a furniture business. Brooks did not know whether Hardison was paid for the property.

{¶ 16} Fry's bond was modified on July 25 to a $10,000 signature bond on the condition that he would have no contact with Hardison. Fry was also placed on day reporting. A new pretrial date was set for August 4, 2005, and he was released later that day.

{¶ 17} The next day, Fry went to the Akron Police Department and told Officer Mychal Brown that he had been released from jail for domestic violence and wanted to report a theft of property by his girlfriend. Brown told Fry to make a police report and not return to the apartment without the police.

{¶ 18} Juersivich, the victim-assistance advocate, testified that on July 28, she received a "hot line" call from Hardison, who was upset and afraid after learning that Fry had been released from jail.

{¶ 19} Hardison spent the night of July 30, 2005, at her daughter Nikita Knox's home at 824 Ina Court in Akron. On the morning of July 31, the daughter left for work, and Hardison remained to babysit for her daughter's three children: [J.B.], age five, [Jaion B.], age three, and [D.B.], age two.

{¶ 20} The Knox home was the property of the Akron Metropolitan Housing Authority ("AMHA"). Fry had been banned from entering AMHA property between February 14, 2005, and February 14, 2006, for having no bona fide reason to be there, but had violated this ban at least twice. In the early afternoon of July 31, Fry went to the Knox home. [J.B.] was playing outside with his brother Jaion and a friend, eight-year-old [M.V.]. [J.B.] and [M.V.] testified that they saw Fry walking through the courtyard toward the back of the Knox home. Fry was wearing a yellow sleeveless shirt and carrying an empty bowl and a long butcher knife. [J.B.] asked Fry why he was going into the house, and Fry said, "[T]o cut potatoes." [J.B.] followed Fry into the home.

{¶ 21} According to [J.B.], Fry went into the living room, where Hardison was watching TV and [D.B.] was sleeping on the couch. [J.B.] heard Fry ask Hardison, "Where are my clothes?" [J.B.] then saw Fry "cut" Hardison with the knife. Hardison told [J.B.] to call the police. [J.B.] tried, but Fry kept taking the phone from him. Fry was at the home no more than five minutes.

{¶ 22} [M.V.], the eight-year-old, testified that he saw Fry "speed walking" as he left the home carrying the knife and bowl. At about the same time, [J.B.] ran to [M.V.]'s home and screamed that his grandmother had been killed. Tanya Magrell, [M.V.]'s mother, testified that she then called 9-1-1. On the 9-1-1 tape, [J.B.] can be heard identifying "Clarence" as the killer.

{¶ 23} Akron patrolman Anthony Sutton arrived at the Knox home at approximately 1:00 p.m. Sutton testified that he found the side door partially open. Inside, he found Hardison's body on the living room couch and [D.B.] cuddled against her. A paramedic determined that Hardison was dead.

{¶ 24} Fry was quickly identified as the primary suspect in Hardison's killing. Police searched the area for Fry but were unable to find him. They were also unsuccessful in their search for a murder weapon. On August 3, 2005, Fry was found and arrested in Charleston, West Virginia.

{¶ 25} Corporal Keith Peoples, a Charleston police officer, transported Fry to the police station. Peoples testified that Fry did not complain of any injuries and that he did not notice any injuries to Fry's head.

{¶ 26} While awaiting extradition to Ohio, Fry made several phone calls from the Charleston jail to his mother. The recorded calls were entered into evidence. On August 9, Fry said, "It was just meant to be, Momma. * * * Just that simple." Fry continued, "I went in there trying to scare that girl. * * * I didn't go in there to kill nobody. That girl attacked me, Momma. * * * The audacity."

{¶ 27} Following Fry's extradition to Ohio, Akron Detective Michael Shaeffer conducted a tape-recorded interview of Fry. After waiving his *Miranda* rights, Fry stated that Hardison had confiscated all his belongings from his apartment while he was in jail and had taken them to a consignment store to be sold. Fry also said that Hardison had taken a TV that she had stolen from her daughter. He then put "the word out" that Hardison "stole her daughter's stuff, stole [his] stuff." Fry stated that he was not carrying a knife when he went to the Knox home. Instead, he got the knife from the kitchen to cut the noodles that he had been eating on the way there.

{¶ 28} Fry said he entered the living room slurping the noodles. Hardison had a "pet peeve" about his slurping noodles in her presence and became angry. Fry said, "I went straight off and I got to the point I mean how the hell you gonna [rob] me * * * and I'm cussing her out something fierce. * * * I'm calling her hoes, bitches, crackhead, dicksuckers and her grandson walks in." According to Fry, Hardison responded, "You ain't gonna talk to me like that in front of my grandson" and hit him in the jaw with an ashtray. Fry said he started "seeing stars," and his "vision blurred." Hardison was on top of him, Fry said, and he heard her say, "I'll kill you you tell my grandson * * * shit like that." Fry "got her up off" him and then stabbed Hardison because "she was trying to kill" him. He stated that his Marine training took over.

{¶ 29} Fry said he handed the phone to [J.B.], Hardison's grandson, and told him to call 9-1-1. Fry then fled the apartment with the bowl of noodles, the knife, and the ashtray. He said he threw the knife away "in a yard somewhere" near the crime scene.

4

{¶ 30} Dr. Lisa Kohler, the chief medical examiner for Summit County, conducted the autopsy on Hardison. Hardison suffered four stab wounds to her left arm and torso. The fatal wound entered the left upper back and injured the left upper lobe of the lung, cut into the aorta, and injured the left pulmonary artery. Dr. Kohler stated that a "significant amount of force" would have been necessary to "get the knife in deep enough to damage the structures near the heart." A drug screen was also conducted, and benzoylecgonine, a breakdown product of cocaine, was detected in Hardison's system. Dr. Kohler ruled that the "cause of death was * * * a stab wound to the back and the manner of death was * * * homicide."

{¶ 31} Lynda Eveleth, a forensic scientist with the Ohio Bureau of Criminal Identification and Investigation, testified that she conducted DNA testing of a bloodstain found on Fry's yellow sleeveless shirt, which [J.B.] testified that he had seen Fry wearing the day of the murder. Eveleth testified that she determined that "Hardison cannot be excluded as the source of DNA from the * * * shirt."

*B. The Defense Case*

{¶ 32} The defense called one witness and introduced five exhibits. Mary Reid,  who lives near Knox's Ina Court home, testified that Hardison was not wearing a cast on her arm when Hardison came to a birthday party at Reid's house on July 30, 2005. Reid also testified that she saw Fry walk by her front door toward Ina Court with a bowl in his right hand on the morning of July 31. She testified that Fry was not carrying a knife.

{¶ 33} Defense exhibit A is a notice to Hardison that she was required to appear in court on July 18 when her application for a protective order would be considered. Defense exhibit B is the case jacket for Fry's domestic-violence charges in Akron Municipal Court, showing that the case was assigned to Judge Williams, with pretrial dates of July 25 and August 4.

{¶ 34} Defense exhibit C documents that on July 29, 2005, Knox, Hardison's daughter, reported that a Hitachi big-screen TV that she rented had been stolen. Defense exhibit D provides the written policy for addressing criminal trespass on AMHA property. During cross-examination of William Liska, the AMHA security director, trial counsel demonstrated that AMHA policy did not authorize trespassers to be orally notified that they were banned from the premises.

{¶ 35} Finally, defense exhibit E is a photograph taken on July 31, showing the untidy bedroom at the Knox home. Trial counsel used this photograph during Officer Sutton's cross-examination to illustrate the clutter throughout the home.

*State v. Fry*, 125 Ohio St. 3d 163, 164-68 (Ohio 2010).

These factual findings "shall be presumed to be correct," and Fry has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## PROCEDURAL HISTORY

### A. State-Court Proceedings

#### 1. Trial

A Summit County, Ohio, Grand Jury indicted Fry on August 30, 2005, for the aggravated murder of Tamela Hardison. (Doc. No. 13-1 at 29-35.)[1]  Count One charged Fry with aggravated murder under Ohio Rev. Code § 2903.01(B) for causing Ms. Hardison's death while committing or attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary.  (*Id*. at 29.) This count carried two capital specifications – one for felony murder, alleging murder during an aggravated burglary, under Ohio Rev. Code § 2929.04(A)(7) and one for murder to prevent a witness' testimony under Ohio Rev. Code § 2929.04(A)(8) – and a specification for repeat violent offender under Ohio Rev. Code § 2929.13(C).  (*Id*. at 29-30.) Count Two charged Fry with aggravated murder under Ohio Rev. Code § 2903.01(A) for purposely causing Hardison's death with prior calculation and design, with a repeat-violent-offender specification under Ohio Rev. Code § 2929.13(C).  (*Id*. at 30.)  Count Three charged him with involuntary manslaughter under § 2903.04(A).  (*Id*. at 31.)  The indictment further charged Fry with:  felonious assault or aggravated burglary (Count Four), in violation of Ohio Rev. Code § 2903.02(A)/(B), with a repeat-violent-offender specification under Ohio Rev. Code § 2929.13(C); aggravated burglary (Count Five), in violation of Ohio Rev. Code

---

[1] For ease of reference, all citations to page numbers of documents filed in the court's electronic court filing system ("ECF") are to the ECF-assigned page numbers of the individual documents, not to the documents' original page numbers or the ECF "PageID" numbers.

§ 2911.11(A)(1)/(2), with a repeat-violent-offender specification under Ohio Rev. Code § 2929.13(C); domestic violence (Counts Six, Seven and Eleven), in violation of Ohio Rev. Code §§ 2903.14, 2909.06, 2909.07, 2911.12, 2911.211, 2919.22, or 2919.25(A), (C); tampering with evidence (Count Eight), in violation of Ohio Rev. Code § 2921.12(A)(3); intimidation of a crime victim or witness (Count Nine), in violation of Ohio Rev. Code § 2921.04(B); menacing by stalking (Count Ten), in violation of Ohio Rev. Code § 2903.211(A); and aggravated menacing (Count Twelve), in violation of Ohio Rev. Code § 2903.21.  (*Id*. at 31-35.)

Fry appeared at his arraignment without counsel, and having "stood mute," the trial court entered a technical plea of not guilty to all charges for him.  (*Id*. at 51.)

Fry's trial began on June 2, 2006.  (*Id*. at 399.)  He was represented by Lawrence Whitney and Kerry O'Brien.  (*Id*.)  During trial, counts Three, Eleven, Twelve, and all repeat-violent-offender specifications were dismissed, and the counts were renumbered accordingly.  (*Id*.)  On June 13, 2006, the jury returned a verdict of guilty on all charges and specifications.  (*Id*. at 399-400.)

The sentencing phase of Fry's trial began on June 26, 2006.  (*Id*. at 426.)  That same day, the jury recommended a death sentence on Count One, for aggravated felony murder.  (*Id*.)  The trial court then announced that it accepted the jury's recommendation and imposed a death sentence for Count One.  (*Id*. at 426-27.)  It also merged Count One with the second aggravated-murder count and counts for murder, aggravated burglary, and domestic violence (renumbered Counts Two through Five).  (*Id*. at 427.)  And it merged the two capital specifications contained in Count One into a single capital specification.  (*Id*.)  Finally, the court imposed prison sentences of five years each for domestic violence (renumbered Count Six), tampering with evidence (renumbered Count Seven), and intimidation of a crime victim or witness (renumbered Count

Eight), and of eighteen months for menacing by stalking (renumbered Count Nine), to be served consecutively with Count One and with each other.  (*Id*. at 428.)

### 2.  Direct Appeal

Fry filed a timely appeal of his convictions and sentences directly to the Ohio Supreme Court.  (*Id*. at 454-55.)  He was represented by appointed counsel George Pappas and David Doughten.  (*Id*.)  In his merit brief, Fry presented the following twenty propositions of law, stated as:

1. When the trial court becomes aware that the attorney-client relationship has deteriorated to the point that a capital defendant will not co-operate with counsel in the penalty phase procedures, the court must conduct an inquiry with the defendant to determine [the] basis for the problem.  If the attorney-client relationship has deteriorated to the extent that counsel can no longer effectively represent the defendant, the court must remove defense counsel and appoint new counsel for the penalty phase hearing.

2. A waiver of the presentation of mitigation evidence in the penalty phase of trial is not valid unless the defendant is informed that the waiver will result in the death penalty.  A waiver is not knowingly, intelligently and voluntarily made if the defendant is motivated into the waiver because of his dissatisfaction with his trial counsel rather than a sincere desire to receive the death penalty.

3. A capital defendant's right to allocution before being sentenced is mandatory.  Where the sentencing court neglects this right, the subsequent sentence is void or voidable.

4. A child witness under the age of ten years must be found incompetent to testify unless the record affirmatively establishes that the witness is able to distinguish right from wrong and the truth from a lie.

5. In a capital case, the introduction of evidence of alleged prior acts of violence [is] unfairly prejudicial unless such acts are intrinsically related to the charged offense.

6. Statements to police, a hospital nurse and a victim-witness advocate [violates] the Confrontation Clause under the Sixth Amendment to the United States Constitution when it is reasonably foreseeable by the declarant that the statements would be used in a subsequent criminal prosecution.

7.  The mere fact that a defendant kills a person who had earlier sworn out a complaint against the defendant for an offense is insufficient to sustain a finding of guilt for the R.C. § 2929.04(A)(8) specification.  The evidence must prove beyond a reasonable doubt that the defendant killed the victim because she had sworn out the earlier complaint.

8.  In a charge of Aggravated Murder pursuant to R.C. § 2903.01(A), where there is no evidence to establish that the intent to commit a purposeful killing did not form prior to a heated argument between the defendant and victim, the evidence may not support the element of prior calculation and design.

9.  The trial court must ensure that a criminal defendant understand not only that he has the right against self-incrimination, but also the right to testify should he or she so choose.  The court must inquire at the close of the defense case where a defendant has not testified if the defendant made a knowing, intelligent and voluntary waiver of his right to testify.

10. O.R.C. § 2929.04(A)(7) is unconstitutional where the same acts which constitute the charge of aggravated murder are also used to narrow the class of death eligible defendants.

11. An indictment which fails to set forth each and every element of the charged offense is in violation of the Due Process Clause of both the State and Federal Constitution.

12. Where distinct charges of the same indictment reflect that the grand jury made inconsistent findings as to the intent on the same actions of the defendant, the facts allowing the lesser intent finding are favorable to the defendant and must be provided to the defense in discovery.

13. The state may not charge a defendant with one theory of guilt and argue for a conviction on a second and inconsistent theory of the same act.

14. A jury verdict of guilty must be based upon a unanimous finding of proof beyond a reasonable doubt as to each element of the charged offense.  Where the jury is encouraged to find either one of two distinct acts as the basis for the particular element, a subsequent conviction is invalid.

15. Where the trial court fails to merge convictions and capital specifications, the resultant sentence is void or voidable as the weighing process is tainted with the consideration of improper aggravating factors.

16. A trial court must merge capital specifications where warranted prior to the jury deliberations on the appropriate penalty.  Where two statutory aggravators are merged, the jury must be instructed that it is to consider only one statutory aggravator in the weighing process.

17. The failure to raise and preserve meritorious issues during a capital trial results in the denial of a defendant's right to effective assistance of counsel.

18. A criminal defendant possesses the constitutional right to counsel of his choice. Where an African-American defendant requests at his arraignment for a death penalty charge that at least one of his counsel be of his same heritage, the trial court must grant the request if such qualified counsel is available.

19. The death penalty may not be sustained where the cumulative errors that occur[ed] in [] the trial deprived the defendant of a fair consideration of the appropriateness of the death penalty.

20. The death penalty is unconstitutional as presently administered in Ohio.

(*Id*. at 493-508.)  The State filed a responsive brief.  (*Id*. at 704-810.)

On March 23, 2010, the Ohio Supreme Court affirmed Fry's convictions and sentence of death, but it remanded the case to the trial court for the imposition of post-release control pursuant to Ohio Rev. Code § 2929.191 on the sentences for domestic violence, tampering with evidence, intimidation of a crime victim or witness, and menacing by stalking.  *See Fry*, 125 Ohio St. 3d at 163.

Fry then filed a motion for rehearing and to stay the issuance of the mandate.  (Doc. No. 13-1 at 902-12.)  The State opposed the motion (*id*. at 913-15), and the court denied it (*id*. at 925).

Two years later, on September 7, 2012, Fry, now represented by Timothy Sweeney, filed in the Ohio Supreme Court an application to re-open his direct appeal pursuant to Ohio Supreme Court Practice Rule 11.6.  (*Id*. at 929-1378.)  That rule permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause."  *See* Ohio S. Ct. Prac. R. 11.06(A); *see also State v. Murnahan,* 63 Ohio St. 3d 60 (Ohio 1992).

In his reopening application, Fry asserted that appellate counsel were ineffective for failing to assert five claims, stated as:

10

1. The trial court failed to ensure the inclusion of African-American jurors on the jury panel in Fry's capital trial to Fry's extreme prejudice, and thereby deprived Fry of his rights to due process, a fair trial, to equal protection, and to a jury that represents a fair cross section of the community.

2. Fry was denied his constitutional rights to a fair trial by an impartial jury and to an individualized sentencing determination when the trial court failed to excuse for cause a juror (Vanessa Racut) whose disqualifying bias became apparent before the sentencing phase, and when this failure resulted in Fry's sentencing phase being tried before a jury which included that biased juror.

3. Fry's trial counsel provided ineffective assistance by failing to fully develop, and include in the record additional evidentiary support for, meritorious constitutional claims, thereby allowing the record for direct appellate review on such claims to be insufficiently complete.

4. Fry's trial counsel provided ineffective assistance during the plea bargaining process by failing to spend sufficient time with Fry in explaining a plea bargain proposed by the state that would have allowed Fry to avoid the death penalty, thereby prejudicing Fry.

5. Fry's trial counsel provided ineffective assistance during and in preparation for the mitigation phase by failing to obtain the appointment of necessary experts and to be prepared to present such experts.

(*Id*. at 933-39 (capitalization altered).)

The State opposed the application (*id*. at 1379-83), and the court summarily denied it on June 26, 2013 (*id*. at 1384).

### 3.  Post-Conviction Proceedings

Meanwhile, on May 11, 2007, Fry – represented by Richard Vickers and Justin Thompson of the Ohio Public Defender's Office – filed a motion in the trial court for the judge to voluntarily recuse herself due to bias against him and hold the case in abeyance pending a decision on recusal. (Doc. No. 13-2 at 16-22.)  Fry filed his post-conviction petition that same day.  (*Id*. at 39-961.)  It raised the following grounds for relief, stated as:

1. Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at a critical stage of his trial – the penalty

11

phase. . . .  Petitioner's counsel utterly failed [to] address the issues of race with Petitioner or his family. Instead, his counsel ignored the family, thus enhancing their perceptions of counsel as racist.

2.  Petitioner Fry's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of his capital case. . . .  Petitioner's trial counsel failed to inform the jury, through cross-examination of [State witness J.B.] or Detective King of the discrepancies between [J.B.]'s original statement to Detective King and his testimony.

3.  The convictions and sentence imposed against Petitioner are void and/or voidable because trial counsel rendered ineffective assistance of counsel at Petitioner's trial. The trial court failed to act to ensure the inclusion of African American jurors on the panel that was to decide his guilt or innocence and whether he should live or die.

4.  Petitioner Fry's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of his capital case. . . .  Petitioner's trial counsel failed to inform the jury, through cross-examination of [State witness J.B.] or Detective King of the discrepancies between [J.B.]'s original statement to Detective King and his testimony.

5.  The failure of the state to provide exculpatory evidence that had been apparently provided to the Summit County Grand Jury deprived the Petitioner of a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

6.  Petitioner Fry's convictions and sentences are void and/or voidable because Petitioner was denied the effective assistance of counsel during the trial stage of his capital case. . . .  Petitioner's trial counsel failed to inform the jury, through cross-examination of [State witness J.B.] or Detective King of the discrepancies between [J.B.]'s original statement to Detective King and his testimony.

7.  Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at a critical stage of his trial – the penalty phase . . . .  His counsel did not arrange a meeting with Petitioner and his family to discuss the need to put on mitigating evidence. . . .  For example, Petitioner's mother would have testified on his behalf.

8.  Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at a critical stage of his trial – the penalty

phase . . . .  His counsel did not arrange a meeting with Petitioner and his family to discuss the need to put on mitigating evidence. . . .  For example, Petitioner's brother[] Frank McCray would have testified on his behalf.

9.  Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at a critical stage of his trial – the penalty phase . . . .  His counsel did not arrange a meeting with Petitioner and his family to discuss the need to put on mitigating evidence. . . .  For example, Petitioner's brother[] Lawrence Fry would have testified on his behalf.

10.  Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at a critical stage of his trial – the penalty phase.

11.  Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at a critical stage of his trial – when his case would have been resolved through a plea offer.

12.  Petitioner Fry's convictions and death sentence are void or voidable because he was not allowed to testify at his capital trial.  His rights as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution were violated and he was prejudiced.

13.  Petitioner Fry's death sentence is void or voidable because of the complete breakdown of the attorney-client relationship at his capital trial.  As a result of that breakdown, he was denied counsel at two critical stages of his trial: (1) when his case could have been resolved through a plea offer, and (2) when he made the uninformed decision to waive mitigation.

14.  Petitioner Fry's death sentence is void or voidable because, assuming arguendo that none of the Grounds for Relief in the Post-Conviction Petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions as presented in the Petition . . . have denied the Petitioner his rights as secured by the United States and Ohio Constitutions.

(*Id*. at 51-84.)

On September 18, 2007, the State moved to hold Fry's post-conviction petition in abeyance because Fry's first proposition of law in his then-pending direct appeal to the Ohio Supreme Court

13

would "substantially if not totally determine the issues presented" in the petition.  (*Id*. at 969-70.)
The court granted the motion.  (*Id*. at 971.)

On January 20, 2011, after Fry's direct appeal was completed, the State filed a motion in
the trial court opposing Fry's motion to recuse.  (*Id*. at 1142-44.)  The State also filed that day a
motion to dismiss the petition.  (*Id*. at 1145-58.)  Fry, now represented by Tyson Fleming and
Kimberly Rigby of the Ohio Public Defender's Office, replied to the State's motion on March 7,
2011.  (*Id*. at 1163-77.)  On April 6, 2011, Fry moved for funds for experts on psychology,
substance abuse and neuropsychology, for leave to amend the petition, and for discovery.  (*Id*. at
1180-267.)  The State opposed all motions.  (*Id*. at 1268-71.)  On April 12, 2011, Fry filed a motion
for leave to file a second amendment to his petition.  (*Id*. at 1272-77).  The State also opposed this
motion.  (*Id*. at 1278-79.)

On August 29, 2011, the trial court denied Fry's post-conviction petition and motions for
recusal, discovery, and funds for expert assistance.  (*Id*. at 1280-88.)

Fry filed a timely notice of appeal to the state court of appeals.  (*Id*. at 1289-99.)  In his
appellant brief, Fry presented the following five assignments of error, stated as:

1. The trial court erred by applying the doctrine of res judicata to bar Fry's grounds
   for relief.

2. The trial court erred in dismissing Fry's post-conviction petition when he
   presented sufficient operative facts to merit relief or, at a minimum, an evidentiary
   hearing.

3. The trial court erred when it failed to grant funding for expert assistance in
   violation of Fry'[s] rights under the Sixth, Eighth, and Fourteenth Amendments to
   the United States Constitution.

4. The trial court erred when it refused to allow Fry to conduct discovery in violation
   of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United
   States Constitution.

14

    5.  The trial court erred when [it] denied Fry's motion for voluntary recusal in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Doc. No. 13-3 at 65 (capitalization altered).)  The State filed a responsive brief.  (*Id.* at 110-63.)

On June 13, 2012, the appellate court affirmed the trial court's judgment in part, but reversed in part, concluding that the trial court erred in finding Fry's twelfth ground for relief, asserting his right to testify was violated, was barred by the doctrine of *res judicata*.  *State v. Fry*, No. 26121, 2012 WL 2128027, at *6 (Ohio Ct. App. June 13, 2012).  The court remanded the matter back to the trial court to consider the evidence Fry presented supporting that claim.  *Id*. at *7.

Fry appealed the appellate court's judgment to the Ohio Supreme Court.  (Doc. No. 13-3 at 343-57.)  In Fry's memorandum in support of jurisdiction, he raised the following propositions of law, stated as:

    1.  When a death-sentenced defendant files a post-conviction petition, due process, equal protection, the right to counsel, and the freedom from cruel and unusual punishment require that the defendant receive funding for expert assistance and discovery upon a showing of good cause. U.S. Const. amend[s]. VI, VIII, XIV.

    2.  Effective assistance of counsel at the trial phase of a capital trial requires that counsel consult with necessary experts, properly advise their client, and use appropriate evidence readily at hand to counter the State's evidence. U.S. Const. amend[s]. VI, VIII, XIV.

    3.  A criminal defendant is entitled to a petit jury selected from a fair cross section of the community. U.S. Const. amend[s]. VI, VIII, XIV.

    4.  A criminal defendant is entitled to have his case decided by a trial court who is not biased or prejudiced against the defendant.

(*Id*. at 360.)  The State waived a response.  (*Id*. at 415.)  The court declined jurisdiction over the case on June 28, 2013.  (*Id*. at 416.)

Upon remand, the trial court held hearings on the matter on July 14, 2016, and December 7, 2016.  (Doc. No. 13-2 at 1363-64, 1435-36.)  The court denied Fry's right-to-testify claim on November 21, 2017.  (*Id*. at 1452-76.)

Fry filed a timely appeal of the trial court's decision.  (*Id*. at 1477-1503.)  In his appellant brief, Fry presented two assignments of error, stated as:

1. Appellant Fry proved that his trial counsel unconstitutionally deprived him of the right to testify in his own defense.  Accordingly, the trial court erred and abused its discretion when it denied Fry relief on his Twelfth Ground for Relief in his post-conviction petition.

2. The trial court erred and abused its discretion when it denied Appellant Fry's post-conviction petition after conducting an evidentiary hearing.

(Doc. No. 13-3 at 526.)  The State filed a responsive brief.  (*Id*. at 654-710.)  On March 20, 2019, the state appellate court denied Fry's appeal.  *State v. Fry*, No. 28907, 2019 WL 1318562, at *8 (Ohio Ct. App. March 20, 2019).

Fry filed a timely appeal to the Ohio Supreme Court.  (Doc. 13-3 at 784-86.)  In his memorandum in support of jurisdiction, Fry raised two propositions of law, stated as:

1. A criminal defendant is deprived [of] his right to testify as afforded by the United States Constitution when his attorneys substitute their judgment for that of the defendant; unilaterally waiving the defendant's right to testify despite knowing that he wanted to testify; and affirmatively misleading the trial court about the defendant's desire to testify pursuant to *Rock v. Arkansas*, 483 U.S. 44 (1987) and its progeny. U.S. Const. amend[s]. V, VI, XIV.

2. Where there were issues presented in the original post-conviction petition not previously considered, because the court of appeals determined they were not yet ripe for review, the court of appeals errs when it fails to review those issues that are now ripe for review.

(*Id*. at 796.)  The State filed a memorandum in opposition.  (*Id*. at 904-12.)  The court declined jurisdiction on August 6, 2019.  (*Id*. at 913.)

Fry then filed a petition for writ of certiorari in the United States Supreme Court.  (*Id*. at 788.)  The Supreme Court denied the petition on January 13, 2020.  (*Id*. at 789.)

**B.  Federal Habeas Proceedings**

Fry filed a petition for writ of habeas corpus in this Court on August 6, 2020, asserting twenty-four claims for relief.  (Doc. No. 21.)  Respondent filed a return of writ on September 28, 2020.  (Doc. No. 24.)  Fry filed a traverse on August 11, 2021.  (Doc. No. 32.)  And Respondent filed a sur-reply on September 30, 2021.  (Doc. No. 37.)

Fry then filed two motions, one seeking permission to conduct discovery on many of his claims (Doc. No. 36) and one asking the Court to stay these proceedings pending a Supreme Court decision in *Shinn v. Ramirez* (Doc. No. 39).  Respondent opposed both motions.  (Doc. Nos. 38, 40.)  This Court denied Fry's motion for discovery without prejudice and denied his motion to stay on December 7, 2021.  (Doc. No. 41.)  Fry filed a renewed motion for discovery (Doc. No. 42), which Respondent opposed (Doc. No. 43), and this Court denied on February 17, 2022 (Doc. No. 47).

Fry next filed a motion for evidentiary hearing, which Respondent opposed.  (Doc. Nos. 50, 51.)   The Court will address that motion in this memorandum of opinion and order.

Fry also filed a motion to stay these proceedings and hold them in abeyance while he exhausted a new federal constitutional claim then pending in state court. (Doc. No. 54.)  The claim was based on newly discovered evidence that at least one juror at his trial was opposed to sentencing him to death but was "instructed" that she had no option but to impose the death penalty because Fry had waived his right to present mitigation evidence.  (*Id*. at 6-7.)  Respondent opposed the motion (Doc. No. 55), and the Court denied it (Doc. No. 57).

On December 20, 2022, Fry filed a motion for leave to amend his petition by adding a new claim based on the evidence of the confused juror.  (Doc. No. 58.)  Respondent opposed this motion as well.  (Doc. No. 59.)  The Court denied the motion.  (Doc. No. 61.)

## PETITIONER'S CLAIMS FOR RELIEF

1. Petitioner Fry was deprived of his constitutional right to the effective assistance of counsel during the trial phase of his capital trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

2. Trial counsel [were] ineffective when they allowed Fry to waive his right to present mitigation evidence.  Because trial counsel did not inform Fry of the consequences of waiver, the waiver was not knowing, voluntary and intelligent.

3. Fry's right[s] to due process, a fair trial and the effective assistance of counsel [were] denied by counsel's deficient performance during the penalty phase of his trial in violation of the Sixth, Eighth and Fourteenth Amendments [to] the United States Constitution.

4. Trial counsel were ineffective for failing to challenge Juror Hogue for cause during the voir dire of Clarence Fry's trial[,] denying Fry his right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution.

5. The trial court erred when it found [J.B.], a six-year[-]old boy, competent to testify without affirmatively establishing that the witness was able to testify truthfully in violation of Clarence Fry's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

6. The admission of irrelevant and unfairly prejudicial evidence of prior acts violated Clarence Fry's right[] to due process, and was in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

7. Fry's right to confront witnesses under the Sixth Amendment was violated when hearsay statements to police, a hospital nurse and a victim-witness advocate were introduced in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

8. The trial court's denial of Fry's right to allocution before being sentenced renders the subsequent death sentence void or voidable in violation of the Fifth, Sixth, Eight[h] and Fourteenth Amendments to the United States Constitution.

9. Fry's due process, equal protection, fair trial, and fair and reliable sentencing determination rights were denied when he was found guilty of a capital

specification that was not proven beyond a reasonable doubt under the Fifth, Sixth, Eighth, and Fourteenth Amendments [to the United States Constitution].

10. The trial court violated Petitioner Fry's right to testify in his own defense when the court failed to conduct an independent inquiry of Fry.

11. The trial court and the State of Ohio violated Fry's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the court erroneously allowed Fry to waive the presentation of mitigation evidence.

12. The State violated Petitioner Fry's right to counsel under the Sixth Amendment when it refused to appoint Fry an African[-]American attorney.

13. The trial court failed to ensure the inclusion of African-American jurors on the jury panel in Fry's capital trial to Fry's extreme prejudice, and thereby deprived Fry of his right[s] to due process, a fair trial, to equal protection, and to a jury that represents a fair cross[-]section of the community.

14. The trial court violated Fry's constitutional rights to a fair trial by an impartial jury and to an individualized sentencing determination because the court failed to excuse Juror Racut for cause when her bias became obvious.

15. The trial court failed to merge the capital murder specifications and thus the weighing process was improperly tainted by the consideration of improper aggravating factors.

16. Fry was denied his right to due process when his jury verdict was not based upon a unanimous finding beyond a reasonable doubt as to each element of the charged offense[s,] violating Fry's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

17. Fry was denied his right to a fair trial when he was charged with three separate murder counts involving different mens rea and violating his right to due process under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

18. The State violated Fry's constitutional rights under the Due Process Clause of the Fifth, Sixth, Eighth and Fourteenth Amendments by producing an indictment that failed to set forth every element of the charged offenses.

19. Appellate counsel were ineffective on direct appeal to the Ohio Supreme Court, depriving Fry of his due process rights under U.S. Const. amends. [VI and XIV].

20. The death penalty on its face and as applied to Fry is arbitrary, cruel and unusual, and violates due process in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

19

21. The cumulative effects of the errors and omissions set forth in the preceding claims for relief prejudiced Fry and deprived him of his right to a fair trial and sentencing determination in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the [United States] Constitution.

22. Fry's trial counsel rendered ineffective assistance due to counsel['s] failure to investigate and present additional evidence during the trial phase of Fry's capital trial in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

23. Fry's trial counsel rendered ineffective assistance due to counsel['s] failure to investigate and present mitigating evidence during the penalty phase of Fry's capital trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

24. Fry's right to effective counsel was violated by trial counsel's failure to present evidence of Petitioner's exposure to racism while growing up [in violation of the] Sixth and Fourteenth Amendments to the United States Constitution.

(Doc. No. 21 at 59, 80, 87, 94, 96, 99, 103, 107, 108, 114, 117, 122, 124, 126, 128, 131, 135, 136, 138, 143, 156, 158, 159 (capitalization altered).)

STANDARD OF REVIEW

### A.  AEDPA Review

In essence, habeas corpus is "an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Fry's petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (AEDPA governs federal habeas petitions filed after Act's effective date). The Act, which amended 28 U.S.C. § 2254, authorizes federal courts to issue writs of habeas corpus to state prisoners who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

At the same time, however, AEDPA was intended "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *(Michael) Williams v. Taylor*, 529 U.S. 420, 436 (2000)).  The Act "recognizes a foundational principle of our federal system:  State courts are adequate forums for the vindication of federal rights."  *Burt v. Titlow*, 571 U.S. 12, 18 (2013).  It therefore "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id*. at 19.

Most significantly, § 2254(d) forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Habeas courts will presume a state court has adjudicated a federal claim "on the merits," and AEDPA deference therefore applies, regardless of whether the last state court to decide the claim provided little or no reasoning at all for its decision.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (applying presumption to state-court summary dispositions); *see also Johnson v. Williams*, 568 U.S. 289, 292-93 (2013) (applying *Richter* presumption to state-court decisions that rule against a defendant and address some issues, but not expressly the federal claim in question).

21

"[C]learly established Federal law" for purposes of § 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).  It includes "only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks and citations omitted).  When identifying what a Supreme Court decision actually holds, courts should not frame the decision "at too high a level of generality." *Woods v. Donald*, 575 U.S. 312, 318 (2015).  Clearly established law under § 2254(d)(1) "squarely addresses" the issue presented or "clearly establishes" a legal rule developed in a different context applied to the facts of that case. *Wright v. Van Patten*, 552 U.S. 120, 125 (2008).

A state-court decision is "contrary to" clearly established federal law under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Under § 2254(d)(1)'s "unreasonable application" clause, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 75 (citations omitted).  "The unreasonable application clause requires the state court decision to be more than incorrect or erroneous"; it must be "objectively unreasonable." *Id*. (citations omitted).  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) if the court made a "clear factual error." *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003).  The petitioner bears the burden of rebutting the state court's factual findings "by clear and convincing

evidence." *Burt*, 571 U.S. at 18; *see also Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).  This requirement mirrors the "presumption of correctness" AEDPA affords state-court factual determinations, which only can be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).[2]  The Supreme Court has cautioned, however, that "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt*, 571 U.S. at 18 (quoting *Wood v. Allen,* 558 U.S. 290, 301 (2010)).

In deciding whether a state court's decision "involved" an unreasonable application of federal law or "was based on" an unreasonable determination of fact under § 2254(d), a habeas court must "'train its attention on the particular reasons – both legal and factual – why state courts rejected a state prisoner's federal claims . . . .'"  *Wilson v. Sellers,* – U.S. –, 138 S. Ct. 1188, 1191-92 (2018) (quoting *Hittson v. Chatman*, 576 U.S. –, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari).  In cases in which the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion, a habeas court "simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable."  *Id.* at 1192.[3]  But when the last state court to adjudicate a federal claim on the merits

---

[2] Section 2254(e)(1) provides:  "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

[3] The Sixth Circuit has adhered to *Wilson*'s directive.  *See, e.g., Coleman v. Bradshaw*, 974 F.3d 710, 719 (6th Cir. 2020) ("AEDPA requires this court to review the actual grounds on which the state court relied") (citing *Wilson*, 138 S. Ct. at 1192); *Thompson v. Skipper*, 981 F.3d 476, 480 (6th Cir. 2020) (following and quoting *Coleman*); *Cassano v. Shoop*, 1 F.4th 458, 472 (6th Cir. 2021) ("this Court reviews only the Ohio Supreme Court's reasons for denying Cassano's claim") (citing *Wilson*, 138 S. Ct. at 1192).  But the circuit court also has noted that "[i]n the wake of *Wilson*, courts have grappled with whether AEDPA deference extends only to the reasons given by a state court (when they exist), or instead applies to other reasons that support a state court's

issues an *unexplained* order upholding a lower court's *explained* judgment on a federal claim, the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "then presume that the unexplained decision adopted the same reasoning." *Id.* (adopting the "look through" presumption in determining procedural default of federal habeas claims established in *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).  The state may then rebut this presumption "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued for the state supreme court or obvious in the record it reviewed." *Id*.

The Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims.   The Court has admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.").  Rather, § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal." *Richter,* 562 U.S. at 102-03 (internal quotation

---

decision." *Thompson*, 981 F.3d at 480 n.1 (listing cases); *see also id*. at 483-85 (Nalbandian, J., concurring in result but emphasizing that "[f]ederal courts have never been required to confine their habeas analysis to the exact reasoning that the state court wrote, and neither [*Wilson* nor *Coleman*] compels us to change our analysis.").

marks and citation omitted).  A petitioner, therefore, "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.  This is a very high standard, which the Court readily acknowledges:  "If this standard is difficult to meet, that is because it is meant to be." *Id.* at 102.

But AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*.  "[E]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  Federal habeas courts may, for example, review *de novo* an exhausted federal claim where a state court misapplied a procedural bar and did not review the claim on the merits.  *See, e.g., Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).  They likewise may review *de novo* claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions.  *See, e.g., Wiggins,* 539 U.S. at 534 (performing *de novo* review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong).

### B.    Exhaustion and Procedural Default

Under AEDPA, state prisoners must exhaust all possible state remedies, or have no remaining state remedies, before a federal court will review a petition for a writ of habeas corpus. 28 U.S.C. § 2254(b) and (c); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  This entails giving the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  In other words, "the highest court in the state in which the petitioner was convicted [must have] been given a full and fair opportunity to rule on the petitioner's claims." *Manning v.*

*Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).  The exhaustion requirement, however, "refers only to remedies still available at the time of the federal petition."  *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982).  It "does not require pursuit of a state remedy where such a pursuit is clearly futile."  *Wiley v. Sowders*, 647 F.2d 642, 647 (6th Cir. 1981).

Procedural default is an "important corollary" to the exhaustion requirement.  *Davila v. Davis,* – U.S. –, 137 S. Ct. 2058, 2064 (2017) (internal quotation marks and citation omitted).  The doctrine generally prevents federal courts from hearing federal constitutional claims that were not presented to the state courts "consistent with [the state's] own procedural rules."  *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000).  It occurs when a habeas petitioner failed to either:  (1) comply with a state procedural rule that prevented the state courts from reaching the merits of the petitioner's claim; or (2) fairly raise that claim before the state courts while state remedies were still available.  *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1977); *Engle*, 456 U.S. at 125 n.28.

Where a state court declines a prisoner's federal claim because the prisoner failed to meet a state procedural requirement, federal habeas review is barred as long as the state judgment rested on "independent and adequate" state procedural grounds.  *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  To be independent, a state procedural rule and the state courts' application of it must not rely in any part on federal law.  *Id.* at 732-33.  To be adequate, a state procedural rule must be "'firmly established' and 'regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).[4]

---

[4] In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit established the now-familiar test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's failure to observe a state procedural rule.  It is:

A petitioner also may procedurally default a claim by failing to raise the claim in state court and pursue it through the state's "'ordinary appellate review procedures,'" if, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006) (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F. Supp. 2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition.").  Under these circumstances, while the exhaustion requirement is technically satisfied because there are no longer any state-court remedies available to the petitioner, the petitioner's failure to have the federal claims fully considered in the state courts constitutes a procedural default of those claims, barring federal habeas review.  *Williams*, 460 F.3d at 806 ("Where state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review."); *see also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) ("Because the exhaustion requirement 'refers only to remedies still available at the time of the federal petition,' . . . it is satisfied 'if it is clear that [the petitioner's] claims are now procedurally barred under [state] law'" (internal citations omitted)).

---

First, the federal court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule.  Second, the federal court must determine whether the state courts actually enforced the state procedural sanction – that is, whether the state courts actually based their decisions on the procedural rule.  Third, the federal court must decide whether the state procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. Fourth, if the federal court answers the first three questions in the affirmative, it would not review the petitioner's procedurally defaulted claim unless the petitioner can show cause for not following the procedural rule and that failure to review the claim would result in prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further citations omitted).

Furthermore, to "fairly present" a claim to a state court, a petitioner must assert both its legal and factual basis. *Williams*, 460 F.3d at 806 (citing *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000)).  Most importantly, a "'petitioner must present his claim to the state courts as a federal constitutional issue – not merely as an issue arising under state law.'"  *Id*. (quoting *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984)).

In determining whether a claim is procedurally defaulted and barred from consideration on federal habeas review, habeas courts again employ a "look through" presumption and review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst,* 501 U.S. at 805 (emphasis in original).  If the last state court "explicitly imposes a procedural default," then the claim is presumed defaulted.  *Id.* at 803; *see also Harris v. Reed*, 489 U.S. 255, 263 (1989) (state court must "clearly and expressly state[] that its judgment rests on a state procedural bar" to result in procedural default).  Conversely, if the last state court presented with the claim reaches its merits in a decision that "'fairly appear[s] to rest primarily upon federal law,'" then any procedural bar is presumed removed, and the federal habeas court may consider the merits of the claim in its review.  *Ylst*, 501 U.S. at 803 (citation omitted).[5]

A petitioner may overcome procedural default by demonstrating cause for the default and actual prejudice that resulted from the alleged violation of federal law, or that there will be a "fundamental miscarriage of justice" if the claim is not considered.  *Coleman*, 501 U.S. at 750.  "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot be fairly attributed to him."  *Id*.  To establish prejudice, a petitioner must

---

[5] Also, where a later state-court decision rests upon a prohibition against further state review, the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ."  *Ylst*, 501 U.S. at 804 n.3.

demonstrate "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (citing *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

A fundamental miscarriage of justice in capital cases also means actually innocent of the death penalty. *See Sawyer v. Whitley*, 505 U.S. 333, 347 (1992). In this sense, "[t]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable jury would have found the petitioner eligible for the death penalty under the applicable state law." *Id*. at 336. This "actual innocence" standard "must focus on the elements that render a defendant eligible for the death penalty." *Hutton v. Mitchell*, 839 F.3d 486, 498 (6th Cir. 2016) (citing *Sawyer*, 505 U.S. at 347).

### C.     Cognizability

Federal habeas courts also must consider whether the petitioner's claims are cognizable. To the extent a claim alleges state-law violations, it is not reviewable by a federal habeas court and must be dismissed on that basis. "It is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241); *see also Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."); *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted)).

Moreover, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle*, 502 U.S. at 67-68).  A federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure.  *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988).

State-court rulings on issues of state law may, however, "rise to the level of due process violations [if they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But they must be "so egregious that [they] result in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Courts, therefore, "'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Id*. (quoting *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir. 1993)).

## DISCUSSION

### I.  First through Fourth and Twenty-Second through Twenty-Fourth Claims for Relief: *Ineffective Assistance of Trial Counsel*

In his first through fourth and twenty-second through twenty-fourth grounds for relief, Fry asserts numerous claims of constitutionally ineffective assistance of trial counsel.  (Doc. No. 21 at 59-96; 158-60.)  Combined, he alleges trial counsel failed to: (1) adequately relay a plea deal the prosecution offered (Claim One); (2) allow him to testify at trial (Claim One); (3) effectively cross-examine a child witness (Claim One); (4) request severance of the domestic-violence and menacing counts in the indictment (Claim One); (5) create a record about the alleged lack of African-American jurors (Claim One); (6) object to (a) "other acts" testimony, (b) victim-impact evidence, (c) the indictment, and (d) other miscellaneous errors (Claim One); (7) ensure that his waiver of his right to present mitigation evidence was knowingly, voluntarily, and intelligently

made (Claim Two); (8) investigate and present evidence during the mitigation phase of trial, such as evidence about racism in the United States, childhood abuse, family history of domestic violence, and his drug addiction, and a full psychological and neuropsychological review (Claims Three, Twenty-Three, and Twenty-Four); (9) challenge a juror for bias (Claim Four); and (10) investigate and present evidence during the guilt phase of trial (Claim Twenty-Two).  (*Id.*) Respondent argues that these claims either lack merit or are procedurally defaulted.  (Doc. No. 24 at 14-44.)

## A.  Procedural Posture

Respondent maintains that claims (1) through (4), (6)(a) – (c), (7), and (9), as listed above, were adjudicated on the merits in state court and are preserved for habeas review.  (Doc. No. 24 at 18-20, 22-23, 24, 46-47.)[6]  He contends, however, that claims (5), (6)(d), and (8), as listed above, are procedurally defaulted.  (*Id.* at 21, 23-24, 40, 46.)  Neither party addresses the procedural posture of claim (10), as listed above.

### 1.  Claim (5)

---

[6] The last state court to address claim (1), as listed above, the appellate court on post-conviction review, did not address the merits of the sub-claim relating to counsel's "failure to spend enough time reviewing the State's offer" with Fry.  Instead, it found that claim barred from review under Ohio's doctrine of *res judicata*, because it was based on the trial-court record but Fry failed to raise it on direct appeal.  *See Fry*, 2012 WL 2128027, at *3 (¶ 13); *see also Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of *res judicata*.").  Respondent has not raised a procedural-default defense to this claim, however, and it is therefore waived.  *See, e.g., Trest v. Cain*, 522 U.S. 87, 89 (1997) ("procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter'") (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("The state may waive a defense," including procedural default, "by not asserting it.").

Respondent asserts that Fry's ineffective-assistance claim in his first ground for relief, based on counsel's failure to make a record regarding the lack of African-American jurors (claim (5) above), as well as his related thirteenth claim for relief, challenging the trial court's jury-selection procedures, are both procedurally defaulted.  (Doc. No. 24 at 21; Doc. No. 37 at 4.)  Fry raised these claims in state court on post-conviction review as a single ground for relief.  (*See* Doc. No. 13-2 (Post-Conviction Pet.) at 56-57.)

The last state court to consider the claims was the state appellate court.  But that court addressed and ruled only on the trial-court error portion of the claim, finding it barred under Ohio's doctrine of *res judicata*, because, as the trial court conducted a full hearing on the matter, the claim was based on the trial-court record and could have been raised on direct appeal, but was not.  *See Fry*, 2012 WL 2128027, at *2 (¶¶ 8-10); *see also State v. Perry*, 10 Ohio St. 2d 175, 180 (Ohio 1967) (Ohio's *res judicata* rule precludes a defendant from raising for the first time in post-conviction proceedings a claim that was fully litigated or could have been fully litigated at trial or on direct appeal.)  This Court, therefore, must look through this decision to the trial court's judgment to determine whether Fry's jury-selection ineffective-assistance claim is procedurally defaulted.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (in determining procedural default, federal habeas courts look to the last reasoned state-court judgment).  The trial court found that claim also barred by *res judicata*.  (Doc. No. 13-2 at 1286.)  Fry's jury-selection ineffective-assistance claim, therefore, is procedurally defaulted.  *See, e.g.*, *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007) (Ohio's *res judicata* rule is an adequate and independent state ground to procedurally bar claims asserted in federal habeas actions).

Moreover, Fry does not offer any argument regarding the cause for, or prejudice resulting from, his procedural default of this claim; nor does he contend that he is actually innocent such

that the default should be excused.  The Court, therefore, will not address those issues.  *See, e.g,
Wogenstahl v. Mitchell,* 668 F.3d 307, 342 (6th Cir. 2012) ("Wogenstahl does not argue cause to
excuse his default.  Thus, we conclude that this claim was procedurally defaulted."); *Acosta v.
Artuz*, 221 F.3d 117, 122 (2nd Cir. 2000) ("Generally, courts should not raise *sua sponte*
nonjurisdictional defenses not raised by the parties.") (citing *Hardiman v. Reynolds,* 971 F.2d 500,
502 (10th Cir. 1992) (quoting *United States v. Burke*, 504 U.S. 229 (1992) (Scalia, J., concurring)
("The rule that points not argued will not be considered is more than just a prudential rule of
convenience; its observance, at least in the vast majority of cases, distinguishes our adversary
system of justice from the inquisitorial one.")).

### 2.  Claim (6)(d)

Respondent appears to argue that Fry's ineffective-assistance claims based on counsel's
failure to object at trial (claim (6)(d) above) are procedurally defaulted because the Ohio Supreme
Court on direct review found no merit to the underlying claims of trial-court error, which
themselves were procedurally defaulted (most often because defense counsel did not object to the
errors at trial, violating Ohio's well-established contemporaneous objection rule).  (Doc. No. 24 at
23-24.)  Fry responds that he can demonstrate cause for the defaulted claims of counsel's
ineffective assistance, as the underlying claims have merit and counsel should have objected to the
errors at issue.  (Doc. No. 32 at 49-50.)  There is no need to tackle these confusing and circular
arguments, however, because the issue here is whether the *ineffective-assistance* claims at issue
are procedurally defaulted, not the underlying *trial-court error* claims, and the ineffective-
assistance claims clearly are not.  The Ohio Supreme Court reviewed those claims on the merits
on direct review and denied them.  *See Fry*, 125 Ohio St. 3d at 198-99 (¶ 213).

### 3.  Claim (8)

Respondent also argues that Fry's claim asserting counsel were ineffective for failing to adequately investigate or present mitigation evidence (claim (8) above) is procedurally defaulted. (Doc. No. 24 at 40, 46.)  His basis for the default is not entirely clear, but it appears he contends this claim is defaulted because the state post-conviction appellate court found Fry's "corresponding" claim – challenging his *waiver* of mitigation evidence – barred by the *res judicata* rule, as Fry already had raised it on direct review.  (*Id*.)  *See also Fry*, 2012 WL 2602, at *4-5 (¶ 23).

Fry raised numerous claims in his state post-conviction petition relating to counsel's deficient performance in failing to present certain mitigating evidence, including three relating to family members' potential testimony in his petition and two relating to Fry's family history of domestic violence and his history of drug addiction in proposed amendments to the petition.  (Doc. 13-2 at 66-72 (Post-Conviction Pet.); 1205-11 (Proposed Amend. to Post-Conviction Pet.).)  But the state appellate court did not address these claims at all; it discussed only the ineffective-assistance waiver-of-mitigation claim.  *See Fry*, 2012 WL 2602, at *4-5 (¶¶ 22-27).  This Court, must look through this decision, therefore, to the trial court's judgment to determine the procedural status of those claims.

The trial court found Fry's claims relating to the family members' potential mitigation testimony barred by *res judicata*, although it also addressed the merits of the claims.  (*See* Doc. 13-2 at 1286-87.)  To the extent Fry complains that his trial counsel should have offered his family members' testimony for mitigation purposes, therefore, that claim is procedurally defaulted.  *See Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (a state court's "alternative holding [on the merits] does not require us to disregard the state court's finding of procedural bar") (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)).

34

As to Fry's proposed claims relating to potential mitigation evidence concerning his family history of domestic violence and his drug abuse, the trial court did not rule on Fry's motion for leave to amend his petition, so that claim was never properly presented to state courts and was not considered. *See Fry*, 2012 WL 2602, at *2 n.1.  Further, Fry is no longer able to raise them in state court due to Ohio's filing deadlines, post-conviction procedures, and *res judicata* rules.  *See* Ohio R. Crim. P. 33(B) (defendant may be entitled to new trial after deadline for filing motion for new trial if he was "unavoidably prevented" from filing motion or there is "newly discovered evidence"); Ohio Rev. Code § 2953.21(A)(1) (second, successive, or untimely post-conviction petition permitted if petitioner shows: (1) that he was "unavoidably prevented from discovery of the facts" of the claim, or the claim is based on a new federal or state right the Supreme Court has recognized that applies retroactively; and (2) but for constitutional error at trial, no reasonable factfinder would have found petitioner guilty of offense or eligible for death sentence).  Fry also has defaulted, therefore, any claim that his trial counsel were deficient for failing to produce mitigation evidence relating to his family history of domestic violence and his drug abuse.

Moreover, again, Fry does not make any showing regarding either the cause for, or prejudice resulting from, his procedural default.  Nor does he contend that he is actually innocent such that the default should be excused.

### 4.  Claim (10)

Fry also did not raise in state court claim (10), that counsel failed to reasonably investigate "the circumstances surrounding Hardison's death" and "investigate and challenge the State's witnesses and evidence admitted against their client."  (Doc. No. 21 at 158-59.)  This claim also is procedurally defaulted, therefore, because, as with claim (8) above, a return to state court at this point would be futile.  But regardless, Respondent did not raise this defense, and it is waived.

Accordingly, Fry's ineffective-assistance claims relating to jury selection and mitigation evidence are procedurally defaulted; the rest of his ineffective-assistance claims are ripe for federal habeas review.

## B.  Merits Analysis

Even if all of Fry's claims of ineffective assistance of trial counsel were preserved for review, they would fail on their merits.

The Supreme Court has long recognized the Sixth Amendment right to effective assistance of counsel at trial as a "bedrock principle in our justice system." *Martinez v. Ryan*, 566 U.S. 1, 12 (2012); *see also Gideon v. Wainwright*, 372 U.S. 335, 342-44 (1963).  The Court announced a two-prong test for claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  An attorney's performance is "deficient" if his or her representation falls "below an objective standard of reasonableness." *Id*. at 688.  The court must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  Second, the petitioner must show that he was prejudiced by counsel's errors, demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*.  Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail. *Id.*  Whether a petitioner has been deprived of the effective assistance of counsel,

however, is a mixed question of law and fact to which the unreasonable-application prong of §
2254(d)(1) applies.  *See, e.g., Mitchell v. Mason*, 325 F.3d 732, 738 (6th Cir. 2003).

The Supreme Court has emphasized that "'[s]urmounting *Strickland*'s high bar is never an
easy task.'"  *Harrington v. Richter,* 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559
U.S. 356, 371 (2010)).  It has explained,

> An ineffective-assistance claim can function as a way to escape rules of waiver and
> forfeiture and raise issues not presented at trial, and so the *Strickland* standard must
> be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity
> of the very adversary process the right to counsel is meant to serve.

*Id*. (internal quotation marks and citations omitted).  Thus, "[j]udicial scrutiny of a counsel's
performance must be highly deferential" and "every effort [must] be made to eliminate the
distorting effects of hindsight . . . ."  *Strickland,* 466 U.S. at 689.  "*Strickland* specifically
commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant
decisions in the exercise of reasonable professional judgment,'" recognizing "'the constitutionally
protected independence of counsel and . . . the wide latitude counsel must have in making tactical
decisions.'"  *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quoting *Strickland,* 466 U.S. at 689).

The Court further has observed that the standards imposed by *Strickland* and § 2254(d) are
both "highly deferential," so that in applying them together, "review is 'doubly' so."  *Richter*, 562
U.S. at 105 (internal quotation marks and citations omitted).  It has cautioned:

> Federal habeas courts must guard against the danger of equating unreasonableness
> under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies,
> the question is not whether counsel's actions were reasonable. The question is
> whether there is any reasonable argument that counsel satisfied *Strickland's*
> deferential standard.

*Id*.

## 1.  Plea deal negotiations

Fry first complains that his counsel provided constitutionally ineffective assistance by failing to properly advise him concerning a plea deal the prosecution offered him before trial of a sentence of thirty years to life (Claim One).  (Doc. No. 21 at 60-64.)  The state appellate court on post-conviction review was the last state court to address the claim, opining:

{¶ 12} In his eleventh ground for relief, Fry argued that his attorneys were ineffective because they did not sufficiently counsel Fry about his decision to reject the plea agreement.

{¶ 13} First, Fry argued that his counsel was ineffective because they did not spend enough time reviewing the State's offer with him. Fry cites to statements in the record made by his trial counsel to support his argument. Because this argument could have been raised on appeal based on evidence in the record, it is now barred by res judicata.

{¶ 14} Second, Fry argued that his counsel was ineffective because they did not request assistance from outside counsel or from Fry's family members to help persuade him to accept the plea offer. The trial court found that, while the issue was barred by res judicata, the argument also failed on the merits. Because Fry's argument relies on information (i.e., personal affidavits) outside of the record, we do not agree that this issue is barred by res judicata, but do agree that the argument fails on the merits.

{¶ 15} Generally, a claim of ineffective assistance of counsel requires a claimant to satisfy a two-prong test. First, he or she must prove that trial counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, he or she must show that trial counsel's deficient performance caused him or her prejudice. *State v. Srock*, 9th Dist. No. 22812, 2006–Ohio–251, ¶ 21. Prejudice entails "a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus.

{¶ 16} Under certain circumstances, a person claiming ineffective assistance of counsel is presumed to have been prejudiced and need not make a showing of such. See *United States v. Cronic*, 466 U.S. 648 (1984). One such situation in which the defendant is entitled to a presumption of prejudice is "where the defendant is subject to a 'complete denial of counsel,' including those situations where a defendant was denied the presence of counsel at a 'critical stage.' " *Johnson v. Bradshaw*, 205 Fed.Appx. 426, 430 (6th Cir.2007), quoting *Cronic* at 659.

{¶ 17} Fry argues that *Cronic* applies because he was "constructively" denied counsel during his plea bargaining phase, which has been recognized as a critical stage. *Lafler v. Cooper*, ––– U.S. –––, 132 S.Ct. 1376, 1385–1386 (2012); *Missouri v. Frye*, ––– U.S. –––, 132 S.Ct. 1399, 1407 (2012). It is possible that a defendant

may be "constructively" denied counsel when "performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided." *Cronic* at 654, fn. 11.

{¶ 18} Neither the record nor the post-conviction relief exhibits support Fry's argument that he was constructively denied counsel at the plea bargaining stage. Fry was informed of the plea offer, which his counsel discussed with him for an hour one week before the start of trial. Fry confirmed his rejection of the plea offer on the record. There is no evidence that Fry was denied access to his counsel. The crux of Fry's argument is his belief that his trial counsel did not try hard enough to convince him to accept the State's plea offer. This does not rise to the level of *Cronic*, and therefore, the Strickland test applies. Compare *Hunt v. Mitchell*, 261 F.3d 575 (6th Cir.2001) (defendant was presumed to be prejudiced when his counsel was appointed on the day trial began and counsel's request for an additional ten minutes to consult with defendant before the start of trial was denied).

{¶ 19} Assuming arguendo that Fry's counsel was deficient for failing to solicit assistance from outside counsel or family members to help convince Fry to accept the plea offer, Fry has not established prejudice. "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel." *Frye* at 1409. Fry presented no evidence, except a self-serving affidavit, to show that he would have accepted the plea offer if his counsel had consulted outside counsel or his family members. See *Bradley*, 42 Ohio St.3d at paragraph three of the syllabus.

> In reviewing a petition for post-conviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact.

*State v. Calhoun*, 86 Ohio St.3d 279 (1999), paragraph one of the syllabus.

{¶ 20} There is evidence in the record that Fry did not want to consult with his family members about his decisions, and that he would not likely have been persuaded by his family members even if he had met with them about the plea offer. Fry repeatedly told the court that he did not want to discuss his decision to waive mitigation with anyone. Fry did ultimately meet with his mother, but still refused to present mitigation evidence.

{¶ 21} Because Fry has not established prejudice, his allegation that his counsel was ineffective for failing to seek assistance to help persuade him to accept the plea is without merit.

*Fry*, 2012 WL 2128027, at *3-4.

Fry challenges the state court's conclusion that he had not established prejudice.  (Doc. No. 32 at 23-25.)[7]  He argues the court "erroneously" found "'evidence in the record that Fry did *not* want to consult with his family members about his decisions, and that he would not likely have been persuaded by his family members even if he had met with them about the plea offer.'"  (Doc. No. 32 at 23 (quoting *Fry*, 2012 WL 2128027, at *4 (¶ 20) (emphasis in original)).)  The court wrongly rejected his affidavit as self-serving, Fry contends, and unreasonably cited his opposition to consulting with his family before waiving mitigation, which was "completely irrelevant" to his rejection of the plea offer.  (*Id*.)  Instead, he maintains, as he did in state court, that his trial attorneys discussed the plea offer with him just one hour, had an antagonistic relationship with him, and knew that he was "unschooled in the law and the likelihood of his conviction" and only "trusted those with similar backgrounds . . . ."  (*Id*. at 24.)

Yet, as Respondent counters, Fry offers no evidence refuting the state court's findings except his own affidavit.  Fry claimed in the affidavit (Doc. No. 13-2 (Fry Aff.) at 89-92) that his counsel did not explain why a sentence of thirty years to life was better than a possible death sentence or "what would happen" if he were convicted and sentenced to death, and that he "now kn[e]w" his family "would have supported taking the plea offer[, which] would have mattered to me."  (*Id*. at 91.)

But courts routinely afford little weight to assertions made in a petitioner's affidavit that are unsupported by other credible evidence.  *See, e.g., Thomas v. Perry*, 553 Fed. Appx. 485, 487 (6th Cir. 2014) ("Nothing in the record, other than Thomas's self-serving affidavit, suggests that

---

[7] Fry does not assert an allegation of constructive denial of counsel under *United States v. Cronic*, 466 U.S. 648 (1984), in support of this claim as he did in state court.

trial counsel promised an acquittal if Thomas waived his right to a jury trial or abandoned her loyalty to him."); *Highers v. Kapture*, 93 Fed. Appx. 48, 50 (6th Cir. 2004) ("However, there is nothing in the record, aside from Highers's self-serving affidavit, to suggest that Campbell guaranteed a particular result to his client."); *Hawkins v. Woods*, 2015 WL 348530, at *2 (E.D. Mich. 2015) ("Self-serving affidavits are regarded with extreme suspicion."); *Jackson v. United States*, 248 F. Supp. 2d 652, 655 (E.D. Mich. 2003) ("Petitioner has presented *no credible evidence* that counsel failed to inform him of a plea offer and instead merely relies on his own self-serving statements.")  (emphasis in original) (internal quotation marks and citation omitted).  And, as the state court reasonably found, Fry offers no credible evidence of prejudice that would "'demonstrate a reasonable probability [he] would have accepted the . . . plea offer had he been afforded effective assistance of counsel'" – whether through more consultation with him or assistance from outside counsel and family members.  *Fry*, 2012 WL 2128027, at *4 (quoting *Missouri v. Frye*, 566 U.S. 134, 147 (2012)).

The Ohio appellate court's decision that Fry was not prejudiced by any deficiency in his counsel's performance relating to the plea negotiations was one over which fair-minded jurists could disagree.

### 2.  Decision whether to testify

Fry next alleges his trial counsel were ineffective for not permitting him to testify at trial against his express wish and constitutional right to do so (Claim One).  (Doc. No. 21 at 64-71.) Fry raised this claim in state post-conviction proceedings.  The trial court denied the claim, finding it both barred by *res judicata* and without merit.  (Doc. No. 13-2 at 1286.)  On appeal, the state appellate court ruled that the trial court erred in finding the claim procedurally barred and failing to "assess the credibility of the evidence presented in his petition"; it remanded for the court to

41

consider the evidence Fry had submitted. *Fry*, 2012 WL 2128027, at 6-7 (¶¶ 38-39). On remand, the trial court conducted two evidentiary hearings on the matter and denied the claim. *See Fry*, 2019 WL 1318562, at *2-7.

The state appellate court, the last state court to address the claim, decided:

{¶8} In Mr. Fry's twelfth ground for relief, he argued that his "convictions and death sentence are void or voidable because he was not allowed to testify at his capital trial." He claimed his counsel knew that he wanted to testify, but did not want him to testify, so they impermissibly waived that right on his behalf, in violation of his constitutional rights. Mr. Fry's other argument under this ground for relief—i.e., that the trial court erred in failing to inquire of him as to whether he was knowingly, intelligently, and voluntarily waiving his right to testify—has already been rejected by the Supreme Court of Ohio on appeal and will not be addressed further, as the Supreme Court's decision on that issue is the law of the case. . . .

{¶9} Upon remand from this Court, the trial court held two hearings to address Mr. Fry's claim that he was denied his right to testify at trial by his counsel. At the first hearing, the court heard testimony from Mr. Fry as well as his two trial attorneys, Lawrence Whitney and Kerry O'Brien. At the second hearing, the court heard testimony from private investigator Thomas Fields as well as Mr. Fry's sister and brother. The trial court reviewed all of the evidence and ultimately found no merit in Mr. Fry's twelfth ground for relief.

{¶10} The trial court found the testimony of Mr. Whitney and Mr. O'Brien to be "extremely credible[,]" but found Mr. Fry's testimony to be "totally devoid of credibility and completely self-serving." The court determined that Mr. Whitney's testimony was consistent with Mr. Fry's demeanor and disinterest toward the end of the trial proceedings and into the mitigation phase. The court further determined that Mr. O'Brien's testimony contradicted Mr. Fry's testimony, establishing that counsel met with Mr. Fry periodically and was certain that Mr. Fry had decided to not testify on June 11, 2006, the day before the defense rested its case. As the trial court judge presiding over the evidentiary hearings was in the unique position of having also presided over the trial in this matter, she recalled in her order several instances of Mr. Fry being strong-willed and outspoken during the trial, which she noted belied his claim that he suddenly "choked" at trial or was somehow incapable of informing the court of his desire to testify: e.g., chuckling during the victim's six-year-old grandson's testimony about witnessing Mr. Fry enter the home with a knife and stab his grandmother; eating candy during the proceedings; admitting to making a threatening gesture to someone in the back of the courtroom; and being so vocally disruptive during sentencing that he had to be physically removed from the courtroom by the Sheriff's deputies. The court further found the testimony of Mr. Fields, Mr. Fry's sister, and Mr. Fry's brother all to be "largely unhelpful" to Mr. Fry, and found no evidence that counsel prevented Mr. Fry from testifying at trial. The

court found that the outspoken and strong-willed Mr. Fry said nothing when the defense rested at trial and, thus, a waiver of his right to testify was presumed.

{¶11} After reviewing the record in this case, we determine that the trial court's decision was supported by competent and credible evidence. Mr. Whitney served as lead counsel in Mr. Fry's case, and he testified at the evidentiary hearing as to his extensive knowledge and experience in handling numerous capital cases throughout his career. Mr. Whitney testified that both he and Mr. O'Brien spent time discussing with Mr. Fry the decision of whether to testify because "that's his decision, not my decision." He testified that his recommendation to Mr. Fry was for him to not testify at trial, and he provided several reasons supporting his recommendation.

{¶12} According to Mr. Whitney, he did not think Mr. Fry would have made a very good witness, as he was "volatile" and "expressed a lot of anger * * *." Had Mr. Fry testified at trial, Mr. Whitney recalled his concern over some jail calls between Mr. Fry and his mother, including a call in which Mr. Fry laughed that the victim would not be stealing any more of his clothes and another call in which Mr. Fry said, "The bitch got what she deserved." Mr. Whitney also recalled the possibility of rebuttal testimony from two women regarding Mr. Fry's prior acts of domestic violence against them and Mr. Fry's involvement in burning down one of their houses. He testified that other potential evidence would have affected his recommendation as well, such as the coroner's testimony that the victim was stabbed twice in the back and Mr. Fry's remarks to the arresting officers in West Virginia, specifically: "Remorse, I don't have any remorse for that woman. I didn't shoot her."

{¶13} When specifically asked if Mr. Fry told counsel he wanted to testify at trial, Mr. Whitney testified:

> I think there may be a point where he said he wanted to testify either early on or midway through, and then at the end - - certainly, he didn't want to testify at the end. I mean, it was clear that he had had enough and he didn't want - - particularly, during the trial. It was clear that he was - - didn't want to testify in trial. In fact, he didn't want us to offer mitigation at the trial.

Mr. Whitney further testified that Mr. Fry became "more and more disinterested in what was going on" as the trial progressed and his decision to not testify was "unequivocal" in the days leading up to his trial. He testified that, when the defense rested, he did not recall Mr. Fry saying or doing anything to either object or notify the court that he wanted to testify. According to Mr. Whitney:

> the record doesn't reflect that. I would have reacted to that in some way or another. * * * I would have asked for a recess. I would have talked to the defendant. I would have - - Kerry and I would have met with him, [found] out what's happening here, why [Mr. Fry wants] to testify. If he was adamant, I would have asked the [c]ourt to give me until tomorrow morning

or whatever it would take to catch up with this issue and make sure it was done correct[ly].

{¶14} Mr. O'Brien served as Mr. Whitney's co-counsel in Mr. Fry's capital case. He also testified at the hearing as to his extensive knowledge and experience in handling capital cases throughout his own career. He did not initially recall his recommendation to Mr. Fry as to whether he should testify at trial or if Mr. Fry said he wanted to testify, but he did testify as to the normal procedures he follows in advising all of his clients on that issue. According to Mr. O'Brien, when speaking to all of his clients regarding the issue of whether to testify, he informs them of the full range of their options and penalties, along with the "pros and cons" of testifying and not testifying.

{¶15} When shown several hand-written notes while on the witness stand, Mr. O'Brien recognized them as notes he had written while representing Mr. Fry. The first note is dated December 1, 2005, and includes the statement "Trial tactics" followed by "Wants to take stand[.]" Mr. O'Brien called attention to the fact that this note was made six months prior to trial. The second note is dated June 7, 2006, and includes the statement "Trial strategy" followed by "Test.?" Mr. O'Brien testified that this statement meant Mr. Fry "doesn't know whether he wants to testify or not." The third note is dated June 11, 2006, and includes the statement "C.F. wants to testify! (Reasons given for not test.)" When explaining this particular note, he testified that Mr. Fry may have changed his mind after listening to the reasons not to testify, and he recalled: "I believe what happened was that after - - if I wrote down he wants to testify, then I gave him reasons for not testifying, then he would have told me, 'Okay, I don't want to testify,' and then I would have reported that the next morning." Mr. O'Brien testified that he would have talked to Mr. Fry about his criminal record, including his prior arson conviction and prison sentence, as well as the potentially damaging jail calls between Mr. Fry and his mother. Mr. O'Brien agreed that it would be a fair characterization to say that Mr. Fry vacillated in his desire to testify between December 1, 2005, and June 11, 2006, but he nonetheless emphasized: "My position would have been when I left the jail [on June 11, 2006], I was certain that Clarence did not want to testify." The following exchange also occurred during the prosecutor's questioning of Mr. O'Brien:

Q: Is there any indication on this [June 11, 2006, note] that this represents the final word or final decision of Clarence Fry?

A: No.

Q: Do you recall what happened - - what was the conclusion of this meeting with Clarence Fry?

A: When I left the jail he did not want to testify.

Q: Was there any question in his mind about that?

A: No.

Q: Was he sure? Was he certain?

A: In my mind he was very certain.

Q: So [the June 11, 2006, note] does not reflect the whole picture of that meeting. You would agree with that?

A: It's not the final word.

Mr. O'Brien also testified that Mr. Fry never said in open court that he wanted to testify, even though Mr. Fry had a "strong personality" and "if he wanted to testify, he would have said so."

{¶16} A partial transcript of an in-chambers conversation held on June 12, 2006, between the trial court and the attorneys was also introduced at the hearing and includes the following statements:

MR. WHITNEY: We have talked to Clarence over the last couple of weeks. I spent five or six hours invested talking to him, talking to the defendant about his testimony.

He has really not wavered. He's playing a little game, I think in my mind about it, but he has not wavered in his opinion that he would not testify today.

Kerry, I think, spent some time with him yesterday morning.

MR. O'BRIEN: Yes. Sunday morning I spent some time in the Summit County Jail with Mr. Fry, and he indicated that he did not want to testify.

MR. WHITNEY: And he was unequivocally against testifying Friday afternoon when we met with him in the courthouse upstairs.

The deputies had him available for us for an hour. We talked to him and he was unequivocally opposed to it, so.

THE COURT: All right. If there was any vacillation, the Court would ask him on the record. But you are indicating to the Court that he has decided of his own volition not to testify?

MR. WHITNEY: That's correct.

{¶17} Mr. Fry testified at the hearing that "[f]rom the beginning" he wanted to testify at trial because "[s]omebody had to tell the story." He asserted that he did not know

it was his right to testify, but he nonetheless told his attorneys, the investigator, and several family members of his desire to tell his story to the jury. According to Mr. Fry: "[I]t was always said, like, not I want to testify, it was when. It was never an issue of how, it was always when because for me it was always: When I tell these people what happened, they would understand." He surmised that he told his attorneys at least 20 times about what he planned to tell the jury. He testified that Mr. Whitney disagreed with him, had a different plan for his defense, and told him, "Well, I'm sorry. The prosecutor, she'll eat you up." He further testified that Mr. O'Brien "tricked" him because Mr. O'Brien seemed to understand "where [Mr. Fry] was trying to go with it," but neither attorney actually listened to Mr. Fry's input.

{¶18} Mr. Fry admitted hearing Mr. Whitney rest for the defense when he testified: "[Defense counsel] went up to the [j]udge, I'm pretty sure, and then I think they said, 'The defense rests.' I'm not sure. I think that's how it went. Because I remember looking back at my little brother, like. (Indicating.)" Mr. Fry claimed he was unaware that Mr. Whitney resting for the defense was his last opportunity to speak up; otherwise, he would have "hollered and screamed" because "[t]hat's never been a problem for [him] to speak [his] mind." He conceded that he "should have known[,]" but instead he "messed up[,]" "dropped the ball[,]" and "sat there looking stupid." He testified that he only realized he was not going to testify "[w]hen the jury started walking out[,]" and the prosecutor asked him if he spoke up at that time:

Q: Did you say anything?

A: No.

Q: Why not?

A: What was I gonna say?

Q: "Why can't I testify, Judge?" She's sitting right there
.
A: I probably should have.

* * *

Q: Why didn't you tell Judge Cosgrove when you realized that you were not going to be testifying, why didn't you say to her, "Judge, I wanted to testify?"

A: I choked.

Mr. Fry testified that he would have spoken up if the trial court had asked him about his desire to testify.

{¶19} Mr. Fields was the private investigator appointed to assist in Mr. Fry's capital case. He testified at the hearing that, in his conversations with Mr. Fry, Mr. Fry was "very animated generally" and wanted to testify at trial, but Mr. Fields could not

"remember anything specific." He also could not remember saying anything specific to Mr. Whitney about Mr. Fry's desire to testify, but he testified that his usual procedure would be to do so. Mr. Fields testified on cross-examination that his last interaction with Mr. Fry was on May 15, 2006. Opening statements in the trial were not heard until June 5, 2006.

{¶20} Mr. Fry's sister testified at the hearing that during her conversations with Mr. Fry throughout the trial, the two never talked specifically about his desire to testify, but they both "just thought that is what was going to happen." She testified that Mr. Fry was upset at one point and expressed to her the possibility that he would not be allowed to testify by saying, "I don't think these crackers gonna let me say nothing." When she spoke to one of Mr. Fry's attorneys in the hallway outside of the courtroom and asked why Mr. Fry was not going to testify, the attorney replied, "We don't think that is a good idea; that is not a good idea." She did not recall telling the attorney specifically that Mr. Fry wanted to testify, but only recalled telling him, "Well, I thought he was going to testify * * *." She instead believed that her "demeanor" communicated to counsel the idea that Mr. Fry wanted to testify and that everyone "expected to hear from him." She admitted on cross-examination that she observed Mr. Fry becoming irritated and very disinterested in the trial proceedings. When asked if she agreed that there is a difference in the conversations between her and Mr. Fry throughout the trial and the conversations between Mr. Fry and his attorneys near the end of the trial, she admitted, "All I know is what [Mr. Fry] told me. I don't know what he told his lawyers."

{¶21} Mr. Fry's brother testified at the hearing that he spoke to Mr. Fry almost daily throughout the trial. He claimed that he asked Mr. Fry if he was going to testify, and Mr. Fry told him that was his plan. Mr. Fry told his brother there was a story to be told, which he wanted to be heard. When asked on another occasion about whether he would testify, Mr. Fry told his brother, "Hell, yeah. Can't nobody tell my story better than I can." Mr. Fry's brother testified that he also spoke to Mr. Whitney once in the hallway outside of the courtroom and Mr. Whitney told him, "You know your brother wants to testify on his own behalf" and "I don't think that is a good idea." His brother testified that he did not think Mr. Fry knew it was his right to testify "[b]ecause if he knew that he could have testified, trust me, [Mr. Fry] would have testified." When asked if Mr. Fry ever changed his mind regarding testifying at trial, his brother testified, "No. At least - - if he did, he didn't express it to me."

{¶22} Assistant Prosecuting Attorney Angela Walls-Alexander was one of the prosecutors in Mr. Fry's criminal case. She testified that when exhibits were being offered for admission into evidence and defense counsel were making and renewing their Crim.R. 29 motion for acquittal, Mr. O'Brien—on the record and in Mr. Fry's presence—said that Mr. Fry "absolutely was not going to testify." A review of the trial transcript reveals that the court denied the Crim.R. 29 motion and defense counsel then asked for a sidebar to discuss a witness who had failed to appear in court. During the sidebar, Mr. O'Brien stated, "[Inasmuch] as I can report to the [c]ourt that we were only going to have one witness for the defense, I can tell you

categorically and emphatically that Mr. Fry, the [d]efendant, is not going to testify." Defense counsel then offered their exhibits for admission into evidence before the court brought the jury back into the courtroom and recessed until the following Monday morning. Although the courtroom was equipped during the trial with a device to create "white noise"—which prevents the jury from hearing what is said between the judge and attorneys during sidebars—Ms. Walls-Alexander testified that it was not activated at that time because the jury was not in the courtroom.

{¶23} Mr. Fry was then recalled to the witness stand. He testified that he did not hear Mr. O'Brien make the aforementioned statement during the sidebar, but he acknowledged that he was present in the courtroom at that time.

{¶24} The right to testify at one's own criminal trial is rooted in the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's privilege against self-incrimination. *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). "Generally, the defendant's right to testify is regarded both as a fundamental and a personal right that is waivable only by an accused." *Bey*, 85 Ohio St.3d at 499. The ultimate decision of whether to testify rests with the defendant, but because attorneys are presumed to follow the professional rules of conduct and presumed to render adequate assistance in advocating the defendant's cause and in consulting with the defendant on important decisions, the defendant's assent may be presumed when a tactical decision is made to not have the defendant testify. *United States v. Webber*, 208 F.3d 545, 551 (6th Cir.2000). Barring any statements or actions from the defendant indicating either disagreement with counsel or the desire to testify, the trial court is not required to ensure that the defendant has waived the right to testify on the record. *State v. Jackson*, 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 162, citing *Webber* at 551.

A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.
(Citations omitted.) *Webber* at 551.

{¶25} Here, witness testimony and Mr. O'Brien's notes were introduced to demonstrate that Mr. Fry initially wanted to testify and perhaps wavered on the issue at times during the pendency of his case. As Mr. Fry notes in his merit brief, a review of the trial transcript also reveals that Mr. Whitney remarked during his opening statement, "Clarence has been waiting a long time to come here and tell you what happened and why it happened, and have a jury determine his guilt and (sic) innocence." But, notwithstanding such comments by counsel during opening statements, defendants are not precluded from abandoning an initial desire to testify and, instead, deciding later not to testify at trial. See *State v. Ball*, 9th Dist. Summit

No. 26537, 2013-Ohio-3506, ¶ 35-37 (noting that a defendant may still choose to not testify even after counsel makes multiple references during opening statements that he will testify).

{¶26} Even in light of the foregoing evidence highlighting Mr. Fry's initial desire to testify, he nonetheless failed to demonstrate that he was actually denied his right to testify. The evidence established that Mr. Fry's counsel, on several occasions, discussed with him his right to testify and recommended that he not testify for a litany of presumably valid reasons. While conceding Mr. Fry had an initial desire to testify either early on or midway through the trial, Mr. Whitney nonetheless testified that Mr. Fry's decision to not testify was "unequivocal" in the days leading up to his trial and "certainly, he didn't want to testify at the end." Mr. O'Brien admitted that Mr. Fry sometimes vacillated in his decision of whether to testify, but he also testified that when he left the jail on June 11, 2006, after speaking to Mr. Fry and explaining to him the reasons to not testify, he was "certain" that Mr. Fry did not want to testify. Counsel relayed Mr. Fry's final decision to not testify to the trial court on the following day, and the defense rested.

{¶27} If Mr. Fry changed his mind and once again wished to testify, regardless of the decision he conveyed to counsel, it was incumbent upon him, at the very minimum, to alert the trial court of either his desire to testify or of any disagreement with counsel regarding his right to testify. See *Webber* at 551. By his own admission, and as observed by several witnesses, Mr. Fry failed to do so at any point during the proceedings. Mr. Fry testified that he was present in the courtroom and heard Mr. Whitney rest for the defense, yet he said nothing to the court, choosing instead to simply make a gesture to his brother in back of the courtroom. Multiple witnesses, as well as Mr. Fry himself, testified that he undoubtedly possessed the ability and wherewithal to freely speak his mind. Mr. Fry also conceded that he "should have known" and "probably should have" said something to the trial judge. His conscious decision to remain silent instead of overtly asserting his right to testify does not comport with his present claim that he was denied the right to testify. Mr. Fry's decision to sit by idly in silence is further consistent with the evidence presented that he became increasingly irritated and disinterested in the trial proceedings as they progressed toward the end. A waiver of Mr. Fry's right to testify could therefore be inferred from his conduct and presumed from his failure to alert or inform the trial court of his desire to testify. See *Webber* at 551.

*Fry*, 2019 WL 1318562, at *2-7.

Fry contends that the state post-conviction appellate court unreasonably determined in this decision that the record from the 2016 hearings on remand did not support this right-to-testify ineffective-assistance claim.  It afforded too much weight to his lawyers' testimony, Fry claims, while it "ignored" and "discount[ed]" evidence favorable to him.  (Doc. No. 32 at 29-30.)  He

argues the evidence showed that his attorneys "substituted their will for Fry's right, unilaterally waiving Fry's right to testify despite knowing that he wanted to testify . . . and affirmatively misleading the trial court about Fry's insistence that he be permitted to do so." (*Id*. at 29.)

As Respondent notes, however, the evidence to which Fry refers is the same evidence he emphasized in state court, namely: (1) Attorney O'Brien's notes from a meeting with Fry six months before trial and the day before the defense began to present its case stating that Fry wanted to testify; (2) Attorney Whitney's remark in his opening statement to the jury that Fry had been "waiting a long time to come here and tell you what happened and why . . ."; (3) Fry's testimony that he wanted to testify and repeatedly told his lawyers he did; and (4) the testimony of his family members and investigator on the subject. (*Id*. at 27-28.)

The state appellate court neither ignored nor discounted this evidence. As shown above, the court provided a thorough summary of the testimony and exhibits presented at the two hearings, beginning its analysis of Fry's claim by reciting the very evidence upon which Fry now relies. *Fry*, 2019 WL 1318562, at *6 (¶ 25). But it reasonably concluded that, "[e]ven in light of the foregoing evidence highlighting Mr. Fry's initial desire to testify, he nonetheless failed to demonstrate that he was actually *denied* his right to testify." *Id*. at *7 (¶ 26) (emphasis in original).

As the state court explained, Fry's counsel credibly testified that they discussed with Fry his right to testify and their many reasons for advising against it and were "certain" on the day he was set to testify that "he was unequivocally opposed to it . . . ." *Id*.; *see also id*. at *3-4 (¶¶ 11-16). Moreover, the state court correctly observed that, regardless of Fry's vacillation on the issue, "it was incumbent upon him, at the very minimum, to alert the trial court of either his desire to testify or of any disagreement with counsel regarding his right to testify." *Id*. (¶ 27). Yet Fry never did so, in contrast to his previous assertive behavior in court but consistent with his

"increasingly irritated and disinterested" behavior as the trial progressed, and which he acknowledged at the hearing that he "should have known" to do and "probably should have" done. *Id*. Under these circumstances, the court reasonably concluded that the trial court properly presumed Fry had waived of his right to testify. *Id*.

Fry protests that it was unreasonable to require Fry to speak up in court about testifying.[8] He claims he did not hear his counsel tell the trial court at the side bar that he did not want to testify, so that when his attorney rested his case, he "did not know what was happening," leaving him "unable to testify." (Doc. No. 32 at 32-33.) But as the state court reasoned, Fry did not alert the court to his desire to testify or to any disagreement with counsel on that issue at any point in the proceedings. As the state court explained, Fry testified that he was "pretty sure" that he heard his lawyer state in court that "the defense rests . . . [b]ecause I remember looking back at my little brother," yet he said nothing to the court about testifying. *Fry*, 2019 WL 1318562, at *4, 7 (¶¶ 18, 27). The Ohio court of appeals' decision, therefore, was one over which fair-minded jurists could disagree, and this claim lacks merit.

### 3. Cross-Examination of child witness

Fry further claims his trial counsel performed deficiently in the cross-examination and impeachment of the victim's six-year-old grandson, referred to here as J.B., who witnessed the

---

[8] Fry asserts that the state appellate court misapplied the Sixth Circuit case *United States v. Webber*, 208 F.3d 545 (6th Cir. 2000), in finding his waiver of the right to testify presumed. (Doc. No. 32 at 31-33.) Relief under § 2254(d)(1), however, is limited to the contravention or misapplication only of United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Also, as will be explained below, the Ohio Supreme Court similarly – and reasonably – decided on direct appeal that the trial court did not err by presuming Fry's waiver of the right to testify without questioning him directly on the matter. *See infra* Section VII.

murder (Claim One).  (Doc. No. 21 at 71-73.)  Fry presented this claim in state court on post-conviction review, and it was litigated on the merits.

The last state court to address the claim was the state appellate court, which opined:

{¶ 30} In his second, fourth, and sixth grounds for relief, Fry argued that his attorneys were ineffective for failing to impeach a State's eyewitness. Specifically, Fry argues that his attorneys were ineffective for failing to point out differences in J.B.'s statements to the police and his testimony to the jury.

{¶ 31} The trial court found that "it was trial counsel's tactical decision not to cross-examine" J.B. about his statements to the police. Reasonable strategic decisions by trial counsel are afforded deference. *Strickland*, 466 U.S. at 681.

{¶ 32} J.B. was five years old when he watched his grandmother get stabbed to death. He was six years old when he testified at Fry's trial. At trial, J.B. testified that Fry was carrying a bowl and a knife when he entered the apartment and that he told Fry not to go inside. His statement to the police did not include this information. However, the police reports do show that other witnesses made statements consistent with J.B.'s testimony. Specifically, witnesses told the police that a man carrying a bowl and a knife approached 824 Ina Court. After reviewing the record, trial counsel's decision not to impeach J.B. was a reasonable tactical decision. Therefore, we cannot conclude that the trial court abused its discretion in so holding.

*Fry*, 2012 WL 2128027, at *5-6.

Fry argues the state court was unreasonable in concluding that defense counsel's decision not to cross-examine J.B., a key State witness, about inconsistent statements he made to police was a sound tactical decision.  (Doc. No. 21 at 71-72.)  Specifically, Fry cites three instances in which J.B. testified to something at trial that he did not tell the police:  (1) that Fry carried a knife and bowl into his grandmother's apartment; (2) that Fry visited his grandmother every day at her daughter's home while she babysat her grandchildren and gave the children candy; and (3) that Fry asked Ms. Hardison where his clothes were before the assault.  (*Id*.)  Fry claims these inconsistencies in J.B.'s testimony would have undermined the State's case for murder with prior calculation and design and the murder-witness capital specification and supported the defense's request for a jury instruction on the lesser-included offense of voluntary manslaughter.  (*Id*.)

The state court reasonably concluded that it was reasonable trial strategy not to impeach a child witness over testifying to facts that he may not have provided to police, but other witnesses corroborated in their statements.  There is little apparent impeachment value in cross-examining a six-year-old child who witnessed his grandmother being murdered about his failure to tell the police every detail of what he saw and heard during the assault and his prior experiences with the perpetrator – especially when that information is corroborated by other witnesses.

Accordingly, the state appellate court was correct in finding counsel's tactical decision not to impeach J.B. regarding facts he testified to but did not tell the police fell within the range of reasonable professional judgment, and the court neither contravened nor misapplied *Strickland* in rejecting this claim.

### 4.  Severance motion

Fry next faults his counsel for failing to request a severance of the domestic-violence and menacing-by-stalking counts in the indictment (Claim One).  (Doc. No. 21 at 73-74.)  Fry raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated its merits.

The state court reasoned:

{¶ 195} Fry argues that his counsel were ineffective by failing to request severance of the domestic-violence and menacing-by-stalking counts pursuant to Crim.R. 14. Because these offenses were not severed, Fry asserts that the state was allowed to present "other acts" evidence showing that he abused Hardison over a period of time and to introduce his prior convictions.

{¶ 196} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.' " *State v. Lott* (1990), 51 Ohio St.3d 160, 163, 555 N.E.2d 293.

{¶ 197} Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses," a trial court shall grant severance or other relief. Crim.R. 14. The defendant, however, bears the burden of proving prejudice and of proving that the

trial court abused its discretion in denying severance. *State v. Torres* (1981), 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

{¶ 198} The state may rebut a defendant's claim of prejudicial joinder in two ways. First, if in separate trials the state could introduce evidence of the joined offenses as "other acts" under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder. *Lott*, 51 Ohio St.3d at 163, 555 N.E.2d 293. Second, the state can refute prejudice by showing that "evidence of each crime joined at trial is simple and direct." *Id.*

{¶ 199} In this case, Hardison's murder could not be viewed in isolation without reference to the domestic-violence and menacing-by-stalking charges. On July 18, Fry assaulted Hardison, who then filed a complaint against him. Over the next several days, Fry demanded that Hardison drop the charges and threatened her if she failed to do so. After being released from jail, Fry pursued Hardison. On July 31, Fry killed her in retaliation for filing the complaint or to prevent her further testimony against him. Without evidence of the domestic-violence and menacing-by-stalking offenses, the state would have been unable to show what provoked Fry to kill Hardison.

{¶ 200} Additionally, the evidence of each crime was simple and direct. Under these circumstances, it is unlikely that the trial court would have granted severance. Accordingly, Fry has failed to establish that trial counsel were deficient for failing to request severance of the domestic-violence and menacing-by-stalking charges.

*Fry*, 125 Ohio St. 3d at 195-96.

Fry argues that the state court unreasonably found his trial counsel were not deficient for failing to move to sever the domestic-violence and menacing-by-stalking charges or stipulating to prior offenses, because without severance the State was able to introduce prejudicial evidence of his prior convictions and pattern of abusive conduct toward Ms. Hardison.  (Doc. No. 32 at 38-40.)  Fry fails to address, however, aside from conclusory assertions, the state court's objectively reasonable finding that the trial court was unlikely to grant severance because the aggravated murder charge was intertwined with the domestic-violence and menacing-by-stalking charges in that the domestic violence and menacing-by-stalking charges provoked Fry to commit the murder, and the evidence of each crime was "simple and direct."

A fair-minded jurist could conclude Fry's counsel were not ineffective for failing to move for severance, therefore, and this claim also fails.

### 5. Record of lack of African-American jurors

Fry also contends his counsel should have created a record at trial regarding the lack of African Americans on his jury venire and seated jury (Claim One).  (Doc. No. 21 at 40-42.)  As explained below, the Court finds no constitutional error in the selection of Fry's jury.[9]  Fry, therefore, cannot demonstrate that he was prejudiced by his counsel's alleged failure to create a record at trial regarding the inclusion of African Americans on the jury venire or seated jury.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (noting that an ineffective-assistance claim fails if the petitioner does not prove either deficiency or prejudice and citing *Strickland*, 466 U.S. at 697).  This claim, too, fails.

### 6. Failure to object

Fry further asserts that his counsel were ineffective for failing to object to: (a) "other acts" testimony, (b) victim-impact evidence, (c) the indictment, and (d) other miscellaneous errors regarding the indictment, capital specification § 2929.04(A)(7), the lack of a jury-unanimity jury instruction, and the trial court's pre-hearing preparation of its sentencing opinion (Claim One).  (Doc. No. 21 at 43-51.)  Fry raised these claims on direct appeal to the Ohio Supreme Court, which resolved them on their merits.

Ohio's high court opined:

{¶ 201} Fry argues that his counsel were ineffective by failing to object to Nikita Knox's victim-impact testimony and the prosecutor's final argument mentioning that Fry had killed Hardison in front of her grandchildren.

{¶ 202} First, Fry argues that his counsel should have objected to Knox's testimony that she passed out when she learned her mother had been killed. However, her

---

[9] *See infra* Section X.

reaction was part of the series of events that occurred in the immediate aftermath of Hardison's killing. There is little risk that counsel's failure to object to such testimony had any impact on the jury's verdict. See *State v. Reynolds*, 80 Ohio St.3d at 679, 687 N.E.2d 1358. This claim lacks merit.

{¶ 203} Second, Fry asserts that his counsel were ineffective by failing to object to Knox's testimony about her children's reaction to Hardison's killing. Knox testified that her oldest son "really was the one in shock," while the two younger ones "didn't really know * * * so, [they were] not like really scared." Trial counsel may have made a "tactical decision" to forgo objecting to this testimony because it reflected on the credibility of [J.B.] (Knox's oldest son), who witnessed Hardison's murder. See *State v. Keith* (1997), 79 Ohio St.3d 514, 521, 684 N.E.2d 47. This claim also lacks merit.

{¶ 204} Third, Fry claims that his counsel were ineffective by failing to object to Knox's testimony that she stayed away from her apartment for a month after the murder because of the bloody scene. During cross-examination, Knox testified that she did not know whether forcible entry was used in entering her apartment because she did not return to the apartment for a month. On redirect, Knox testified that she was scared to return to the apartment and when she finally returned, "There was blood everywhere. * * * Blood soaked through the couch, through the carpet. All my kids' pictures * * * blood splattered all over the walls."

{¶ 205} Trial counsel may have made a tactical decision to forgo an objection to follow-up questions about Knox's reasons for not returning to her apartment to avoid the risk of antagonizing the jury. Her testimony was not prejudicial, because the state later introduced numerous photographs showing the bloody crime scene. Thus, counsel were not ineffective by failing to object to this testimony.

{¶ 206} Finally, Fry argues that his counsel were ineffective by failing to object to the prosecutor's final argument that Fry killed Hardison in front of her grandchildren. However, the jury would not have been inflamed by the prosecutor's argument because they had previously heard testimony that Hardison was killed in front of her grandchildren. Counsel may have made the tactical decision not to object to this argument to avoid unduly emphasizing the prosecutor's brief remarks and to avoid the risk that the jury might view such an objection as unfeeling. See *State v. Brooks* (1996), 75 Ohio St.3d 148, 158, 661 N.E.2d 1030.

{¶ 207} Fry argues that his counsel were ineffective by failing to object to "other acts" testimony. He contends that his counsel improperly failed to object to Knox's testimony that her home was burgled and someone stole her televisions and other property. Knox also testified that she never suspected her mother of committing these offenses. Fry asserts that Knox's testimony implied that he was the thief. However, this testimony was introduced to rebut Fry's police statement alleging that Hardison had committed the thefts. This testimony did not implicate Fry. Thus, trial counsel were not ineffective by failing to object.

56

{¶ 208} Fry also argues that his counsel were ineffective by failing to object to Juersivich's testimony about the "cycle of violence." However, as discussed above, Juersivich's testimony was properly admitted.

{¶ 209} Fry asserts that his counsel were ineffective by failing to object to the indictment because not all facts and elements were set forth in the charged offenses as required by *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. However, as discussed above, the indictment was proper. Accordingly, trial counsel were not deficient by failing to object.

. . .

{¶ 213} Fry alleges other instances of alleged ineffectiveness, none of which have merit. As discussed in this opinion, because there was no error or harmless error in these aspects of the proceedings, counsel were not ineffective by failing to object to the denial of his right to allocution, the absence of narrowing of the R.C. 2929.04(A)(7) specification, multiple murder counts with different mens rea, or the lack of juror unanimity. In addition, counsel were not ineffective by failing to request disclosure of grand jury evidence or merger of the R.C. 2929.04(A)(7) and 2929.04(A)(8) specifications.

*Fry*, 125 Ohio St. 3d at 196-99.

Again, as will be discussed in detail below, this Court finds no constitutional error in the claims underlying these ineffective-assistance claims.[10]  The Ohio Supreme Court reasonably decided that Fry was not prejudiced by his trial counsel's failure to object to those matters, and its decision was neither contrary to, nor an unreasonable application of, *Strickland*.

### 7. Mitigation waiver

Fry also maintains that his counsel were ineffective in permitting him to waive his right to present mitigation evidence at the sentencing phase of his trial (Claim Two).  (Doc. No. 21 at 80-87.)  He specifically alleges that: (1) counsel were ineffective under *Strickland* in failing to ensure that his waiver was knowingly, voluntarily, and intelligently made; and (2) because of counsel's many deficiencies and the complete breakdown in his relationship with them, he was "actually or

---

[10] *See infra* Sections V, XII-XIV, and XVII.

constructively" denied counsel at this critical stage of his trial, entitling him to a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648 (1984).  (*See* Doc. No. 21 at 80, 87.)

Fry presented this claim in state courts as several separate claims, which were last examined by the court of appeals on post-conviction review.  The court explained:

*b. Mitigating Evidence*

{¶ 22} In his seventh, eighth, and ninth grounds for relief, Fry argued that because of a complete breakdown in his attorney-client relationship he did not present any mitigation evidence.
. . .

{¶ 24} Fry argued that his counsel was ineffective because they did not involve the family members in trying to dissuade Fry from waiving his right to present mitigation evidence. Fry offers affidavits from his mother and two step-brothers which contain statements that each would have talked with Fry about his decision not to present mitigating evidence.

{¶ 25} As discussed above, under the circumstances of this case, the *Strickland* test applies. Therefore, to prevail on his claim of ineffective assistance of counsel, Fry must show that his counsel's performance was deficient and that he was prejudiced by his counsel's deficient performance. *Strickland*, 466 U.S. at 687.

{¶ 26} The trial court conducted an *Ashworth* hearing to determine whether Fry's waiver of his right to present mitigating evidence was knowingly and intelligently made. See *State v. Ashworth*, 85 Ohio St.3d 56 (1999), paragraph one of the syllabus. During that hearing the court asked Fry if he wanted to talk to his mother, his brothers, or anybody else about his decision to waive his right to present mitigation evidence. Despite repeatedly responding no, Fry did meet with his mother for 30–45 minutes after which he informed the court that he still did not want to present any mitigation evidence. Moreover, because Fry knowingly and intelligently waived his right to present mitigation evidence, he cannot use this valid waiver to show that he was prejudiced.

{¶ 27} Because Fry has not established prejudice, his allegation that his counsel was ineffective for failing to "involve family members in trying to dissuade Fry from waiving his right to present mitigation evidence" is without merit.

*c. Rejection of Plea and Decision to Forego Mitigation*

{¶ 28} In his thirteenth ground for relief, Fry argued that because of his trial counsel's deficient performance . . . his decision not to present mitigation evidence was uninformed.

{¶ 29} Having already concluded that . . . Fry's decision to waive presentation of mitigation evidence was knowingly and intelligently made, this argument is without merit.

. . .

*e. Racism*

{¶ 33} In his first ground for relief, Fry argued that his attorneys were ineffective because issues of race resulted in a complete breakdown of the attorney-client relationship.

{¶ 34} The Ohio Supreme Court found that Fry failed to request that the trial court appoint an African–American attorney to represent him. Moreover, so long as an indigent defendant is adequately represented, he "does not have the constitutional right to choose the attorney who will represent him or her at state expense." *Fry*, 125 Ohio St.3d 163, 2010–Ohio1017, at ¶ 64.

{¶ 35} To the extent that Fry's argument is not barred by res judicata, it fails on the merits. First, Fry is not entitled to the *Cronic* presumption of prejudice because he was not denied counsel, constructively or otherwise. Second, Fry has not established that his counsel's performance was deficient. We cannot conclude that there was a breakdown in the attorney-client relationship because of race merely because Fry did not heed his counsel's advice. The record reflects that Fry had adequate representation at trial.

*f. Lack of Rapport*

{¶ 36} In his tenth ground for relief, Fry argued that he was effectively denied his right to counsel because his attorneys failed to ever establish a rapport with him. The only evidence submitted in support of this argument is Fry's self-serving affidavit.

{¶ 37} The trial court "may * * * judge the credibility of the affidavits in determining whether to accept the affidavits as true statements of fact." *Calhoun*, 86 Ohio St.3d at paragraph one of the syllabus. After reviewing the record, we cannot conclude that the trial court abused its discretion in rejecting Fry's argument that his counsel was so deficient that he was effectively denied representation.

*Fry*, 2012 WL 2128027, at *4-6.

As an initial matter, Fry argues that the Court should review this claim *de novo* because the Ohio courts did not properly address it.  (Doc. No. 32 at 56-57.)  He states he raised this claim "in part" to the Ohio Supreme Court on direct review under the same proposition of law

challenging the validity of his mitigation waiver (*id*. at 52), but variously contends the court either gave the claim "short shrift" (*id*.) or "did not address" the issue at all (*id*. at 56).  A review of Fry's merits brief in Ohio's high court, however, indicates that Fry did not fairly present this claim to that court; he made no mention of *Strickland* or *Cronic*, and he did not provide any analysis under those cases.  (*See* Doc. No. 13-1 at 537-540.)

Fry did raise both the *Strickland* and *Cronic* grounds of this claim on post-conviction review.  (*See* Doc. No. 13-2 at 66-72, 81-83.)   But, according to Fry, the last state court to address the claims, the state appellate court, "supplied no more than a summary conclusion" that he was not entitled to *Cronic*'s presumption of prejudice and "failed to address [his] precise claim" that the breakdown in his relationship with counsel caused him to waive the presentation of mitigation evidence.  (Doc. No. 32 at 56.)   This Court disagrees.   As Fry concedes, the state court acknowledged his argument: that "because of a complete breakdown in this attorney-client relationship he did not present any mitigation evidence.'"  *Fry*, 2012 WL 2128027, at *4 (¶ 22).)  Moreover, the court directly addressed Fry's *Cronic* argument in the context of three other ineffective-assistance claims, two of which Fry has incorporated into this claim (regarding racism and the "lack of rapport"), and one relating to Fry's rejection of the plea offer, discussed above.[11]  As with the claim at issue here, Fry's state post-conviction racism and rapport ineffective-assistance claims were based on the allegedly progressive breakdown of Fry's relationship with his counsel throughout his trial, and in each case, the court explicitly concluded that Fry was not denied counsel, constructively or otherwise.   *Id*. at *6 (¶¶ 35, 37).  The state post-conviction appellate court, therefore, fully adjudicated the merits of this claim, and AEDPA deference applies.

### a.  *Cronic* claim

---

[11] *See supra* Section I.B.1.

In *United States v. Cronic*, the Supreme Court identified situations affecting a defendant's Sixth Amendment right to counsel that involved circumstances "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."  *Cronic*, 466 U.S. at 658-59.  The first and "[m]ost obvious" situation – and the one Fry claims his case presents – is one in which there is a "complete denial of counsel" or the denial of counsel at a "critical stage of . . . trial."  *Id.* at 659.  A defendant can also be "constructively" denied counsel when "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided."  *Id.* at 654 n.11.

The Court distinguished *Cronic* from *Strickland*, its companion case, in that *Cronic* addressed "the type of breakdown in the adversarial process" stemming from "counsel's performance as a whole[,]" whereas *Strickland* concerned "specific errors and omissions" of counsel.  *Id*. at 657 n.20.  Courts generally apply *Cronic* "only where the constructive denial of counsel and the associated collapse of the adversary system is imminently clear."  *Moss v. Hofbauer*, 286 F.3d 851, 860 (6th Cir. 2002) (citing *Rickman v. Bell*, 131 F.3d 1150, 1156-60 (6th Cir. 1997) (holding that defense counsel's performance amounted to the constructive denial of counsel because his hostility towards his client at trial "succeeded in presenting a terrifying image of Rickman, and thereby aligned [defense counsel] with the prosecution against his own client")).

In this case, the state appellate court reasonably concluded that *Cronic* did not apply.  The Supreme Court has recognized sentencing as a critical stage of trial.  *See Van v. Jones*, 475 F.3d 292, 299 (6th Cir. 2007) (citing *Mempa v. Rhay*, 389 U.S. 128 (1967)).  But, nonetheless, to whatever extent Fry's counsel failed to maintain a cordial and trusting professional relationship with Fry, and more specifically failed to persuade him to present mitigation evidence, their shortcomings were not of the "magnitude" necessary to demonstrate a constructive denial of counsel.  *Cronic*, 466 U.S. at 659.

Fry cites as supporting evidence of his attorney's alleged failure to establish a working attorney-client relationship here, as he did in state court: (1) his affidavit (Doc. No. 13-2 at 89-92); (2) his testimony at the post-conviction hearing that his father taught him to be distrustful of white people (Doc. No. 14-2 (Post-Conv. Hrg.) at 711); (3) Attorney Whitney's testimony at that hearing that he may have told Fry, in an effort to encourage him to follow his advice, that he would not do well "on the street [selling] crack cocaine," just as Fry would not "do any better than [him] in a courtroom" (*id*. at 620); and (4) affidavits of attorneys regarding professional norms at the time of Fry's trial (Doc. 13-2 at 101 (Doc. No. 13-2 at 93-100 (Shank Aff.), 101-04 (Troccoli Aff.).) (Doc. No. 32 at 53, 56-57.)

This evidence may show a difficult, strained relationship between Fry and his lawyers, but, as the state court concluded, it does not prove there was a complete breakdown in the relationship that caused Fry to waive the presentation of mitigation evidence.  This Court already has noted the reluctance of courts to rely on a defendant's affidavit. [12]  Further, the record from the hearing at trial on his mitigation waiver belies Fry's claim.

The trial court told Fry at the hearing that she "noticed during the trial that [he] was able to talk to [his] counsel as each witness was on the stand." (Doc. No. 14-2 (Trial Tr.) at 436.)  Fry agreed with her, stating that he was "able to confer with [his] counsel" and they "understood what he was saying . . . [f]or the most part." (*Id*. at 436-37.)  And, aside from telling the judge at the hearing that his counsel "didn't say much" about mitigation (*id*. at 437), Fry did not raise with the trial court any specific complaints about his counsel or ask that they be dismissed.  He just expressed his general dissatisfaction with them and spoke of his desire to appeal his conviction on ineffective-assistance grounds.  (*See id*. at 437-38 ("The job that's been done here by these two

---

[12]  *See supra* Section I.B.1.

guys, I don't know them personally, but if I was paying them I would not pay them. . . .  Because I am not pleased with what they have done at all, so there's no reason for us to parade my family up here, to do no mitigating things."); 438 (expressing interest in raising ineffective-assistance-of-counsel claims).)

Fry's attorneys, for their part, explained to the court that they did what they could to protect Fry given his waiver.  They testified that they had: investigated and compiled mitigation evidence and were prepared to present witnesses, reports, and other evidence at the sentencing phase of trial (*id*. at 449-50); explained the mitigation phase to Fry, discussing with him his options and the consequences of waiving mitigation and answering his questions about appellate procedure, which Fry "was most interested in" (*id*. at 451-52); offered for the record and appellate purposes a report summarizing the evidence they intended to present, which the judge accepted (*id*. at 452-54); and made a statement to the court, asking the judge to review the mitigation report the defense submitted (*id*. at 576).

In fact, at the hearing, Fry saved his real ire for the jury – not his attorneys.  (*See id*. at 440 ("And the dumbest people I ever seen in my life"); 441 ("These people is pitiful.  They slept.  The ones that didn't sleep was just staring off into space."); 442 ("I wouldn't trust these people no farther than I can spit."); 445 ("But we got the 12 dumbest people that couldn't even recognize that.  And you want me to come up here and give them mitigating factors?"); 446 ("I wouldn't give them the time of day.  They too stupid to tell what time of day it is.  You can't trust them no more.  We tried them, Your Honor.  They failed.  They dropped the ball."); 455 ("I couldn't look at these 12 people and tell they were dumb.  I could not tell.  But, unfortunately, we found out the hard way."); 462 ("It is my expressed wish that me and my attorneys have nothing to say to these people.  We through with them.").)

63

But most significantly, as the state court noted, indigent defendants like Fry are entitled to competent counsel but not to counsel of their choice, no matter the race.[13]  *E.g., United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) ("[T]he right of counsel does not extend to defendants who require counsel to be appointed for them.").  And when evaluating Sixth Amendment claims, the Supreme Court instructed in *Cronic,* "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance."  *Cronic*, 466 U.S. at 657 n.21.   For that reason, the Court added, "we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction."  *Id*.

And here, Fry's trial counsel were "reasonably effective advocate[s]" in representing a capital defendant who had made a problematic decision to waive the presentation of mitigation evidence – in preparing their mitigation case, informing and advising their client about his waiver, and protecting him by placing mitigation evidence into the record and making a statement to the court at sentencing.  The state court, therefore, reasonably applied *Cronic* in concluding that counsel's performance relating to the mitigation waiver was not so egregious that Fry was constructively denied counsel and therefore entitled to a presumption that he was prejudiced by their representation.

### b.  *Strickland* **claim**

Nor has Fry shown that the state court's decision rejecting this claim under *Strickland* was unreasonable in any respect.  Fry repeats his arguments here that he would not have waived the

---

[13] *See infra* Section IX, addressing Fry's claim that he was denied his Sixth Amendment right to counsel of choice.

presentation of mitigation evidence had counsel brought in family members to speak to him, or properly explained appellate review and his chances of success in overturning his death sentence, what aggravating circumstances are in capital sentencing, or his right to make an unsworn statement to the jury.  (Doc. No. 21 at 82-86.)  But the record contradicts these allegations.  As the state court noted, the trial judge expressly offered Fry the opportunity to discuss his decision with family members, and although he declined to do so, he did end up meeting with his mother for 30-45 minutes.  Yet, even then, he insisted on the record that he did not want to present mitigation evidence.  *Fry*, 2012 WL 2128027, at *5.  Fry further demonstrated at the hearing that he understood appellate procedure (*see* Doc. No. 14-2 (Trial Tr.) at 438-40, 451-52, 454); the importance of mitigating evidence in offsetting aggravating circumstances (*see id*. 444, 447, 454-55); the legal ramification of the jury's finding of the witness-murder specification (*see id*. at 444-45); and his right to make an unsworn statement (*see id*. at 460, 466).

Moreover, as will be explained in detail below regarding Fry's challenge of the mitigation waiver's validity, this Court agrees with the state court that Fry's waiver was knowingly, voluntarily, and intelligently made.[14]  Regardless of what his attorneys did or did not do, therefore, the trial court conducted a hearing to ensure that Fry understood the nature of his right to present mitigation evidence and the consequences of forgoing that right, obviating any prejudice to Fry resulting from his counsel's performance.

Accordingly, the state appellate court's decision rejecting Fry's mitigation-waiver ineffective-assistance claim neither contradicted nor misapplied *Strickland*, *Cronic*, or any other Supreme Court precedent, and this claim also fails.

---

[14] *See infra* Section VIII, addressing Fry's claim of trial-court error in accepting the mitigation waiver.

### 8. Mitigation investigation and presentation

Fry next argues that his counsel was ineffective in failing to investigate and present mitigation evidence, such as evidence about racism in the United States, his childhood exposure to domestic violence, and his drug abuse, as well as a full psychological and neuropsychological review (Claims Three, Twenty-Three, and Twenty-Four).  (Doc. No. 21 at 87-94, 159, 159-60.) As this Court explains below,[15] the Ohio Supreme Court reasonably determined that Fry's waiver of mitigation evidence was valid.  Fry, therefore, is precluded from asserting a claim of ineffective assistance of trial counsel for failing to do what he expressly prevented them from doing.  In fact, the trial court explained this to Fry at the hearing on his mitigation waiver, and he responded under oath and on the record that he understood.  (Doc. No. 14-2 (Trial Tr.) at 438-40.)  This claim, therefore, is procedurally defaulted and without merit.

### 9. Biased juror

Fry next complains that his trial counsel performed deficiently in failing to challenge a juror for cause on the ground that he was biased in favor of the death penalty (Claim Four).  The Ohio Supreme Court addressed this claim on direct review, stating:

> {¶ 210} Fry contends that his counsel wasted a peremptory challenge on prospective juror Hogue, whom he should have challenged for cause. This argument focuses on the following question and answer from Hogue's juror questionnaire: "32. Which of the following statements best reflects your view of using the death penalty (Check One)." Given five options, Hogue checked, "Appropriate in every case where someone has been murdered."

> {¶ 211} During individual voir dire, the trial court asked Hogue about this response. Hogue indicated that he would be able to set aside his views and decide the case on only the facts, the evidence, and the court's instructions on the law. Thereafter, trial counsel did not challenge Hogue for cause, but later peremptorily challenged him.

---

[15] *See infra* Section VIII.

66

{¶ 212} In *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492, the United States Supreme Court held that a juror who will automatically vote for death without regard to mitigating factors is biased and may not sit on a capital case. Hogue's voir dire responses made clear that he was not an automatic-death-penalty juror and would consider mitigating factors. These answers would not have supported a challenge for cause, and therefore, trial counsel cannot be considered ineffective for failing to make such a challenge. See *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 82.

*Fry*, 125 Ohio St. 3d at 198.

Fry argues that the state court's decision unreasonably applied *Morgan v. Illinois*, 504 U.S. 719 (1992), and *Strickland*, and was based on unreasonable determinations of facts in light of the evidence presented.  (Doc. No. 32 at 71-72.)  His main complaint here, as in state court, is that juror Hogue answered on his juror questionnaire that he believed the death penalty was appropriate in all murder cases and the *voir dire* questioning was "inadequate" to sufficiently rehabilitate, or life-qualify, the juror.  (*Id*. at 71.)  Fry claims his counsel should have asked the juror "if he could actually vote for a life verdict following a guilty verdict in a murder case." (*Id*. at 71-72.)

As the Ohio court explained, the Supreme Court held in *Morgan* that a juror "who will automatically vote for the death penalty in every case" is not impartial as required by the Sixth and Fourteenth Amendments, and a capital defendant may challenge for cause any prospective juror who holds such views.  *Morgan*, 504 U.S. at 729.  The Court further established the *voir dire* procedures needed to identify that specific bias.  *Id*. at 729-36.  It held that the "[p]etitioner was entitled, upon his request, to inquiry discerning those jurors who" would always impose a death sentence following conviction.  *Id*. at 736.  And in that case, it concluded, general questions about "fairness" and ability to "follow the law" that were asked during *voir dire* were inadequate.  *Id*. at 735-36.  The crux of the matter, according to the Court, was the *defendant's ability* to uncover juror bias through *voir dire*: "'As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, *it is the adversary seeking exclusion who must*

*demonstrate, through questioning*, that the potential juror lacks impartiality.  It is then the trial judge's duty to determine whether the challenge is proper.'"  *Id*. at 733 (emphasis in original) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)); *see also Stanford v. Parker,* 266 F.3d 442, 454 (6th Cir. 2001) ("*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case.  Instead, *Morgan* holds that a defendant has the right to life-qualify his jury upon request.").

Here, as the Ohio Supreme Court concluded, *Morgan*'s requirements were met.  The judge and counsel for both parties queried juror Hogue about his views on sentencing in a capital case. (*See* Doc. No. 14-1 (Trial Tr.) at 244-45 (judge); 246-48 (prosecutor); 250-53 (defense counsel).) And the juror responded to each set of questions posed that he was willing and able to follow the law governing Ohio's death penalty sentencing scheme as instructed, despite his answer on the questionnaire.  Moreover, contrary to Fry's assertion, Fry's counsel asked juror Hogue questions that elicited a response indicating his willingness to impose a life sentence in this exchange:

Mr. O'Brien:   Okay.  Now, we don't – Mr. Whitney and I don't have any responsibility of trying to get the mitigating factors to outweigh the aggravating circumstances.

Do you understand that?

Juror Hogue:   Uh-huh.

. . .

Mr. O'Brien:   The aggravating circumstances must outweigh.  It is that simple.

**If they don't, then you will have to vote for one of the life sentences.**

**Are you with me so far?**

Juror Hogue:   **Yes**.

| Mr. O'Brien: | **Now, because of your questionnaire, we need to know that you are going to seriously consider the mitigating factors, the good things about Mr. Fry.** |
|---|---|
| Juror Hogue: | **Yes.** |
| Mr. O'Brien: | All right.  Now, remember you are under oath. |
| Juror Hogue: | Yes. |

(*Id*. at 252-53 (emphasis added).)  Also, when Fry's counsel asked juror Hogue if he considered mitigating factors a "bunch of baloney" and "excuse-making and whinning [*sic*], crying, and trying to evade responsibility," the juror replied, "I don't really, no."  (*Id*. at 251.)

Fry's counsel, therefore, attempted to establish juror Hogue's bias in favor of the death penalty through specific questioning on the matter, as *Morgan* dictates, but he could not. Accordingly, the Ohio Supreme Court did not contravene or misapply *Morgan* or *Strickland* or unreasonably determine any facts in concluding that defense counsel was not ineffective for failing to challenge the juror for cause when the juror's responses to *voir dire* questioning demonstrated that he would consider mitigating factors and would not automatically impose the death penalty if Fry was convicted of murder.

### 10.  Investigation and presentation of defense

Fry last claims that trial counsel were ineffective for failing to investigate and present additional evidence during the guilt phase of trial (Claim Twenty-Two).  (Doc. No. 21 at 158.) However, Fry failed to develop argumentation for this claim.  His support for it consists entirely of conclusory statements void of factual or legal support, and it is therefore waived.  *See, e.g., United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address [the defendant's] general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d

1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

## II.    Fifth Claim for Relief:  *Trial-Court Error / Competency of Child Witness*

For his fifth claim for relief, Fry argues that the trial court violated his federal constitutional rights to due process and to confront a witness by admitting the testimony of six-year-old J.B., Ms. Hardison's grandson, who witnessed her murder.  (Doc. No. 21 at 96-99.)[16]  Respondent contends the claim is not cognizable on federal habeas review.  (Doc. No. 24 at 49-50.)

Fry asserts that he raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated the claim on the merits, and it is therefore preserved for federal habeas review.  (Doc. No. 32 at 72-73.)[17]  In rejecting the claim, Ohio's high court explained:

---

[16]  Fry also alleges that the evidentiary ruling violated the Eighth Amendment but does not present any argument at all supporting that claim, and the Court will not address it. *See, e.g., Crosgrove,* 637 F.3d at 663; *Hall,* 549 F.3d at 1042.

[17]  Fry may not have fairly presented this claim as a federal constitutional claim in state court.  He asserted there – with no argumentation – that "Ohio's competency standard created a liberty interest. The trial court determination that six-old [J.B.] was competent is in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."  (Doc. No. 13-1 at 547.)  "A petitioner need not cite 'chapter and verse' of constitutional law, . . . but '[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'"  *Blackmon v. Booker*, 394 F.3d 399, 401 (6th Cir. 2004) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) and *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000)); *see also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding claim of "denial of due process and a fair trial" in violation of "14th and 6th Amendments" without citation to federal constitutional cases insufficient for fair presentation). And, because Fry no longer is able to raise this record-based claim in state court, it is procedurally defaulted.  *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata."). Respondent did not raise this procedural-default defense, however, and it is waived. *See, e.g., Trest v. Cain*, 522 U.S. 87, 89 (1997) ("procedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter'") (quoting *Gray v. Netherland*, 518 U.S. 152, 166

{¶ 70} Fry argues that the trial court abused its discretion in allowing six-year-old [J.B.] to testify.

{¶ 71} Evid.R. 601 provides: "Every person is competent to be a witness except: (A) * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

{¶ 72} The trial court conducted a voir dire examination of [J.B.] to determine his competence to testify. In making this determination, the court considered "(1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity, and (5) the child's appreciation of his or her responsibility to be truthful." *State v. Frazier* (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, syllabus.

{¶ 73} [J.B.] was six years old when he testified but five years old when he witnessed the killing of Hardison. During the interview to determine his competence, [J.B.] was able to relate his name and age and the names and ages of his brother and sister. He understood that he was in court to talk about what happened to his grandmother. [J.B.] showed that he knew what it meant to tell the truth and stated that if he told a lie, he would get into trouble and be grounded. [J.B.] stated that he would tell the truth about what he saw when his grandmother was "hurt."

{¶ 74} Following voir dire, the trial court determined that [J.B.] was competent to testify regarding the events of July 31, 2005. Fry argues that the trial court abused its discretion because voir dire examination showed that [J.B.] was unable to distinguish right from wrong and could not tell the difference between the truth and a lie.

{¶ 75} In support of this argument, Fry states that [J.B.] showed that he did not understand the difference between telling the truth and telling a lie when he was asked, "What does that mean if you promise to tell the truth in front of God, and the Judge, and the Court," and [J.B.] answered, "[A] lie." Fry argues that [J.B.] also demonstrated his incompetence when asked whether he knew the difference between right and wrong, and [J.B.] shook his head "no." Fry also points out that [J.B.] improperly raised his left hand when the judge asked him to raise his right hand to take a practice oath. Finally, Fry asserts that [J.B.]'s attempt to explain the difference between telling the truth and telling a lie shows that he did not understand the difference.

---

(1996)); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) ("The state may waive a defense," including procedural default, "by not asserting it.").

{¶ 76} A child may be competent to testify even though the child is unable to recollect some facts or initially does not recognize the concept of truth, so long as other answers demonstrate that the child can perceive and recall generally and understands the concept of truthfulness. See *State v. Anderson*, 154 Ohio App.3d 789, 2003-Ohio-5439, 798 N.E.2d 1155, ¶ 62 (six-year-old witness competent even though she answered some questions wrong). Even though [J.B.] had difficulty answering some questions, his follow-up responses to other questions showed that he knew the difference between truth and falsity and understood that he should tell the truth. See *State v. McNeill* (1998), 83 Ohio St.3d 438, 442–443, 700 N.E.2d 596. For example, [J.B.] demonstrated this understanding near the end of voir dire:

{¶ 77} "THE COURT: What does it mean to tell the truth?

{¶ 78} "[J.B.]: If my friends told my mom something and, um, and, um, if I—and I had something, and I went to go show my mom, that's not a lie.

{¶ 79} "THE COURT: Okay. And, again, if you tell a lie, you said you get into trouble? You get grounded?

{¶ 80} "[J.B.]: Yes.

{¶ 81} "THE COURT: Is it right to tell the truth?

{¶ 82} "[J.B.]: Yes.

{¶ 83} "THE COURT: Is it right to tell a lie?

{¶ 84} "[J.B.]: No.

{¶ 85} "THE COURT: Will you be able to talk to us later out in the courtroom and tell us the truth about what you saw the day your grandmother was hurt?

{¶ 86} "[J.B.]: Yes."

{¶ 87} [J.B.'s] competence is adequately demonstrated on the record. The trial court did not abuse its discretion in finding [J.B.] competent.

*Fry*, 125 Ohio St. 3d at 174-75.

As Respondent argues, to the extent Fry alleges a violation of Ohio evidentiary law, the claim is not cognizable on federal habeas review.  Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review."  *Moreland v. Bradshaw*, 699 F.3d

908, 923 (6th Cir. 2012).  Federal habeas courts presume that state courts correctly interpret state law in their evidentiary rulings.  *Small v. Brigano*, No. 04-3328, 2005 WL 1432898, at *5 (6th Cir. June 17, 2005).  Their review of state-court evidentiary rulings, therefore, "is limited to whether [a petitioner] can demonstrate a violation of his federal constitutional rights."  *Haliym v. Mitchell*, 492 F.3d 680, 700 (6th Cir. 2007) (citing *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976)).

Fry argues that the Ohio Supreme Court's finding that [J.B.]'s testimony against him was competent was an unreasonable determination of fact under AEPDA's § 2254(d)(2) and its decision contravened or misapplied Supreme Court precedent under § 2254(d)(1).  (*See* Doc. No. 21 at 99.)

The Supreme Court has not established a definition of witness competence required by the Due Process Clause.  *Moreland*, 699 F.3d at 923 (citing *Kentucky v. Stincer*, 482 U.S. 730, 741 n.11 (1987)).  Nevertheless, state-court evidentiary rulings may "rise to the level of due process violations [if] they 'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  But even so, as the Supreme Court has cautioned, "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules . . . ."  *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983).

Fry also bases his claim on the Sixth Amendment's Confrontation Clause, which declares that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. CONST. amend. VI.  The provision's "central concern . . . is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in

the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  It guarantees a defendant's right not only to "personal examination," but also

> insures that the witness will give his statements under oath-thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; . . . forces the witness to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth; [and] permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.'

*Id*. at 845-46 (quoting *California v. Green*, 399 U.S. 149, 158 (1970)).

In *Craig*, the Supreme Court held that the Confrontation Clause did not prohibit a defendant's six-year-old accuser from testifying over a closed-circuit television rather than face-to-face because the other "elements of confrontation" were present:  the child was competent to testify, testified under oath, was subject to contemporaneous cross-examination, and the judge, jury and defendant were able to observe the witness's demeanor.  *Id*. at 851.  These safeguards, the Court concluded, "ensure[d] that the [child's] testimony [was] both reliable and subject to vigorous adversarial testing . . . ."  *Id*.

The Sixth Circuit similarly rejected a habeas petitioner's claim that the admission of a seven-year-old witness's testimony violated his confrontation rights because the child was incompetent and did not understand the oath.  *Haliym*, 492 F.3d at 699-703.  The court observed that "some minimum capacity for recording and relaying truthful information is a precondition to a meaningful oath to tell the truth, which is a necessary element of cross-examination."  *Id*. at 703. It declined to define that minimum capacity, but "consider[ed] it satisfied for purposes of the Confrontation Clause if the witness is able to understand the concept of the truth and his duty to present truthful information to the court."  *Id*.  The court further cautioned that a state court's findings of fact made in connection with state evidentiary issues are binding for purposes of the constitutional inquiry absent clear and convincing evidence to the contrary.  *Id*. at 700 (citing 28

74

U.S.C. § 2254(e)(1); *Mitzel v. Tate*, 267 F.3d 524, 537 (6th Cir. 2001)).  In that case, the court held that the Ohio Supreme Court's factual findings that the child witness exhibited an understanding of truth and falsity and appeared to appreciate his responsibility to be truthful were not clearly erroneous.  *Id*. at 703.  The child stated that he would tell the truth, that it was good to tell the truth, and that he would be punished if he lied.  *Id*.  He also was cross-examined and "generally responsive" to the cross-examination.  *Id*.

Here, Fry argues that the Ohio Supreme Court unreasonably determined that J.B. was competent to testify given certain of his responses to the trial court's *voir dire* – namely, when he replied that he did not know his birthday; said he had not attended school or any type of preschool program, although he later testified that he had attended kindergarten; shook his head "no" when asked if he understood the difference between right and wrong; provided unclear answers when asked what it means to tell the truth and what the difference is between telling the truth and telling a lie; and raised his left hand when asked to raise his right hand for a practice oath.  (Doc. No. 21 at 97-98.)  As the state court noted, however, J.B. was able to:  provide his name and age and those of his siblings; explain why he was in court; demonstrate that he knew what it meant to tell the truth and the consequence for telling a lie; and promise to tell the truth about what happened to his grandmother.  (*See* Doc. No. 14-1 (Trial Tr.) at 1493-1504.)  Ultimately, as the trial court ruled, J.B. "indicated as clearly and unequivocally, as much as a six[-]year[-]old can, that he did understand the difference" between truth and lies and that "there are penalties attached to [lying]." (*Id*. at 1513-14.)  Further, J.B. testified under oath, was subject to contemporaneous cross-examination, and the judge and defendant were able to observe his demeanor.  (*See id*. at 1515-33.)

Fry, therefore, has not shown that any factual finding of the Ohio Supreme Court was clearly erroneous or that the admission of the J.B.'s testimony violated his confrontation rights or was so fundamentally unfair that it violated his due process rights.  This claim fails.

### III.    Sixth Claim for Relief:  *Trial-Court Error / Other-Acts Evidence*

For his sixth claim for relief, Fry alleges the trial court violated his due process rights by admitting evidence of his prior convictions for domestic violence and arson.  (Doc. No. 21 at 96-99.)[18]  Respondent argues that this claim is procedurally defaulted and not cognizable on federal habeas review.  (Doc. No. 24 at 50-52; Doc. No. 37 at 15-17.)

### A.  Procedural Posture

Respondent contends that Fry procedurally defaulted this claim by failing to fairly present it to the Ohio Supreme Court on direct appeal.  (Doc. No. 37 at 15-17.)  This Court agrees.  Fry asserted federal constitutional grounds for this evidentiary claim only in the final paragraph of his state-court merit brief's five-page argument.  (*See* Doc. No. 13-1 at 548-53.)  It reads:

> Given the heightened respect for due process generally accorded . . . those charged in capital cases, the presentation of this evidence was particularly egregious. See, *Getsy v. Mitchell* (C.A. 6, 2006), 45 F.3d 575, 583. The admission of the irrelevant and unfairly prejudicial evidence of prior acts was in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

(*Id*. at 552-53.)

A petitioner fairly presents the substance of his federal constitutional claim to the state courts by:  (1) relying upon federal cases that use a constitutional analysis; (2) relying upon state cases using a federal constitutional analysis; (3) phrasing his claim in terms of constitutional law

---

[18] Fry also alleges that the other-acts evidence improperly permitted the jury to consider non-statutory aggravating factors in sentencing him and its admission violated his Sixth and Eighth Amendment rights.  (Doc. No. 21 at 99-100, 102; Doc. No. 32 at 77.)  He provides no developed argumentation for these claims, however, and they are therefore deemed waived.

or in terms sufficiently particular to allege the denial of a specific constitutional right; or (4) alleging facts that are obviously within the mainstream of constitutional law. *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir. 2004) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)). Fry's brief references to due process and the Constitution are too vague and general to fairly present to state court the federal claims he now asserts. "A petitioner need not cite 'chapter and verse' of constitutional law, . . . , but '[g]eneral allegations of the denial of rights to a 'fair trial' and 'due process' do not 'fairly present claims' that specific constitutional rights were violated.'" *Blackmon v. Booker*, 394 F.3d 399, 401 (6th Cir. 2004) (quoting *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987) and *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir.2000)) (holding claim not fairly presented where petitioner's only citation to federal authority appeared in a section heading and petitioner "failed to develop any cogent arguments regarding those rights beyond the naked assertion that they were violated."); *see also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding claim of "denial of due process and a fair trial" in violation of "14th and 6th Amendments" without citation to federal constitutional cases insufficient for fair presentation).

This claim, therefore, is procedurally defaulted. Moreover, as Fry does not offer any argument regarding the cause for, or prejudice resulting from, his procedural default of this claim, or that he is actually innocent such that the default should be excused, the Court will not address those issues.

### B. Merits Analysis

Even if this claim were properly raised in state court, it would fail. The Ohio Supreme Court, which addressed the merits of the claim under state law, decided:

{¶ 88} Fry first argues that evidence of his prior convictions for domestic violence and arson were improperly admitted. During its case-in-chief, the state offered into evidence Fry's three prior convictions for domestic violence and one prior conviction for arson of the dwelling of a family or household member. The defense objected.

The state responded that the convictions were admissible to establish an element of the domestic-violence charges in Counts Four and Five. The trial court overruled the defense objection, but excluded Fry's 1988 conviction for domestic violence.

{¶ 89} A violation of R.C. 2919.25(A), the domestic-violence statute, is a first-degree misdemeanor. R.C. 2919.25(D)(2). A prior domestic-violence conviction raises a later offense to a fourth-degree felony. R.C. 2919.25(D)(3). Two or more domestic-violence convictions elevate a later offense to a third-degree felony. R.C. 2919.25(D)(4). During the admission of the state's evidence, the defense objected to the introduction of more than two convictions. The trial court sustained the objection and excluded Fry's 1992 arson conviction.

{¶ 90} Where a prior conviction elevates the degree of a subsequent offense, the prior conviction is an essential element that the state must prove beyond a reasonable doubt. *State v. Henderson* (1979), 58 Ohio St.2d 171, 173, 12 O.O.3d 177, 389 N.E.2d 494. Thus, Fry's two prior felony convictions elevated the current domestic-violence charges to third-degree felonies and were properly admitted. See *State v. Day* (1994), 99 Ohio App.3d 514, 517, 651 N.E.2d 52; *State v. Torres*, 6th Dist. No. WD–98–049, 1999 WL 173980, *3; *State v. Russell*, 12th Dist. No. CA–98–02–018, 1998 WL 778312, *2.

{¶ 91} The trial court also provided the jury with the following limiting instructions: "You cannot, absolutely under any circumstances, consider these convictions for any other reason except to demonstrate that they are elements of the crime of domestic violence that the State must prove to you beyond a reasonable doubt." During the guilt-phase jury charge, the trial court repeated similar instructions. Accordingly, Fry's first claim lacks merit.

{¶ 92} Second, Fry argues that the trial court erred in permitting Officer Michael Rinn to testify about the "cycle of violence," thereby implying that Fry is a habitual batterer. During preliminary inquiry into his qualifications, Rinn was asked whether he had received instruction about "the cycles of violence." The trial court sustained a defense objection to this line of questioning, and Rinn was asked no further questions on the topic. Thus, no improper evidence was elicited during Rinn's testimony.

{¶ 93} Third, Fry argues that Donnel Juersivich, the victim-assistance advocate, improperly testified about the "cycle of violence" in Hardison's relationship with Fry. "'Generally, battered woman syndrome testimony is relevant and helpful when needed to explain a complainant's actions, such as prolonged endurance of physical abuse accompanied by attempts at hiding or minimizing the abuse, delays in reporting the abuse, or recanting the allegations of abuse.'" *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, 860 N.E.2d 91, ¶ 44, quoting *People v. Christel* (1995), 449 Mich. 578, 580, 537 N.W.2d 194. Here, testimony about the "cycle of violence" was relevant in explaining Hardison's actions, such as talking to Fry twice on the phone on the day of his arrest, obtaining money to post bail, and asking the judge to

drop the case. In addition, the defense was allowed to cross-examine Juersivich on these incidents to suggest that Hardison had not felt abused. Thus, Juersivich's testimony was proper.

{¶ 94} Fourth, Fry argues that the state improperly presented evidence that the apartment of Nikita Knox, Hardison's daughter, had been burglarized and ransacked twice during July 2005, but that the mother-daughter relationship had not deteriorated during this time. Fry claims that Knox's testimony implied that Fry had committed the break-ins and thefts. However, the defense failed to object to such evidence at trial and waived all but plain error. See *State v. Childs*, 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 95} The state introduced testimony about the theft because Fry had told police that when he was in jail, Hardison had broken into her daughter's apartment and had stolen her TV. Fry also indicated to the police that Hardison's theft of her daughter's TV was a reason he pursued Hardison on July 31. During his police statement, Fry also mentioned Hardison's theft in explaining his actions when he killed her. Fry said, "[W]hy did she hit me * * * what the hell was she thinking * * * ? You done robbed me, *you robbed your daughter*, now you're getting cussed out about it, then you bust me in my head, what did you think was gonna happen?" (Emphasis added.) Thus, Knox's testimony was presented to refute Fry's claims that Hardison had stolen the TV from her home. None of her testimony suggested that Fry had committed the break-ins. Accordingly, no plain error occurred in introducing such evidence.

*Fry*, 125 Ohio St. 3d at 175-76.

As noted above, to the extent Fry argues that this evidence was admitted in violation of Ohio law, the claim is not cognizable in habeas corpus.  "[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983).  And Fry has not established that the admission of the other acts evidence was so unfairly prejudicial that it violated his fundamental right to a fair trial.  The state court reasonably determined that the evidence at issue was an essential element of an offense and the subject of limiting jury instructions; the subject of a sustained defense objection; directly relevant to the victim's actions near the time of the murder and subject to cross-examination by the defense; and offered by the State to refute Fry's assertions to the police that Ms. Hardison had stolen her daughter's television with no objection by the defense.  The trial

court's admission of this other acts evidence, therefore, was not so fundamentally unfair as to rise to the level of a due process violation.

Moreover, there can be no relief under § 2254(d)(1) as "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003); *see also Richter*, 562 U.S. at 101 ("'[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'" (citation omitted)).  And Fry cannot prevail under § 2254(d)(2), because he has not specified any unreasonable determination of fact upon which the state court decision was based.

Fry's sixth claim for relief, therefore, is procedurally defaulted and without merit.

## IV.     Seventh Claim for Relief:  *Trial-Court Error / Right to Confront Witnesses*

For his seventh claim for relief, Fry argues that the trial court's admission of Ms. Hardison's statements to a police officer, nurse, and victim's advocate violated his Sixth Amendment right to confrontation.  (Doc. No. 21 at 103-07.)  Fry raised this claim on direct appeal to the Ohio Supreme Court, which adjudicated the claim on the merits.  *See Fry*, 125 Ohio St. 3d at 177-82.  Respondent argues this claim lacks merits.  (Doc. No. 37 at 17-21.)

In addressing this claim, the Ohio Supreme Court provided this description of the trial testimony of Officer Hackathorn, nurse Veney, and victim's advocate Juersivich about statements Ms. Hardison made to them:

> {¶ 96} Fry argues that the admission of Hardison's statements to a police officer, a nurse, and a victim's advocate violated his Sixth Amendment right to confrontation as set forth in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177.
>
> ### a.  Hardison's statement to Officer Hackathorn

80

{¶ 97} Police arrived at Fry's apartment building on July 18, 2005, following a call reporting a domestic disturbance. They heard screaming coming from inside the apartment. Fry was placed in handcuffs and was taken to a cruiser.

{¶ 98} Officer Matthew Hackathorn testified that Hardison was crying and shaking, as if a traumatic event had just occurred. He could see that she had "some redness to the right side of her face, some swelling that started." Hackathorn determined that Hardison did not need emergency medical assistance. He then asked, "Can you tell me what happened?" Hardison reported that she and Fry had argued. He then struck her in the face about ten times. While she was on the ground, crying, Fry said, "If you don't shut up, I am going to kill you." He then picked up a leather punch from the dresser and showed it to her.

{¶ 99} Hackathorn spent 15 minutes talking to Hardison. During that time, Hardison also prepared a written statement describing what had happened. The trial court admitted Hardison's oral statement as an excited utterance and made findings in support of the ruling. The trial court did not admit Hardison's written statement.

* * *

{¶ 101} The trial court must also determine whether Hardison's statements were testimonial. *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. Improper admission of testimonial statements may violate the Sixth Amendment right to confrontation. *Id*. at 68, 124 S.Ct. 1354, 158 L.Ed.2d 177. Crawford declined to comprehensively define the term "testimonial," opining, "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. (Emphasis added.)

{¶ 102} In the consolidated cases of *Davis v. Washington* and *Hammon v. Indiana (*2006), 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224, the United States Supreme Court distinguished between police interrogations that concern an ongoing emergency and those that relate to past criminal conduct. In considering whether the statements in these cases were testimonial, the court formulated the primary-purpose test: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 103} *Hammon* also involved a victim's statements to police officers responding to a domestic-violence complaint after they had secured the scene. *Id*. at 817–821, 126 S.Ct. 2266, 165 L.Ed.2d 224. The Supreme Court held that these statements were testimonial and were barred by the Sixth Amendment. *Id*. at 829–832, 126 S.Ct. 2266, 165 L.Ed.2d 224. In *Hammon*, the police had questioned the victim about

"possibly criminal past conduct." *Id*. at 829, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court stated that "there was no immediate threat" to the victim and "no emergency in progress," because the police had separated the abusive husband from his wife. *Id*. at 829–830, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court stated that when the officer questioned the victim, he was "not seeking to determine (as in *Davis*) 'what is happening,' but rather 'what happened.'" *Id*. at 830, 126 S.Ct. 2266, 165 L.Ed.2d 224. The court concluded that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime * * *." *Id*.

{¶ 104} As in *Hammon*, here there was no ongoing emergency, and Hardison was no longer in any imminent danger when she talked to Hackathorn. Fry had already been removed from the apartment and had been taken to the cruiser. Hackathorn's primary purpose in interrogating Hardison was to investigate a possible crime. Hardison's statements related to past events and what happened rather than what was currently happening. Accordingly, her statements were testimonial.3

FN. 3.  Several jurisdictions have found that victim statements to the police in similar situations are testimonial. *See People v. Cage* (2007), 40 Cal.4th 965, 985, 155 P.3d 205, 56 Cal.Rptr.3d 789 (assault victim's statements to police were testimonial because assailant and victim were separated, and victim "was in no danger of further violence as to which contemporaneous police intervention might be required"); *Commonwealth v. Galicia* (2006), 447 Mass. 737, 745–746, 857 N.E.2d 463 (victim's statements to police describing assault that occurred less than five minutes earlier were testimonial because victim and defendant were separated); *Zapata v. State* (Tex.App.2007), 232 S.W.3d 254, 260 (victim's statements to police about recent assault were testimonial because she was separated from defendant and there was no evidence of an "ongoing conflict"). Compare *United States v. Arnold* (C.A.6, 2007), 486 F.3d 177, 189–192 (victim's statement to police about an earlier threat to kill her was nontestimonial because defendant was armed and in the vicinity).

{¶ 105} However, the state claims that Fry forfeited his right to confront Hardison because his intentional criminal act made her unavailable to testify. The state argues that *Hammon* also recognized the doctrine of forfeiture by wrongdoing, which means that the admission of Hardison's unconfronted statements did not violate the Confrontation Clause. *Id*. at 833, 126 S.Ct. 2266, 165 L.Ed.2d 224.

{¶ 106} But in *Giles v. California* (2008), 554 U.S. 353, 128 S.Ct. 2678, 2683, 171 L.Ed.2d 488, the court recognized that this doctrine of forfeiture by wrongdoing applies only "when the defendant engaged in conduct *designed* to prevent the witness from testifying." (Emphasis sic.) *Id*. *Giles* also states that "the rule * * * makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying." (Emphasis sic.) *Id*. at 2684.

{¶ 107} In *Giles*, the defendant had killed his former girlfriend. At the defendant's murder trial, the court admitted the victim's statements to a policeman during a domestic-violence call three weeks before the shooting. *Id*. at 2681–2682. Although

the court vacated Giles's conviction, it held that the forfeiture doctrine would apply in many domestic-violence cases where the victim's statement was introduced after the victim was killed. "Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine." *Id*. at 2693.

{¶ 108} Similarly, the record demonstrates that Fry's killing of Hardison was "designed" to prevent her from testifying against him in any future criminal proceedings. While in jail and awaiting a court hearing on assault charges, Fry made several phone calls to Hardison and his mother about the case. He began coercing Hardison to drop the charges against him and threatening her if she did not. After Fry received the paperwork that Hardison had signed against him, Fry told her, "You don't know me." He said, "I got two of them under my belt * * * toe tags." He then told Hardison to "fix this, fix this."

{¶ 109} The jury also found Fry guilty of Specification Two of Count One for purposely killing Hardison to prevent her testimony in another criminal proceeding or killing her in retaliation for her testimony in any criminal proceeding under R.C. 2929.04(A)(8). Thus, the jury's verdict supports the conclusion that Fry forfeited his right to confront Hardison's statement to police. Based on the foregoing, Hardison's statements to Hackathorn were properly admitted.

### b.  Hardison's statement to Veney

{¶ 110} On July 18, Hardison went to Akron City Hospital for medical treatment following her assault. Amy Veney, a nurse examiner with Developing Options for Violent Emergencies ("DOVE"), treated Hardison. During the course of her treatment, Veney asked Hardison a series of questions about what happened. Trial counsel objected to the admission of Veney's testimony about what Hardison told her. The trial court overruled that objection on the basis that Hardison's statements were for the purposes of medical treatment. See Evid.R. 803(4).

{¶ 111} Veney testified that Hardison told her she was the girlfriend of Clarence Fry, the person who hurt her. Hardison said that she had been hit in the jaw and face, grabbed by the wrist, and strangled. Hardison also said that Fry had threatened her with some kind of "poker or ice pick" and had told her "he was going to stab" her and "kill" her. In further describing what happened, Hardison reported that "Clarence came into the house 'talking crazy' and that he just 'started hitting on'" her.

{¶ 112} Fry argues that Hardison's statements to Veney were testimonial statements admitted in violation of the Sixth Amendment right to confrontation. We reject this argument on the basis of *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855

N.E.2d 834. In Stahl, a rape victim had made statements identifying the person who raped her during an interview conducted by a nurse at a DOVE unit. *Id.* at ¶ 5–6. Stahl held that the victim's statement to the DOVE nurse was nontestimonial. *Id.* at ¶ 48. In reaching that conclusion, this court adopted the "objective witness" test, which provides: "For Confrontation Clause purposes, a testimonial statement includes one made 'under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial.' (*Crawford v. Washington* (2004), 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, followed.) * * * In determining whether a statement is testimonial for Confrontation Clause purposes, courts should focus on the expectation of the declarant at the time of making the statement; the intent of a questioner is relevant only if it could affect a reasonable declarant's expectations." *Id.* at paragraphs one and two of the syllabus.

{¶ 113} In applying the objective-witness test, Stahl noted that the victim had already given a statement to the police identifying the perpetrator. This court stated that the victim "could reasonably have assumed that repeating the same information to a nurse or other medical professional served a separate and distinct medical purpose." *Id.* at ¶ 46. Stahl concluded that the victim's statement to the DOVE nurse was not made "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' because the declarant had previously made the identifying statement to the police." *Id.*, quoting *Crawford*, 541 U.S. at 53, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 114} The holding in Stahl applies to Hardison's statements to Veney. Hardison talked to Hackathorn and identified Fry as her assailant before Veney interviewed her at the hospital. Hardison could reasonably assume that repeating the same information to Veney was for a separate and distinct medical purpose. Applying the objective-witness test, we conclude that Hardison's statements to Veney were nontestimonial statements whose admission did not violate the Confrontation Clause.

### c. Hardison's statement to Juersivich

{¶ 115} After treating Hardison, Veney called Donnell Juersivich, a victim-assistance advocate and nighttime crisis responder, to come to the hospital and meet with Hardison. Juersivich works for a nonprofit victims' assistance organization. Her job is to follow a victim from the scene of the crime all the way through the court system. She stated that she has received specialized training in crisis intervention and domestic violence.

{¶ 116} Juersivich talked to Hardison about developing a safety plan. Juersivich testified that during their meeting, Hardison had said that she was going to follow through with the criminal charges against Fry. Trial counsel objected to this testimony. However, the trial court overruled the objection, and Hardison's statement was admitted under Evid.R. 803(3) as a statement of her existing, mental, emotional, or physical condition. On July 28, Juersivich received a "hot line" call from

Hardison. Over defendant's objection, Juersivich testified that Hardison told her that she was "very fearful" because Fry was out of jail on a signature bond.

{¶ 117} Fry argues that Hardison's statements to Juersivich on July 18 and 28 were testimonial statements because it was reasonably foreseeable that they could be used in a later criminal prosecution. With respect to the July 18 statements, Juersivich, a victim-assistance advocate, was not a hospital employee and did not provide Hardison with medical care when they met and talked. Their discussion was not conducted for health-related purposes. Under these circumstances, Hardison could have reasonably believed that her statements to Juersivich "would be available for use at a later trial." See *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, paragraph one of the syllabus. And in calling Juersivich later on July 28, Hardison was expressing concern about Fry's release—an event that had already happened. She could have reasonably believed that her statements would be available for use at a later trial.

{¶ 118} Nevertheless, Fry forfeited his confrontation rights by killing Hardison. As discussed above, the facts demonstrate that Fry's killing of Hardison was "designed" to prevent her testimony against him in a criminal proceeding. Thus, in accordance with *Giles v. California*, 554 U.S. 353, 128 S.Ct. at 2693, 171 L.Ed.2d 488, the doctrine of forfeiture applies, and Hardison's statements to Juersivich were admissible.

*Fry*, 125 Ohio St. 3d at 177-82.

As noted above, the Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."  U.S. CONST. amend VI.  "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."  *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (citation omitted).

In *Ohio v. Roberts*, 448 U.S. 56 (1980), the Supreme Court held that the Clause permits the admission of out-of-court statements by an unavailable witness, so long as the statements carried "adequate 'indicia of reliability.'"  *Id*. at 66.  Such indicia are present, it explained, if "the evidence falls within a firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness."  *Id*.

85

More recently, however, in *Crawford v. Washington*, 541 U.S. 36 (2004), the Court adopted a different approach.  It concluded that "witnesses" under the Confrontation Clause are those "who bear testimony," and defined "testimony" as "a solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id*. at 51 (internal quotation marks and alteration omitted).  The Sixth Amendment, the Court reasoned, prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness was unavailable to testify and the defendant had had a prior opportunity for cross-examination. *Id*. at 54.  It has force outside traditional hearsay rules. *Id*. at 50–51.  The Court held in *Crawford* that statements by a witness during police questioning at the station house were testimonial and thus could not be admitted. *Id*. at 65-69.  It did not provide an exhaustive definition of "testimonial" statements, but it explained that the label "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id*. at 68.

Fry challenges the Ohio Supreme Court's decision on one ground: that, while the state court properly found Ms. Hardison's statements to Officer Hackathorn, nurse Veney, and victim's advocate Juersivich were testimonial under *Crawford*, it unreasonably determined that Fry forfeited his right to confrontation as to the remarks because he "engaged in conduct designed to prevent [Ms. Hardison] from testifying" under *Giles v. California*, 554 U.S. 353, 361 (2008). (Doc. No. 32 at 80-81; 87-90.)  This argument is unpersuasive.

First, the state court did not find the information Ms. Hardison provided to nurse Veney testimonial, as Fry suggests.  The court determined that the statements were nontestimonial and the unconfronted testimony about them did not violate the Confrontation Clause, because "Hardison could reasonably assume that repeating the same information to Veney [that she had

told Officer Hackathorn about Fry and the assault] was for a separate and distinct medical purpose[,]" and not a subsequent prosecution.  *Fry*, 125 Ohio St. 3d at 181.

Moreover, Fry advances no legal or factual argument as to how this decision regarding Veney's testimony contravened or misapplied *Crawford* or other Supreme Court precedent or was based upon an unreasonable factual determination.  Fry generally challenges the trial court's admission of Veney's testimony about Hardison's statements, asserting that Ms. Hardison knew her statements to the nurse would be used in a subsequent prosecution.  (Doc. No. 32 at 85-86.) But this argument also is unavailing.  Fry cites her signed release of information advising her that her records would be released to law enforcement, and her knowledge that he had been charged with a prior assault.  (*Id*. at 86.)  But he is simply marshalling different facts here to support his argument.  The state court reasonably concluded that, given all the circumstances surrounding Ms. Hardison's conversation with Veney – a nurse examiner for a program assisting victims of violence – her statements were not testimonial and made in furtherance of Fry's prosecution, but were made in the context of obtaining treatment and other specialized services available to victims of domestic abuse.

As to Officer Hackathorn and victim's advocate Juersivich's testimony, Fry argues that the state court's finding that he killed Ms. Hardison to prevent her from testifying was unsupported by the record.  (Doc. No. 32 at 88.)  He claims that actually, the record shows that he murdered Ms. Hardison while "trying to reclaim items that Hardison had taken from him . . . ."  (*Id*.) Although Fry does not address his burden under § 2254(d)(2), the state court's factual finding that he murdered Hardison to prevent her from testifying is presumed correct, and for him to prevail on this claim, he must rebut that presumption by clear and convincing evidence.  28 U.S.C. §

2254(e)(1); *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).  As Respondent argues, he has not.

To support its conclusion that Ms. Hardison's murder was "'designed' to prevent her from testifying against him in any future criminal proceedings[,]" the Ohio Supreme Court noted the following facts from the record:

> While in jail and awaiting a court hearing on assault charges, Fry made several phone calls to Hardison and his mother about the case. He began coercing Hardison to drop the charges against him and threatening her if she did not. After Fry received the paperwork that Hardison had signed against him, Fry told her, "You don't know me." He said, "I got two of them under my belt * * * toe tags." He then told Hardison to "fix this, fix this."

*Fry*, 125 Ohio St. 3d at 180.[19]  Fry does not address or refute these findings in any way, much less present clear and convincing evidence that they are incorrect.  Instead, he presents an alternative view of his violent altercation with Ms. Hardison, one that supports his claim that he murdered her because she stole his property.  He recounts his distress upon discovering Ms. Hardison's theft; his subsequent efforts to file a police report about it and obtain assistance in retrieving his things; J.B.'s testimony that Fry asked Ms. Hardison where his clothes were before he attacked her; and other aspects of his "argument" with Ms. Hardison that ended in her death, such as her intoxication on cocaine, her hitting him on the head with an ashtray, and the fact that "[o]nly one of the wounds was fatal."  (*See* Doc. No. 32 at 89-90.)  But again, Fry's presentation of a different version of events does not render the state court's decision objectively unreasonable.  There was significant and credible circumstantial evidence adduced at trial supporting the jury's verdict that Fry murdered Ms. Hardison to prevent her from testifying against him.

---

[19]  The Ohio Supreme Court elaborated on the facts supporting the State's theory that Fry murdered Ms. Hardison to prevent her from testifying against him later in its opinion in the context of another claim.  *See Fry*, 125 Ohio St. 3d 186-87.

Accordingly, the Ohio Supreme Court's decision that the admission of unconfronted testimony of Hackathorn, Veney, and Jeursivich did not violate the Confrontation Clause was one in which fair-minded jurists could disagree, and this claim also fails.

## V.  Eighth Claim for Relief:  *Trial-Court Error / Right to Allocution*

Fry asserts in his eighth claim for relief that the trial court erred when it issued a written sentencing opinion before he was able to make his unsworn statement, violating both his right to allocution and his right under *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 100-12 (1982), to have the sentencer consider all relevant mitigating factors.  (Doc. No. 21 at 107-08.)  Respondent argues this claim is not cognizable on federal habeas review and also lacks merit.  (Doc. No. 24 at 54-56.)

Fry raised this claim on direct review in the Ohio Supreme Court, which addressed its merits.  It ruled in relevant part:

{¶ 186} Fry argues that the trial court violated his right to allocution by filing the sentencing entry before giving Fry the opportunity to speak on his own behalf, as required by Crim.R. 32(A). Fn.4 The trial court's entry imposing the death sentence in this case bears a time stamp of 1:07 p.m. on July 11, 2006, eight minutes before the scheduled 1:15 p.m. sentencing hearing. During that hearing, the victim's mother made a statement to the court. The trial court then addressed Fry personally and asked whether he wished to say anything. In response, Fry made an unsworn statement blaming the victim for her own death and claiming that she had stolen his property. After stating that he had killed her in a fit of rage and should have been convicted only of voluntary manslaughter, he told the court: "You can do whatever you want to do. If y'all want to put a needle in my arm and poison me because I killed that thieving whore, do what you have got to, but I hope she burn in hell. She will not rob from nobody else." He further told the victim's mother that she "should have raised the little bitch not to be a thief."

Fn. 4: {¶ a} Crim.R. 32(A) states:
{¶ b} "At the time of imposing sentence, the court shall do all of the following:
{¶ c} "(1) * * * [A]ddress the defendant personally and ask if he or she wishes to make a statement in his or her behalf * * *."

89

{¶ 187} Following his statement, the trial court informed the parties that it had already "issued an opinion today adopting the jury's recommendation of the sentence of death in this case."

{¶ 188} As we explained in *State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 135, the provisions of Crim.R. 32(A) are mandatory in both capital and noncapital cases, absent invited error or harmless error. In this instance, the trial court afforded defense counsel an opportunity to speak and addressed Fry personally, asking whether he wished to make a statement on his own behalf. The questions here are whether the trial court failed to comply with Crim.R. 32(A) by filing its sentencing entry before Fry spoke and whether, as a result, the court's action prejudiced him. It did not. We have addressed this situation in the past.

*Fry*, 125 Ohio St. 3d at 193.

As Respondent correctly notes, it is well settled that there is no federal constitutional right to allocution.  The Supreme Court has explained:

The failure of a trial court to ask a defendant represented by an attorney whether he has anything to say before sentence is imposed is not of itself an error of the character or magnitude cognizable under a writ of habeas corpus. It is an error which is neither jurisdictional nor constitutional. It is not a fundamental defect which inherently results in a complete miscarriage of justice, nor an omission inconsistent with the rudimentary demands of fair procedure. It does not present "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent."

*Hill v. United States*, 368 U.S. 424, 428 (1962) (quoting *Bowen v. Johnston*, 306 U.S. 19, 27 (1939)); *see also Pasquarille v. United States*, 130 F.3d 1220, 1223 (6th Cir. 1997) ("There is no constitutional right to allocution under the United States Constitution.") (citing *Hill*, 368 U.S. at 428).

Furthermore, there is no Supreme Court precedent clearly establishing that a capital defendant's unsworn statement qualifies as mitigating evidence under *Lockett* and *Eddings* and must be considered by the sentencer before sentencing.  As previously explained, "clearly established Federal Law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Id.* at 412.  The

holdings must be from "cases where the facts are at least closely-related or similar to the case *sub judice*.  Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context."  *House v. Hatch*, 527 F.3d 1010, 1017 (10th Cir. 2008) (citing *Carey v. Musladin*, 549 U.S. 70 (2006)).  "In conducting the 'clearly established' inquiry," therefore, "lower courts must narrowly construe Supreme Court precedents and, as a consequence, 'clearly established' law 'consist[s] only of something akin to on-point holdings.'"  *Pouncy v. Palmer,* 846 F.3d 144, 161 (6th Cir. 2017) (quoting *House*, 527 F.3d at 1015).  Here, the Supreme Court has not "squarely address[ed]" the issue of whether a defendant's unsworn statement constitutes mitigating evidence for purposes of sentencing under *Locking* and *Eddings* and "clearly establish[ed]" that sentencers must hear such statements before sentencing.  *See Wright v. Van Patten*, 552 U.S. 120, 125 (2008).  The Ohio Supreme Court's decision, therefore, did not contravene or misapply clearly established Supreme Court precedent under § 2254(d)(1).

Fry's eighth claim for relief, therefore, is noncognizable on habeas and lacks merit.

## VI.    Ninth Claim for Relief:  *Insufficient Evidence*

Fry alleges in his ninth claim for relief that the State failed to prove beyond a reasonable doubt that he was guilty of the capital specification relating to the murder of a witness and murder with prior calculation and design.  (Doc. No. 21 at 108-14.)  Respondent contends this claim is meritless.  (Doc. No. 24 at 22-24.)  Fry presented this claim on direct appeal to the Ohio Supreme Court, which addressed its merits, and it is therefore preserved for federal habeas review.

The Due Process Clause of the Fourteenth Amendment requires a state to prove every element of a crime beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 315–16 (1979).  When reviewing a claim of insufficient evidence, habeas courts must determine "whether, after

viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original). "[T]he *Jackson* inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original).

Because both *Jackson* and AEDPA apply to Fry's insufficiency claims, federal habeas review requires deference at two levels. "'First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). The Sixth Circuit has explained:

> When reviewing whether the state court's determination was "objectively unreasonable," this court necessarily engages in a two-step analysis. First, we must ask whether the evidence itself was sufficient to convict under *Jackson*. The inquiry ends if the panel determines that there was sufficient evidence to convict [the petitioner]. If we find that the evidence is insufficient to convict, we must then apply AEDPA deference and ask whether the state court was "objectively unreasonable" in concluding that a rational trier of fact could find [the petitioner] guilty beyond a reasonable doubt.

*Stewart v. Wolfenbarger*, 595 F.3d 647, 653 (6th Cir. 2010). The circuit court has observed, "'A defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Davis*, 658 F.3d at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)). Fry has not met this burden.

### A. Witness-Murder Capital Specification

In rejecting Fry's claim regarding the witness-murder specification, the state court decided:

{¶ 145} Fry argues that the state failed to prove guilt on the witness-murder specification in Specification Two of Count One.

{¶ 146} When a court reviews a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 147} Fry argues that there is no evidence that he killed Hardison to prevent her testimony as a witness or in retaliation for filing a complaint against him. Fry claims that the evidence shows only that Hardison filed a complaint against him and that he killed her. However, his argument lacks merit.

{¶ 148} On July 18, Hardison filed charges against Fry for assault and aggravated menacing. Later that day, Fry was arraigned on those charges in Akron Municipal Court. Fry was already on probation and faced the possibility of a jail term.

{¶ 149} While in pretrial custody, Fry called Hardison. During their conversation on July 18, Fry repeatedly told Hardison to go to court and drop the charges. Before ending the call, Fry warned Hardison, "You better quit fucking with me."

{¶ 150} On July 21, Fry told Hardison that he received paperwork that she signed saying that he had assaulted and threatened her. During this conversation, Fry told Hardison, "You don't know me." He said, "I got two of them under my belt * * * toe tags," meaning that he had killed two people. He then told Hardison, "Fix this, fix this." He continued, "Those two signatures you put on there. You fix that. That is all I need you to do."

{¶ 151} Following his release from jail on July 25, Fry looked for Hardison. On July 31, Fry stabbed Hardison to death at her daughter's residence.

{¶ 152} Fry's phone conversations with Hardison and his mother provide strong circumstantial evidence showing that Fry killed Hardison to prevent her from testifying against him. In addition, the evidence supports the theory that Fry killed Hardison in retaliation for her testimony in a criminal proceeding, i.e., the bringing of the complaint for assault and aggravated menacing.

{¶ 153} Fry argues that the evidence shows that his purpose in finding Hardison on July 31 was to confront her over stealing his property and taking it to a consignment shop. However, the state was not required to prove that Fry's sole reason for killing Hardison was her filing the complaint against him. See *State v. Filiaggi*, 86 Ohio St.3d at 248, 714 N.E.2d 867. Accordingly, the state presented sufficient evidence to prove the R.C. 2929.04(A)(8) specification.

*Fry*, 125 Ohio St. 3d at 186-87.

Fry argues that the Ohio Supreme Court's decision was based on an unreasonable determination of facts under § 2254(d)(2), because "[t]he abundance of evidence demonstrating [his] intention to procure his property from Hardison is overwhelming compared to the scant evidence of his intention to prevent her from testifying." (Doc. No. 32 at 96.)  This abundant evidence, according to Fry, consists of his recorded statement to Detective Shaeffer about Ms. Hardison's alleged theft of his property and the police report he filed about it, neither of which mentions the criminal case against him.  (*Id*. at 95-96.)  Fry contends the State "[s]imply show[ed] that Fry killed Hardison and that Hardison had sworn out a complaint against him."  (*Id*. at 96.)

But Fry ignores the actual factual basis of the state court's decision.  The court found "strong circumstantial" evidence that Fry murdered Ms. Hardison to prevent her from testifying in the criminal case against him in the numerous phone calls he made from jail, in which he threatened Ms. Hardison that he would murder her unless she dropped the case and asked his mother to try to convince her to drop it.  As the court noted, a rational trier of fact could find this evidence sufficient to prove the murder was related to his pending criminal case – even if Fry *also* may have been moved to kill her by anger over the allegedly stolen belongings.  *Fry*, 125 Ohio St. 3d at 186-87. This claim lacks merit.

### B.  Prior Calculation and Design

As to Fry's assertion of insufficient evidence of prior calculation and design, the state court opined:

> {¶ 154} Fry also argues that the state failed to prove that he murdered Hardison with prior calculation and design as charged in Count Two. No "bright-line test" exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82. However, where the evidence presented at trial "reveals the presence of sufficient

time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph three of the syllabus.

{¶ 155} Fry argues that no evidence was presented that he had made prior threats to kill Hardison or preplanned her killing. However, Fry's phone conversations with Hardison and his mother provide proof that he killed Hardison with prior calculation and design. During Fry's conversations with Hardison, he told her repeatedly to drop the charges so he could be released from jail. After being released from jail, Fry began looking for Hardison. On the day of the murder, Fry went to Knox's house, where Hardison was watching her grandchildren. Fry murdered Hardison shortly after entering the residence. Fry then fled the scene and traveled to West Virginia to elude capture.

{¶ 156} Following his capture, Fry had several phone calls with his mother about killing Hardison. During one conversation, Fry said, "Everything happens for a reason. There's a reason why she not breathing and I am. * * * But I guarantee you this, she ain't gonna take nobody else." During a later conversation, Fry said, "[T]hat bitch got what she deserved. It's just that simple. God knew what he was doin." He continued, "I was Michael. What that angel name? * * * The one that [God] sent down to do his dirt, to do his business, the one he sent down to do the punishment."

{¶ 157} Construing the evidence in a light most favorable to the prosecution, any rational juror could have concluded beyond a reasonable doubt that Fry had formulated a plan to kill Hardison. The evidence shows that there was sufficient time, reflection, and activity involved in Hardison's murder to satisfy the elements of proof that he killed her with prior calculation and design.

*Fry*, 125 Ohio St. 3d at 187-88.

Fry contends the state court's decision was unreasonable because, as he argued to that court, the State presented "little evidence to support a thought[-]out, planned homicide." (Doc. No. 32 at 96.) He argues that his statements captured in phone calls after the murder referenced by the state court "merely demonstrate his resignation after the homicide occurred." (*Id*. at 97.) And Fry points to other evidence in the record that he claims belies any murderous intent, including that: he confronted Ms. Hardison only about the allegedly stolen property; Ms. Hardison admitted

him into her apartment; he did not immediately assault her when he arrived; he requested someone call 911 after stabbing her; and only one of her wounds was fatal. (*Id*. at 96.)

Fry's arguments are weak. A fair-minded jurist could find that any rational juror could have viewed the evidence of Fry's own statements to Ms. Hardison and his mother during numerous phone conversations from jail, as well as Fry's actions the day of the murder, as sufficient evidence to satisfy the element of prior calculation and design. This claim, too, is without merit.

Fry, therefore, is not entitled to relief on his ninth claim.

## VII.  Tenth Claim for Relief:  *Right to Testify*

In his tenth claim for relief, Fry asserts that the trial court violated his constitutional right to testify by accepting his waiver of that right. (Doc. No. 21 at 114-17.) Respondent argues the claim is unfounded. (Doc. No. 24 at 24-25.) Fry presented this claim to the Ohio Supreme Court on direct appeal, and it was adjudicated on the merits. The claim, therefore, is ripe for habeas review.

The Ohio Supreme Court, in addressing the claim, stated:

{¶ 119} Fry argues that the trial court violated his constitutional rights by failing to question him to ensure that he made a knowing, intelligent, and voluntary waiver of his right to testify. However, "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis sic.) *State v. Bey* (1999), 85 Ohio St.3d 487, 497, 709 N.E.2d 484.

{¶ 120} Nothing in the record suggests that Fry wished to testify but was denied the opportunity to do so. Indeed, the record shows that counsel talked with Fry at length about testifying in his own behalf, and Fry decided against it. Before the start of the defense's case, trial counsel informed the court that Fry "categorically and emphatically" would not testify. Trial counsel stated, "We have talked to Clarence over the last couple of weeks. I have spent five or six hours * * * talking to the defendant about his testimony. * * * [H]e has not wavered in his opinion that he would not testify today." The trial court then stated, "All right. If there was any vacillation, the Court would ask him on the record. But you are indicating to the Court that he has decided of his own volition not to testify?" Trial counsel responded, "That's correct."

*Fry*, 125 Ohio St. 3d at 182-83.

Fry asserts that the Ohio Supreme Court's decision was based on unreasonable determination of facts in light of the evidence presented under § 2254(d)(2) and the state court contravened or misapplied Supreme Court precedent under § 2254(d)(1).  (Doc. No. 32 at 101.) The Court disagrees.

"[A] defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."  *Rock v. Arkansas*, 483 U.S. 44, 49 (1987).  This right is grounded in several provisions of the Constitution, including the Due Process Clauses of the Fifth and Fourteenth Amendments, the Compulsory Process Clause of the Sixth Amendment, and the Fifth Amendment's guarantee against compelled testimony.  *Id*. at 51-52.

The right to testify is personal to the defendant and may be relinquished only by the defendant's knowing and intentional waiver of that right.  *United States v. Webber*, 208 F.3d 545, 550-51 (6th Cir. 2000) (citing *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993)).  Defense counsel's role is to advise their client about testifying, but it is ultimately the defendant's choice. *Id.* at 551 (citation omitted).  Where a tactical decision is made that the defendant will not testify, the defendant's assent is presumed.  *Id.* (citing *Joelson*, 7 F.3d at 177).  This is because the defendant's attorney is presumed to follow the professional rules of conduct and is "'strongly presumed to have rendered adequate assistance'" in carrying out the general duty "'to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."  *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 688–90 (1984)).

Thus, if a defendant wishes to testify or disagrees with counsel regarding whether he should, he "must alert the trial court."  *Id.* (internal quotation marks and citation omitted).  "Waiver

is presumed from the defendant's failure to testify or notify the trial court of the desire to do so." *Id.* (citing *Joelson*, 7 F.3d at 177).  And without any such notice from the defendant, "the trial court is neither required to sua sponte address a silent defendant and inquire whether the defendant knowingly and intentionally waived the right to testify, nor ensure that the defendant has waived the right on the record." *Id.* (citing *Joelson*, 7 F.3d at 177; *United States v. Ortiz*, 82 F.3d 1066, 1069 n.8 (D.C. Cir. 1996) (noting agreement of the First, Third, Fifth, Seventh, Ninth, Tenth, and Eleventh Circuits that the trial court does not have a duty to *sua sponte* conduct an on-the-record colloquy regarding waiver)).

Fry first argues that the Ohio Supreme Court unreasonably found "[n]othing in the record [to] suggest[] that Fry wished to testify but was denied the opportunity to do so." (*Id.* at 101 (quoting *Fry*, 125 Ohio St. 3d at 183).)  As support, Fry points to defense counsel's statement to the trial court that Fry was "playing a little game" in his discussion with counsel about him testifying.  (*Id.* at 101-02 (citing Doc. No. 14-2 (Trial Tr.) at 217).)  And he notes that Fry's lead counsel admitted at the state post-conviction evidentiary hearing that Fry did in fact vacillate at times on this decision.  (*Id.* (citing Doc. No. 14-2 (State Post-Conviction Hrg. Tr.) at 704).)

But the dispositive issue for this claim is what the trial court understood regarding Fry's position on whether or not he wished to testify.  Fry's counsel were clear in representing to the court that, at that point in time, Fry "categorically," "emphatically," and "unequivocally" did not want to testify.  (Doc. No. 14-2 (Trial Tr.) at 217-18.)  In context, therefore, counsel's vague reference to Fry playing a "little game" did not detract from their certainty.  Counsel explained to the judge, "[Fry] has really not wavered.  He's playing a little game, I think in my mind about it, but he has not wavered in his opinion that he would not testify today."  (*Id.*)

Most significantly, Fry never notified the trial court that he wanted to testify or that he disagreed with counsel about that issue.  The state appellate court, in summarizing the evidence adduced at the post-conviction hearing on Fry's ineffective-assistance claim related to his right to testify, observed:

> As the trial court judge presiding over the evidentiary hearings was in the unique position of having also presided over the trial in this matter, she recalled in her order several instances of Mr. Fry being strong-willed and outspoken during the trial, which she noted belied his claim that he suddenly "choked" at trial or was somehow incapable of informing the court of his desire to testify: e.g., chuckling during the victim's six-year-old grandson's testimony about witnessing Mr. Fry enter the home with a knife and stab his grandmother; eating candy during the proceedings; admitting to making a threatening gesture to someone in the back of the courtroom; and being so vocally disruptive during sentencing that he had to be physically removed from the courtroom by the Sheriff's deputies. . . . The court found that the outspoken and strong-willed Mr. Fry said nothing when the defense rested at trial and, thus, a waiver of his right to testify was presumed.

*Fry*, 2019 WL 1318562, at \*2.  The court concluded:

> If Mr. Fry changed his mind and once again wished to testify, regardless of the decision he conveyed to counsel, it was incumbent upon him, at the very minimum, to alert the trial court of either his desire to testify or of any disagreement with counsel regarding his right to testify. See *Webber* at 551. By his own admission, and as observed by several witnesses, Mr. Fry failed to do so at any point during the proceedings. Mr. Fry testified that he was present in the courtroom and heard Mr. Whitney rest for the defense, yet he said nothing to the court, choosing instead to simply make a gesture to his brother in back of the courtroom. Multiple witnesses, as well as Mr. Fry himself, testified that he undoubtedly possessed the ability and wherewithal to freely speak his mind. Mr. Fry also conceded that he "should have known" and "probably should have" said something to the trial judge. His conscious decision to remain silent instead of overtly asserting his right to testify does not comport with his present claim that he was denied the right to testify. Mr. Fry's decision to sit by idly in silence is further consistent with the evidence presented that he became increasingly irritated and disinterested in the trial proceedings as they progressed toward the end. A waiver of Mr. Fry's right to testify could therefore be inferred from his conduct and presumed from his failure to alert or inform the trial court of his desire to testify. See *Webber* at 551.

*Id.* at \*6-7.  The Ohio Supreme Court reasonably determined, therefore, that, based on Fry's silence, the trial court properly presumed Fry waived his right to testify, with no obligation to inquire further of him on the record.

Fry also argues that the state court contravened or misapplied Supreme Court precedent under § 2254(d)(1) in concluding that the trial court was not obligated to inquire further into his views about testifying at trial.  Respondent contends this argument fails because there is no controlling Supreme Court precedent to apply here.  The Court agrees.

Fry points to the Supreme Court's holdings establishing a defendant's general right to testify, citing *Rock v. Arkansas, supra*, and the Court's broad holding articulated in *Johnson v. Zerbst*, 304 U.S. 458, 484 (1938), a case concerning a defendant's right to counsel, that "courts indulge in every reasonable presumption against waiver of fundamental constitutional rights" (internal quotation marks and citations omitted).  These cases do not, however, address "the specific question presented by this case" and are "far too abstract to establish clearly the specific rule" governing Fry's right-to-testify claim.  *Lopez v. Smith,* – U.S. –, l35 S. Ct. 1, 4 (2014).  In determining what is "clearly established" Supreme Court precedent, courts may not "'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule'" not announced by the Supreme Court.  *Id.* (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)); *see also House*, 527 F.3d at 1016 n.5 (habeas courts may not "extract clearly established law from the general legal principles developed in factually distinct contexts").  Fry, therefore, is not entitled to relief under § 2254(d)(1) for this claim either.

**VIII.  Eleventh Claim for Relief:  *Waiver of Mitigation Evidence***

Fry argues for his eleventh claim for relief that the trial court erred when it permitted him to waive the presentation of mitigation evidence at the sentencing phase of his trial.  (Doc. No. 21

at 117-22.)  Respondent argues this claim lacks merit.  (Doc. No. 24 at 34-35.)  Fry raised this claim on direct appeal to the Ohio Supreme Court, which denied it on the merits, and it is therefore preserved for federal habeas review.

In addressing this claim, the Ohio Supreme Court stated:

{¶ 168} Fry argues that the waiver of his opportunity to present mitigating evidence was invalid because the trial court failed to fully advise him of the ramifications of the waiver.

{¶ 169} In *State v. Ashworth*, 85 Ohio St.3d at 62, 706 N.E.2d 1231, this court held that "when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary. The trial court must decide whether the defendant is competent and whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings." (Emphasis sic.)

{¶ 170} The trial court conducted a comprehensive *Ashworth* inquiry. The trial court determined that Fry was competent after reviewing the report of Dr. James Siddall, a forensic psychologist, conferring with counsel, and questioning Fry about his educational background and the absence of mental-health problems. The trial court advised Fry of his right to present mitigating evidence and explained what mitigating evidence is. Trial counsel also informed the court that the defense had hired a mitigation specialist and a forensic psychologist, had interviewed Fry's family members, and were prepared to present a mitigation case.

{¶ 171} Fry acknowledged that he understood the importance of mitigating evidence in offsetting the aggravating circumstances and the effect of failing to present mitigating evidence. He stated that he still wished to waive the presentation of mitigating evidence. Afterwards, the trial court made detailed findings that Fry's decision to waive the presentation of mitigating evidence was "knowingly, intelligently, and voluntarily made."

{¶ 172} Fry argues that the trial court improperly accepted his waiver of mitigation because it failed to inquire into the breakdown of the attorney-client relationship. As discussed above, there was no evidence of a breakdown in Fry's relationship with his counsel necessitating further inquiry.

{¶ 173} Next, Fry claims that the trial court should not have accepted his waiver of mitigation without explaining all the legal ramifications of the guilty verdict. During the *Ashworth* inquiry, Fry voiced his disrespect for the jury's intelligence: "There's no way I can have my family come up here and say nothing to these people. We call them 'the dummy dozen.' They say I killed Tammy *because of a misdemeanor*. They found 12 people to believe that?" (Emphasis added.) Fry continued to express his

101

displeasure, "[T]hey say I killed Tamela because she was a *witness in a misdemeanor trial.*" He added, "[T]his thing got nothing to do with no testimony [i.e., Tamela's domestic-violence charges against him], wasn't nothing else but somebody robbing another person." (Emphasis added.)

{¶ 174} Fry contends that the trial court should have advised him that the jury convicted him of entering the Knox residence to commit a felony, rather than a misdemeanor. Apparently such a statement would have affected his decision to waive the presentation of mitigation evidence. However, *Ashworth* does not require the trial court to provide Fry with clarification of all the legal consequences of the guilt-phase verdict. Under *Ashworth,* "the record must affirmatively demonstrate that (1) the court has informed the defendant of the right to present mitigating evidence, (2) the court has explained what mitigating evidence is, (3) the defendant understands the importance of mitigating evidence, (4) the defendant understands the use of mitigating evidence to offset the aggravating circumstances, (5) the defendant understands the effect of failing to present mitigating evidence, and (6) the defendant wishes to waive mitigation." *State v. Cowans* (1999), 87 Ohio St.3d 68, 85, 717 N.E.2d 298, citing *Ashworth,* 85 Ohio St.3d at 62, 706 N.E.2d 1231. Furthermore, Fry fails to explain how the trial court's failure to provide such advice nullified the voluntariness of his waiver.

{¶ 175} Fry also argues that the trial court should have advised him that he could still have been sentenced to death for the felony-murder specification, R.C. 2929.04(A)(7), even if the jury had acquitted him of the witness-murder specification, R.C. 2929.04(A)(8). But Fry was found guilty of the witness-murder specification. The trial court had no duty to advise Fry of a nonexistent possibility before allowing him to waive mitigation.

{¶ 176} Fry also asserts that his waiver was not valid because the trial court failed to advise him that the waiver would result in the death penalty. During the *Ashworth* inquiry, the trial court asked Fry, "Do you understand that the effect of failing to present mitigation evidence undoubtedly makes it more likely, or could make it more likely, that this jury will return a verdict of death instead of life imprisonment?" Fry replied that he did. Later, Fry told the court "[I]f I don't put on any evidence in this mitigation thing, these little 12 people, they'll probably give me the death penalty and they'll probably send me to death row * * *." Thus, the record shows that Fry was fully aware that the waiver of mitigation would probably result in the death penalty.

{¶ 177} Finally, Fry argues that the trial court erred by failing to advise him of the low reversal rate on capital appeals before accepting his waiver of mitigation. *Ashworth* does not require the trial court to advise Fry on his chances for obtaining appellate relief. Moreover, during the *Ashworth* inquiry, counsel informed the trial court that they had discussed appellate procedure with Fry. While it is unclear what exactly counsel told Fry, the record shows that Fry was apprised of appellate procedure before the *Ashworth* inquiry. For example, Fry knew that his appeal would

be to this court. During the *Ashworth* inquiry, Fry stated, "We get to pass the 9th District; we get to go straight to Columbus * * *." Fry did not ask the trial court any questions about appellate procedure.

*Fry*, 125 Ohio St. 3d at 189-91.

Fry argues that this decision contravenes AEDPA's §§ 2254(d)(1) and (d)(2).  (Doc. No. 21 at 122.)[20]  He first argues that his waiver of mitigation evidence was unconstitutional.  (Doc. No. 21 at 118-19.)  He cites as support a line of Supreme Court cases establishing a capital defendant's right to present individualized mitigation evidence at sentencing, including *Payne v. Tennessee*, 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death.") (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)); *Lockett v. Ohio*, 438 U.S. 586, 606 (1978) (holding that Ohio's death penalty statute failed to "permit the type of individualized consideration of mitigating factors we now hold to be required by the Eighth and Fourteenth Amendments in capital cases"); and *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (stating that the Constitution "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death").  (Doc. No. 21 at 118.)[21]

---

[20] Fry also asserts that the state court's decision is not due AEDPA deference, and the Court should review this claim *de novo*, because the state court failed to address Fry's federal constitutional arguments.  (Doc. No. 32 at 103.)  As noted above, however, when a state-court decision rules against a defendant and addresses some issues, but not expressly the federal claim in question, habeas courts presume the state court adjudicated the claim on the merits.  *Johnson v. Williams*, 568 U.S. 289, 292-93 (2013).

[21] Fry also cites Ohio Rev. Code § 2929.03, which he claims codifies the right of capital defendants to present mitigation evidence.  (Doc. No. 21 at 118.)  Federal habeas courts, however, do not consider matters of state law in determining relief.  *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

However, as Respondent argues, and Fry appears to recognize, the Supreme Court has not clearly established that the Constitution prohibits a capital defendant from waiving the right to present mitigation evidence.  Moreover, it is true that the Court generally has held that due process requires that trial courts ensure a defendant's waiver of a constitutional right is knowing, voluntary, and intelligent.  *See, e.g., Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) ("A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.")  But the Court has not clearly established any particular procedures for a trial court to follow with regard to a waiver of mitigation evidence.  And, as previously explained, where there is no Supreme Court precedent on point, there can be no contravention or misapplication of federal law in violation of § 2254(d)(1).

Fry next contends that even if the waiver were constitutional, the trial court erred by failing to appoint new counsel when he claims it became apparent that there was a communication breakdown in Fry's relationship with his counsel.  (Doc. No. 21 at 120.)  As explained above, however, in relation to Fry's related claim of ineffective assistance of trial counsel, the Ohio Supreme Court reasonably found "no evidence of a breakdown in Fry's relationship with his counsel necessitating further inquiry."  *Fry*, 125 Ohio St. 3d at 190.[22]

Finally, Fry claims that his waiver of mitigation evidence was not "knowing, intelligent and voluntary."  (Doc. No. 21 at 120-22.)  As he argued in state court, Fry contends the trial court should have informed Fry of the legal consequences of the jury's verdicts on the felony-murder and witness-murder capital specifications and of the low reversal rate of capital appeals. (*Id.* at

---

[22] *See supra* Section I.B.7.a.

121-22.)  But, again, Fry does not identify any Supreme Court precedent establishing that a trial court must advise capital defendants on any particular issues in this context, much less on these two specific topics.

Fry also asserts that he "misunderstood" his right to appeal.  (*Id*. at 121.)  But the record does not support that contention.  Fry cites a portion of the trial court's inquiry into his mitigation waiver in which the judge explains to Fry that if he waives mitigation, he will forfeit his ability to assert on appeal that his counsel performed ineffectively in failing to present mitigation evidence in the sentencing phase of trial.  (*Id*. at 121 (citing Doc. No. 14-2 (Trial Tr.) at 438-40).)  In context, however, once the judge and his counsel explained to him that he would lose only the ability to claim ineffective assistance at that hearing and in counsel's failure to present mitigation evidence, and not all ineffective-assistance claims, Fry said he understood the issue and accepted it.  (*See* Doc. No. 14-2 (Trial Tr.) at 439.)  Moreover, as the state court pointed out, Fry's counsel told the judge at the hearing that "Fry was most interested in" appellate procedure, which they had discussed with him (*id*. at 451-52); Fry told the judge that "one of the main bases [of his appeal] is the ineffective assistance of counsel" (*id*. at 438); and Fry indicated he understood that his initial appeal would be filed directly in the Ohio Supreme Court (*id*. at 454 ("We get to pass the 9th District [Court of Appeals]; we get to go straight to Columbus")).  Indeed, Fry said nothing during the hearing to suggest that he misunderstood, or wanted further information about, the appellate process.

Accordingly, Fry has not demonstrated that the Ohio Supreme Court's decision rejecting this claim contravened or misapplied Supreme Court precedent or was based on an unreasonable determination of fact, and this claim is denied.

## IX.     Twelfth Claim for Relief:  *Counsel of Choice*

For his twelfth claim for relief, Fry asserts that the trial court violated his Sixth Amendment right to counsel of his choice by refusing his request to appoint an African-American attorney to represent him.  (Doc. No. 21 at 122-24.)  Respondent argues this claim lacks merit.  (Doc. No. 24 at 25-27.)  Fry presented the claim on direct appeal to the Ohio Supreme Court, which adjudicated it on the merits.  It is therefore preserved for habeas review.

The Ohio Supreme Court opined:

{¶ 56} Fry argues that he was deprived of the constitutional right to the counsel of his choice because an African–American attorney was not appointed to represent him after he requested such counsel.

{¶ 57} At his arraignment, the magistrate judge appointed Lawrence Whitney to represent Fry. Whitney stated that he was qualified to sit first chair in a capital case. The judge and Fry then had the following exchange:

{¶ 58} "THE COURT: Any questions, Mr. Fry?

{¶ 59} "THE DEFENDANT: Yeah. You don't have any black lawyers?

{¶ 60} "THE COURT: Well, you can take that up with Judge Spicer.

{¶ 61} "THE DEFENDANT: All right."

{¶ 62} Thereafter, Fry did not request that an African–American lawyer represent him during his trial.

{¶ 63} Fry's general inquiry about the availability of African–American attorneys did not constitute a request that an African–American attorney represent him. His failure to request that the trial court appoint an African–American attorney to represent him waived this issue. See *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus. The issue also lacks merit.

{¶ 64} In general, an indigent defendant does not have a constitutional right to choose the attorney who will represent him or her at state expense. See *State v.* Murphy (2001), 91 Ohio St.3d 516, 523, 747 N.E.2d 765; *Thurston v. Maxwell* (1965), 3 Ohio St.2d 92, 93, 32 O.O.2d 63, 209 N.E.2d 204; *Wilson v. Parker* (C.A.6, 2008), 515 F.3d 682, 696. "[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. United States* (1989), 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528.

106

*Fry*, 125 Ohio St. 3d at 172-73.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. CONST. amend. VI.  And in *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006), the Supreme Court recognized that "an element of this right is the right of a defendant *who does not require appointed counsel* to choose who will represent him." *Id*. at 144 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988)) (emphasis added).

Despite the Court's limitation of the right to counsel of choice to defendants who pay for their lawyers, clearly articulated in *Gonzalez-Lopez*, Fry contends the Ohio Supreme Court misapplied clearly established Supreme Court precedent by denying his right to choose African-American counsel – even though he was indigent when indicted and required appointed counsel. Fry asserts, "While the *Gonzalez-Lopez* decision does not contemplate indigent defense, the request for African American counsel must be considered." (Doc. No. 21 at 123.)  He cites as authority for this proposition the Supreme Court decision in *Wiggins v. Smith*, 539 U.S. 524 (2003), and an American Bar Association guideline, which he claims affirm that "cultural competency" is "essential" to an effective attorney-client relationship. (Doc. No. 32 at 108.)  This argument fails.

The Court in *Gonzalez-Lopez* explicitly recognized that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat*, 486 U.S. at 159).  And it has never deviated from this precedent by clearly establishing an indigent defendant's right to choose African-American counsel.  As the Ohio Supreme Court aptly observed, the Supreme Court has made clear that "those who do not have the means to hire their own lawyers have no cognizable complaint [regarding choice of counsel under the Sixth Amendment] so long as they are adequately represented by attorneys

107

appointed by the court." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Fry's appointed trial counsel were well qualified and provided effective representation, and Fry had no constitutional right to choose different attorneys, no matter their race.

Accordingly, the Ohio Supreme Court did not contravene or misapply Supreme Court precedent in denying this claim, and Fry's twelfth claim for relief is without merit.

## X.     Thirteenth Claim for Relief:  *Jury Selection*

Fry argues in his thirteenth claim for relief that the trial court violated his Sixth Amendment right to a jury that represents a fair cross-section of his community (Summit County, Ohio) and his Fourteenth Amendment rights to due process and equal protection when it "failed to ensure the inclusion of African American jurors" on the jury panel. (Doc. No 21 at 125-26.)  Respondent asserts these claims are procedurally defaulted and meritless.  (Doc. No. 24 at 21-22; Doc. No. 37 at 4.)

### A.  Procedural Posture

Respondent argues that this claim is procedurally defaulted because the last state court to consider the claim, the state appellate court on post-conviction review, found it barred by *res judicata.*  (Doc. No. 24 at 21.)  The state court reasoned that because the trial court conducted a full hearing on the jury-selection matter at issue, the claim was based on the trial-court record and could have been raised on direct appeal but was not.  *Fry*, 2012 WL 2128027, at *2.

Fry counters that the claim is not procedurally barred because the state post-conviction court misapplied the *res judicata* rule.  (Doc. No. 32 at 110.)  *See Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (holding that "an incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground").  He argues that he presented

evidence outside the record to support the claim, which defeats the *res judicata* bar.  (Doc. No. 32 at 110.)

Fry is correct that in Ohio, a post-conviction petitioner can overcome the *res judicata* bar by presenting evidence *dehors*, or outside, the record to support the claim.  *E.g., State v. Smith*, 17 Ohio St. 3d 98, 101 n.1 (Ohio 1985).  But the extra-record evidence submitted must meet a "threshold standard of cogency."  *Wogenstahl*, 668 F.3d at 342.  It must be "new, competent, relevant and material evidence" that was not "in existence and available for use at the time of trial." *State v. Cowan,* 151 Ohio App. 3d 228, 233 (Ohio Ct. App. 2002) (internal quotation marks and citations omitted).  The evidence Fry submitted with his state post-conviction petition in support of this claim was available to him at the time of his trial and for the most part does not even relate specifically to Summit County's jury-selection procedures.  (*See* Doc. No. 13-2 (state post-conviction record) at 103 (page of affidavit of Fry attorney attesting to Fry's concerns about racial makeup of jury), 163-79 (affidavit of professor of African and African-American culture and attached report of his "cultural identity evaluation" of Fry), 208-76 (jury questionnaires), 277-365 (1999 Report of the Ohio Commission on Racial Fairness), 366-417 (1998 article entitled "The Death Penalty in Black and White: Who Lives, Who Dies, Who Decides"), 418-36 (2001 law review article regarding jury selection and other issues), 437-62 (chapter of 1994 book regarding juries and the death penalty).)  The state appellate court, therefore, did not incorrectly apply the *res judicata* rule to preclude review of this claim, and it is procedurally defaulted.  Moreover, Fry does not assert cause and prejudice or actual innocence to excuse the default.  (*See* Doc. No. 32 at 40-42.)

### B.  Merits Analysis

Even if Fry had properly presented this claim to state courts, it would fail.  As no court has adjudicated the merits of this claim, the Court reviews it *de novo*.  28 U.S.C. § 2254(d); *see also Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011).

The Sixth Amendment guarantees criminal defendants a jury selected from a fair cross-section of the community.  *Duren v. Missouri,* 439 U.S. 357 (1979).  The *Duren* Court set forth three criteria necessary to establish a *prima facie* violation of the fair-cross-section requirement: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  *Id.* at 364.  Even if a defendant has established a *prima facie* fair-cross-section violation, the government may overcome the right to a proper jury by proffering a significant state interest that manifestly and primarily advances "those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group."  *Id.* at 367-68.

The selection of juries also must comply with the Equal Protection Clause of the Fourteenth Amendment.  *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994).  The Supreme Court has long recognized that racial exclusions and substantial underrepresentation in juries deny defendants equal protection under the law.  *Castaneda v. Partida*, 430 U.S. 482, 492-93 (1977).  Traditionally, to show that an equal protection violation has occurred in this context, the defendant must satisfy the three-part test established in the Supreme Court decision *Castaneda v. Partida*.  *United States v. Ovalle,* 136 F.3d 1092, 1104 (6th Cir. 1998).  The defendant must demonstrate: (1) "'the group excluded from the grand jury is one that is a recognizable, distinct class capable of being singled out for different treatment under the laws'"; (2) the selection procedure was "'susceptible to abuse

or is not racially neutral'"; and (3) "'the degree of underrepresentation occurring over a significant period of time by comparing the proportion of the excluded group in the total population to the proportion serving as grand jurors.'"  *Id*. (quoting *Jefferson v. Morgan,* 962 F.2d 1185, 1188-89 (6th Cir. 1992)).  Once a defendant has established a *prima facie* case, the burden shifts to the state to rebut the inference of intentional discrimination.  *Id*. (quoting *Jefferson*, 962 F.2d at 1189).

In Fry's case, defense counsel notified the court during *voir dire* that Fry had "raised a concern" about the lack of African Americans on the venire panel.  (Doc. No. 14-1 (Trial Tr.) at 786.)  Of the 61 potential jurors qualified, four were African Americans; and of those, two were excused for cause.  (*Id*. at 954, 956-57.)  The judge explained to the defense that, as in all cases in Summit County, potential jurors were selected from voter registrations lists, which Ohio courts have determined is appropriate.  (*Id*. at 789.)  African Americans, she continued, comprise between fourteen and sixteen percent of the county's population, which was fairly close to the share of African Americans on the venire panel (she later noted the actual figure was 13.18 percent (*id.* at 969)).  (*Id*. at 789.)   The judge stated that she had "seen nothing" in the jury-selection process in his case that was at all "different or discriminating" toward Fry.  (*Id*. at 789-90.)

Nevertheless, Fry requested that, to protect his constitutional due process rights, the judge move ahead the two remaining African-American venirepersons in the order of questioning to increase their chances of being impaneled on the jury.  (*Id*. at 955-56.)  The State opposed the motion, and the trial court conducted a hearing on the matter the following day.  (*Id.*)  The court asked the jury commissioner to testify on the record, under oath, about how juries are selected in Summit County.  The official confirmed that the county chooses potential jurors from the list of registered voters.  (*Id.* at 959.)  She also provided a detailed account of the process by which:  the commission summons potential jurors and qualifies them to serve; the commissioner selects jurors

to appear at one of the county's courts; and jurors are randomly selected by computer to appear at a particular courtroom.  (*Id*. at 959-64.)  Defense counsel cross-examined her on the process.  (*Id*. at 962-64.)

The court denied Fry's request, declining to "tinker with the array" by altering the position of the two remaining African-American venirepersons for *voir dire* questioning.  (*Id*. at 968.)  She grounded her decision on Ohio and federal constitutional law, which affirmed the use of voting lists for jury selection and did not require that juries contain representatives of all economic, social, religious, racial, political, or geographical groups of a community.  (*Id*. at 964-68.)

Defense counsel then argued that the two African-American venirepersons in the final venire (of 45 potential jurors) did not comprise a representative sampling of the county's African-American community, which made up thirteen percent.  (*Id*. at 970.)  When the judge corrected him that there were actually four African Americans in the venire of all qualified jurors (of which there were 61), Fry's attorney appeared to concede that the court had accurately determined that the proportion of African Americans in the jury pool was close to the percentage of the group in the county as a whole.  (*Id*.)

Fry's claim that the trial court's ruling violated the constitution fails, whether asserted under the Sixth or Fourteenth Amendment.  Fry does not allege any constitutional defect in his jury's selection process.  He does not argue that there was a systematic exclusion of African Americans from the procedures; or a feature of the scheme that made it susceptible to abuse or not racially neutral; or that African Americans were underrepresented on juries for a significant period of time in comparison to the group's percentage of the total county population.  Fry complains only about the judge's refusal to "ensure the inclusion of African American jurors" on his jury by

moving African-American venirepersons ahead in the order of questioning.  (Doc. No. 21 at 125-26.)

As Respondent points out, Fry cites no law imposing an obligation on a trial court to effectuate the representation of any particular group on a jury.  And for good reason.  The Supreme Court has held the exact opposite.  In *Taylor v. Louisiana*, 419 U.S. 522 (1975), the Court stated, "It should also be emphasized that in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population."  *Id*. at 538. Criminal defendants, it declared, "are not entitled to a jury of any particular composition" as long as "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."  *Id*.; *see also Ballard v. United States*, 329 U.S. 187, 192 (1946) (noting that the fair-cross-section requirement "does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible").

Accordingly, Fry's jury-selection claim also is denied as procedurally defaulted and without merit.

**XI.     Fourteenth Claim for Relief:  *Biased Juror***

For his fourteenth claim for relief, Fry asserts that the trial court erred by failing to excuse a juror for bias before the sentencing phase of his trial began.  (Doc. No. 21 at 126-28.)  Respondent contends this claim is procedurally defaulted and does not address its merits.  (Doc. No. 24 at 59-61; Doc. No. 37 at 26-27.)

**A.  Procedural Posture**

113

Respondent argues that this claim is procedurally defaulted because Fry never properly raised the claim in state court.  (Doc. No. 24 at 59-60.)  This claim could have been raised on direct appeal because it was based on the trial record, as the trial court conducted a thorough inquiry on the record regarding the juror's alleged bias.  (*See* Doc. No. 14-2 (Trial Tr.) at 465-86.)  But Fry did not.  Instead, he presented this claim to the state trial court on post-conviction review pursuant to a motion for leave to file a second amendment to his petition.  (Doc. No. 13-2 at 1272-77.)  As the state appellate court noted, however, the trial court never granted that motion and did not consider the claim, and neither, therefore, did it.  *See Fry*, 2012 WL 2128027, at *2 n.1.  Moreover, under Ohio law, *res judicata* now prohibits Fry from raising the claim in any post-conviction proceeding.  *See Wong v. Money,* 142 F.3d 313, 322 (6th Cir. 1998) ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of res judicata.")  And with no state-court remedies still available to him, Fry has defaulted this claim.  *See, e.g., Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) ("[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review.").  Moreover, again, Fry offers no argument regarding the cause for, or prejudice resulting from, the default, or that he is actually innocent such that the default should be excused.

Fry attacks this default with several arguments, each misplaced.  He asserts that the state appellate court's finding that the claim was not properly presented to the trial court because he was never granted permission to amend his petition under Ohio state procedural rules was unreasonable and violated AEDPA's § 2254(d).  (Doc. No. 32 at 116.)  But that provision applies only to state-court decisions adjudicated on the merits, not procedural rulings.  *See* 28 U.S.C. § 2254(d).  Fry also argues that he complied with the state procedural rule governing his motion for leave to

amend, and that "any default should be excused because the state rule applied was not adequate and independent."  (Doc. No. 32 at 118.)  However, not only does he fail to provide argumentation to support this contention, but he fails to specify which rule he is challenging, and the argument fails.  This claim is procedurally defaulted.

### B.  Merits

Even if this claim were properly preserved for habeas review, it lacks merit.  Because the claim was not adjudicated on the merits in state court, this Court will review it *de novo*.

The Sixth Amendment protects a criminal defendant's right to a "trial, by an impartial jury."  U.S. CONST. amend. VI.  An impartial jury is one in which every juror is "capable and willing to decide the case solely on the evidence before [him or her]."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  The Constitution, however, "does not require a new trial every time a juror has been placed in a potentially compromising situation."  *Id.*

When there is evidence of possible juror bias, a defendant is entitled to a hearing with all interested parties present to determine the circumstances, the impact on the juror, and whether the information was prejudicial.  *Remmer v. United States*, 347 U.S. 227, 229-30 (1954).  The defendant must show actual prejudice when alleging juror partiality.  *Smith*, 455 U.S. at 217; *see also Cunningham v. Shoop*, 23 F.4th 636, 648-49 (6th Cir. 2022) (explaining that, contrary to other circuits, the Sixth Circuit has concluded that *Smith* "shifted [*Remmer*'s] burden of showing bias at *Remmer* hearings to defendants and stripped defendants of the presumption of prejudice").  In addition, in cases applying *Remmer* and *Smith*, a habeas petitioner bears the burden of demonstrating that a juror was biased.  *Lang v. Bobby*, 889 F.3d 803, 811 (6th Cir. 2018) (citing *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) (Batchelder, C.J., concurring)).  And the

challenged juror's testimony is not inherently suspect.  *Id.* (citing *Jackson v. Bradshaw*, 681 F.3d 753, 767 (6th Cir. 2012); *Zuern v. Tate*, 336 F.3d 478, 486 (6th Cir. 2003)).

The "ultimate question" when a juror's impartiality is at issue is "whether the 'juror swore that he could set aside any opinion he might hold and decide the case on the evidence, and [whether] the juror's protestation of impartiality [should be] believed.'"  *White v. Mitchell*, 431 F.3d 517, 538 (6th Cir. 2005) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).  Habeas courts must accord "special deference" to trial courts in determining a juror's credibility, as trial judges are in the best position to assess the demeanor and credibility of the jurors.  *Patton*, 467 U.S. at 1038.

At a pretrial held between the guilt and sentencing phases of Fry's trial, Fry mentioned to the judge, in the course of explaining to her why he did not want to present mitigation evidence to the jury, that one of the jurors had "talked about it at work," presumably referring to the trial. (Doc. No. 14-2 (Trial Tr.) at 441.)   The judge then, outside the presence of Fry (with his permission) and the jury, asked defense counsel to explain Fry's comment.  (*Id.* at 465.)  Fry's attorney told her that sometime after the jury had reached its verdict, Fry's sister Tara heard from "somebody at the hospital" where she worked that a juror who was a nurse at the same hospital, Vanessa Racut, "made comments to the effect that they had already made up their mind about the sentencing phase and that they were all predisposed to vote for the death penalty."  (*Id.* at 465-67.) However, in an affidavit submitted to the trial court on post-conviction review, Tara stated only that she heard Racut "said that Clarence, Jr. was a real ass-hole.  A friend overheard it and told me about it."  (Doc. No. 13-1 at 1280.)  Defense counsel requested that the judge question the juror. (Doc. No. 14-2 (Trial Tr.) at 467.)

In response to the judge's questioning, Racut testified on the record that she had not said anything to her co-workers about Fry, his trial, his penalty, the jury, or the jury's deliberations; she walked away from anyone trying to ask her about the trial or talk to her about Fry's family.  (*Id*. at 469-70, 483.)  Nor could she recall any contact with Fry's sister Tara.  (*Id*. at 470.)  The juror repeatedly stated, however, that she was "uncomfortable" at work and "nervous" because of her co-workers' comments.  (*Id*. at 471-72, 474, 477-78, 484-85.)  And she admitted that she would prefer to be excused from the penalty hearing.  (*Id*. at 478-79.)  But she was adamant that her discomfort "didn't affect [her] opinions or anything like that" regarding sentencing and that she could "follow the Court's instructions given these comments of [her] coworkers" with "[n]o hesitation."  (*Id*. at 473-74.)

Defense counsel moved to have the juror removed for cause, arguing that it was "not because of anything that she did, but of things that have been done to her since the sentencing in the last 10 or 12 days.  She's indicated, quite unequivocally, that she'd rather not sit through the sentencing or mitigation phase . . . ."  (*Id*. at 479-80.)  The State countered that "comfort level isn't an issue for cause."  (*Id*. at 480.)  The judge denied the motion.  She noted that many participants in capital cases are uncomfortable but concluded that juror Racut could be "fair and impartial," as she had repeatedly testified that she could follow the court's instructions.  (*Id*. at 486.)

Fry argues that the trial court erred by failing to question the entire jury to determine if juror Racut had discussed the case with them.  (Doc. No. 21 at 127.)  But Fry cites to no authority requiring that a trial court interview all jury members every time it encounters an allegation of juror bias, and this Court finds none.  In fact, the trial court took every precaution necessary under *Remmer* and its progeny.  Immediately after learning of Fry's allegation about juror Racut, based on his sister's secondhand knowledge of the juror's alleged comments to an unknown coworker,

117

it immediately asked defense counsel what they knew about it.  Upon defense counsel's motion to challenge the juror for cause, the court conducted a hearing to determine the circumstances, the impact on the juror, and whether the information was prejudicial.  *Remmer*, 347 U.S. at 229-30. Both prosecution and defense counsel participated in the hearing.  *See id.* at 230.

Moreover, Fry did not demonstrate that the juror was actually biased against him.  *See Smith*, 455 U.S. at 215.  Juror Racut assured the court that she did not talk about the trial or the jury to anyone at work and could follow the court's instructions even with her co-workers' upsetting comments with "[n]o hesitation."  *Patton*, 467 U.S. at 1036.  And her testimony was not inherently suspect in any respect.  *See Smith*, 455 U.S. at 217.  Notably, defense counsel did not even use bias as a ground for cause to excuse her; they focused on her discomfort at continuing to serve.  As the trial court reasonably found no bias, there was no need to interview the other jurors.

Fry's fourteenth claim for relief, therefore, is both procedurally defaulted and meritless.

## XII.  Fifteenth Claim for Relief:  *Merger of Charges*

For his fifteenth claim for relief, Fry argues that the trial court's failure to merge two capital-murder specifications led to the jury's improper consideration of aggravating circumstances in his sentencing.  (Doc. No. 21 at 128-31.)  Respondent contends the claim is procedurally defaulted and not cognizable on habeas.  (Doc. No. 24 at 63-65.)

### A.  Procedural Posture

Respondent argues in his return of writ that this claim is procedurally defaulted, because the Ohio Supreme Court on direct review found Fry waived the claim when he failed to request the merger at trial and reviewed the claim only for plain error.  (Doc. No. 24 at 64-65 (citing *Fry*,

125 Ohio St. 3d at 191).)[23]  The Court agrees.  Ohio's contemporaneous objection rule requires that a party preserve an error for appeal by calling it to the attention of the trial court at a time when the error could have been avoided or corrected.  *State v. Mason*, 82 Ohio St. 3d 144, 162 (Ohio 1998); *State v. Glaros*, 170 Ohio St. 471 (Ohio 1960), paragraph one of the syllabus.  Failure to adhere to the "firmly-established" contemporaneous objection rule is "an independent and adequate state ground" upon which to find federal habeas claims procedurally defaulted.  *See, e.g., Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006).  Additionally, the Ohio Supreme Court's plain-error review does not constitute a waiver of the state's procedural-default rules and resurrect the issue.  *Id*.  And Fry again does not assert cause and prejudice or actual innocence to excuse the default.  This claim is defaulted.

## A. Merits Analysis

The Ohio Supreme Court, in considering this claim, ruled:

{¶ 178} Fry contends that the trial court erred by failing to merge the felony-murder/burglary specification, R.C. 2929.04(A)(7), and the witness-murder specification, R.C. 2929.04(A)(8), before the jury's sentencing deliberations. However, the defense failed to request merger and thus waived all but plain error. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 137.

{¶ 179} In the penalty phase of a capital case, "where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative," they will be merged for sentencing purposes. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus. Moreover, "a trial court should instruct the jury in the penalty phase that those duplicative specifications must be considered merged for purposes of weighing the

---

[23] Respondent posits a different basis for this claim's procedural default in his sur-reply. There, he argues that the claim Fry raised in state court was based on a different legal theory than his claim here and therefore was never fairly presented in state court.  (Doc. No. 37 at 27-28.)  The Court does not agree.  Fry's habeas and state-court claims rely on the same basic premise, that the trial court's errors regarding the specifications' merger resulted in the jury improperly considering aggravating factors in sentencing him, violating his federal constitutional rights. *See, e.g., Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) ("To present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support.").

aggravating circumstances against the mitigating factors." *State v. Garner* (1995), 74 Ohio St.3d 49, 53, 656 N.E.2d 623.

{¶ 180} The trial court merged the R.C. 2929.04(A)(7) specification and the R.C. 2929.04(A)(8) specification before imposing sentence. But the trial court failed to instruct the jury that the two capital specifications merged.

{¶ 181} The state argues that the two specifications did not merge because the evidence proving these offenses was separate and distinct. However, as previously discussed, Fry unlawfully entered Knox's residence on July 31 to kill Hardison either in retaliation for filing a criminal complaint against him or to prevent her from testifying against him in future criminal proceedings. He murdered her shortly after entering the residence. Thus, Fry's actions in killing Hardison during an aggravated burglary and killing her because she was a witness were "inextricably intertwined, and thereby constituted one indivisible course of conduct." See *Garner*, 74 Ohio St.3d at 54, 656 N.E.2d 623. Merger was appropriate even though Fry claims that he had other motives for killing Hardison (i.e., because she stole his property).

{¶ 182} Although the specifications should have been merged, "resentencing is not automatically required where the reviewing court independently determines that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict." *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus.

{¶ 183} The outcome of the penalty hearing did not hinge on the failure to merge the felony-murder/burglary specification with the witness-murder specification, because Fry waived the presentation of mitigating evidence. Thus, merger of the two specifications would not have changed the nature of the evidence that the jury was statutorily required to consider. In addition, the trial court did merge the specifications before imposing sentence. Furthermore, this court can cure any error related to the duplicative specifications by merging the two specifications as part of its independent sentence review. See *State v. Mitts* (1998), 81 Ohio St.3d 223, 232, 690 N.E.2d 522. Therefore, no plain error occurred.

{¶ 184} Fry also argues that the trial court erred by failing to merge the two capital specifications before conducting the weighing process in its sentencing opinion, as required by R.C. 2929.03(F). The trial court did not discuss the merger of the felony-murder/burglary specification and the witness-murder specification in its sentencing opinion. Despite this deficiency, no reversible error was committed, because the trial court merged the two specifications before imposing sentence.

*Fry*, 125 Ohio St. 3d at 191-93.

As a preliminary matter, the Court notes that AEDPA applies to a state court's plain-error analysis if it "'conducts any reasoned elaboration of an issue under federal law.'"  *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017) (quoting *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009), and affirming that decision on the issue as controlling circuit precedent).  The state court did not cite to federal law in its analysis of this claim, but the Ohio cases it cited addressed federal law, and AEDPA review therefore applies.

Nevertheless, Respondent argues that this claim is not cognizable on habeas review.  (Doc. No. 24 at 63-65.)  It is true that challenges to a state court's interpretation and application of state sentencing laws generally are not cognizable in federal habeas corpus.  *See, e.g., Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000); *Kipen v. Renico*, 65 Fed. Appx. 958, 959 (6th Cir. 2003).  But Fry's claim is not based on state law.  He does not argue here that the Ohio Supreme Court incorrectly applied Ohio's sentencing laws regarding merger of charges, or allied offenses.

Rather, Fry argues that the jury's consideration of the two capital specifications in weighing aggravating and mitigating factors for sentencing was constitutionally "tainted" – despite Fry's waiver of mitigation evidence, the Ohio Supreme Court's independent sentence review, and the fact that the trial court did merge the specifications before imposing Fry's sentence (which Fry does not acknowledge).  Thus, according to Fry, while Ohio's high court correctly determined that the trial court erred by failing to instruct the jury about the two specifications' merger before its sentencing, the state court unreasonably applied *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 577 U.S. –, 136 S. Ct. 616 (2016), in denying relief based on Fry's mitigation waiver and its own independent reweighing.  (Doc. No. 21 at 129-31.)  In *Ring*, the Court held that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment[,]" and in particular, the finding of an aggravating

121

circumstance.  *Ring*, 536 U.S. at 589.  In *Hurst*, the Court applied *Ring* and decided that Florida's capital sentencing scheme impermissibly allowed "a sentencing judge to find an aggravating circumstance, independent of a jury's factfinding, that is necessary for imposition of the death penalty."  *Hurst*, 136 S. Ct. at 624.

But *Ring* and *Hurst* do not help Fry.  Under *Ring* and *Hurst*, the Supreme Court recently explained,

> a jury must find the aggravating circumstance that makes the defendant death eligible. But importantly, in a capital sentencing proceeding just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing decision within the relevant sentencing range.

*McKinney v. Arizona,* – U.S. –, 140 S. Ct. 702, 707 (2020).  Here, the jury found the two aggravating circumstances at issue were present, as was constitutionally required; its weighing of aggravating and mitigating circumstances is not relevant for constitutional purposes.  Further, in *McKinney*, the Court reaffirmed its holding in *Clemons v. Mississippi*, 494 U.S. 738 (1990), that "'the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review.'"  *Id*. at 706-08 (quoting *Clemons*, 494 U.S. at 741) (explicitly stating that "*Ring* and *Hurst* did not overrule *Clemons* so as to prohibit appellate reweighing of aggravating and mitigating circumstances").  As the Ohio court held, therefore, its independent review of Fry's sentence cured the trial court's merger errors.  Furthermore, the Court also clarified in *McKinney* that *Hurst* does not apply retroactively on collateral review, as Fry urges the Court to do here.  *Id.* at 708 (citing *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004)).

The Ohio Supreme Court's decision, therefore, did not contravene or unreasonably apply *Ring,* and *Hurst* does not apply to his case.  Fry's fifteenth claim for relief fails.

### XIII.  Sixteenth Claim for Relief:  *Unanimity of Jury Verdict*

Fry, for his sixteenth claim for relief, argues that he was denied his due process rights because the indictment, bill of particulars, State's argument, and jury instructions permitted the jury to convict him of aggravated burglary, menacing by stalking, and the witness-murder capital specification based on alternative factual theories and therefore without unanimous agreement.  (Doc. No. 21 at 131-35.)   Respondent argues this claim is procedurally defaulted and not cognizable on federal habeas review.  (Doc. No. 24 at 65-69.)

Fry presented this claim on direct review to the Ohio Supreme Court, which determined he had it waived all but plain error because he did not object to this issue at trial.  *Fry*, 125 Ohio St. 3d at 183.  The claim is therefore procedurally defaulted for failure to comply with Ohio's contemporaneous objection rule.  Fry contends the default should be excused by the ineffective assistance of his counsel in failing to object.  (Doc. No. 32 at 125-26.)  But the Court need not reach this issue, because Fry's claim is clearly not cognizable on habeas.  28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary,* 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

As of the time of Fry's trial and direct appeal, the Supreme Court repeatedly had held that there was no federal constitutional right to a unanimous jury verdict.  *Apodaca v. Oregon*, 406 U.S. 404, 406–14 (1972) (a unanimous jury verdict in state criminal prosecutions is not required by the Sixth and Fourteenth Amendments); *Johnson v. Louisiana*, 406 U.S. 356, 359–63 (1972) (rejecting a due process challenge to non-unanimous state jury verdict).  More recently, the

Supreme Court repudiated *Apodaca* and *Johnson* in *Ramos v. Louisiana*, 590 U. S. —, 140 S. Ct. 1390 (2020), holding that a state jury must be unanimous to convict a criminal defendant of a serious offense.  It subsequently held, however, in *Edwards v. Vannoy,* – U.S. –, 141 S. Ct. 1547, 1551 (2021), that *Ramos* does not apply retroactively on federal collateral review under the test established in *Teague v. Lane*, 489 U.S. 288 (1989).  *Ramos*, therefore, does not apply here, and this claim is not cognizable on federal habeas corpus review.

### XIV.  Seventeenth and Eighteenth Claims for Relief:  *Defective Indictment*

Fry's seventeenth and eighteenth claims for relief challenge the constitutionality of his indictment for: (1) charging him with three different counts of murder that involved three different *mens rea* (Claim Seventeen); and (2) failing to specify every element of the underlying offenses of aggravated felony murder, along with the accompanying capital specification, and felony murder (Claim Eighteen).  (Doc. No. 21 at 135-37.)  Respondent argues these claims are procedurally defaulted and not cognizable on federal habeas review.  (Doc. No. 24 at 65-69.)

Fry raised these claims on direct review to the Ohio Supreme Court.  *See Fry*, 125 Ohio St. 3d at 168-72.  The state court found the claims waived, as Fry did not object to the indictment, and reviewed the claims only for plain error.  *Id*. at 168, 171.  It found no plain error under Ohio law. *Id*. at 168-72.  Again, the Court declines to address Fry's default of these claims because they are clearly non-cognizable.

It is well settled that there is no federal constitutional right to an indictment in state criminal proceedings.  *See, e.g., Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984) (citing *Brazenburg v. Hayes*, 408 U.S. 665 (1972)).[24]  Indeed, "the Constitution does not require any particular state

---

[24] Fry asserts that three circuit courts "have found, or implied, that the use of inconsistent, irreconcilable theories to secure convictions against more than on [*sic*] defendant in prosecutions for the same crime violates the due process clause": *Smith v. Groose*, 205 F.3d 1045 (8th Cir.

indictment rule.  In fact, it does not require an indictment at all if sufficient notice of the charges is given in some other manner."  *Id*.  Fair notice has been given when "the offense [is] described with some precision and certainty so as to apprise the accused of the crime with which he stands charged.  Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial."  *Id*.  "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review."  *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (citing *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986) ("The indictment here had sufficient information to provide petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense.  Any other deficiencies in the indictment alleged by petitioner are solely matters of state law and so not cognizable in a federal habeas proceeding.")).  Therefore, as long as "sufficient notice of the charges is given in some . . . manner" so that the accused may adequately prepare a defense, an indictment comports with due process requirements.  *Koontz*, 731 F.2d at 369.

Here, Fry's indictment clearly stated the essential elements of the crimes of both murder and felonious assault, with sufficient factual allegations to apprise Fry of the charges he faced. (*See* Doc. No. 13-1, Ex. 1).  Fry does not even allege that he did not understand the basis for the charges against him and the predicate offense or offenses of those charges, or that the lack of notice about the predicate offenses undermined his defense in any respect.  The constitutional

_____

2000); *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997), *vacated on other grounds*, 535 U.S. 538 (1998); and *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (Clark, J., concurring).  (Doc. No. 21 at 135-36.)  This argument is misplaced.  As the Ohio Supreme Court observed in addressing Fry's contention that *Groose* supports the proposition that his prosecution on the different murder charges violated his due process rights, *Groose* does not apply to Fry's case, as it involved the state's use of inconsistent theories in prosecution of *multiple defendants* charged with the same single offense.  *Fry*, 125 Ohio St. 3d at 172 (citing *Groose*, 205 F.3d at 1049).  Fry concedes that *Thompson* and *Drake* are distinguishable for the same reason.  (Doc. No. 21 at 136.)

requirement of fair notice, therefore, was satisfied, and these claims fail. *See Williams v. Haviland*, 467 F.3d 527, 535–36 (6th Cir. 2006) ("Although the exact mens rea requirements were not stated in the indictment, the indictment precisely stated the offenses with which Williams was charged so that there could be no confusion on this point.").

## XV.     Nineteenth Claim for Relief:  *Ineffective Assistance of Appellate Counsel*

Fry asserts for his nineteenth claim for relief that his appellate counsel provided constitutionally ineffective assistance.  (Doc. No. 21 at 138-42.)  Specifically, he faults appellate counsel for failing to raise claims on direct appeal that:  (1) the trial court failed to ensure the inclusion of African Americans on the jury; (2) the trial court erred in not excusing a biased juror; (3) trial counsel were ineffective for failing to fully develop and include in the trial-court record additional evidentiary support for "meritorious constitutional claims"; (4) trial counsel's performance relating to the plea negotiations was ineffective; and (5) trial counsel were ineffective in preparing for the mitigation phase of trial.  (*See id.*)  Respondent argues these claims are procedurally defaulted.  (Doc. No. 24 at 61.)

### A.  Procedural Posture

Respondent contends this claim is procedurally defaulted.[25]  (Doc. No. 24 at 61; Doc. No. 37 at 27.)  Fry presented these claims to the Ohio Supreme Court in an application to reopen his

---

[25]  The parties' positions on the procedural posture of this claim are not entirely clear.  Fry did not address the procedural issue in his petition, although directed to do so by the Court's case management order.  (*See* Doc. No. 11 at 5.)  Respondent, in his return of writ, asserted the defense ambiguously at best.  (*See* Doc. No. 24 at 61.)  In his traverse, Fry responded both that "Respondent does not raise procedural default as a defense to this claim," resulting in its waiver, *and* that the "the affirmative defense of procedural default was not waived . . . ."  (Doc. No. 32 at 137 & n.4.) (internal quotation marks and citations omitted).  *See Trest v. Cain*, 522 U.S. 87, 89 (1997) ("[P]rocedural default is normally a defense that the State is obligated to raise and preserv[e] if it is not to lose the right to assert the defense thereafter.")  Respondent then explained in his sur-reply that his assertion of procedural default of this claim was "abbreviated but not imprecise." (Doc. No. 37 at 27.)  The Court finds that Respondent has asserted a procedural-default defense

direct appeal pursuant to Ohio Supreme Court Practice Rule 11.6 more than two years after that court denied his direct appeal. (*See* Doc. No. 13-1 at 929-1378.) That rule permits defendants to request to reopen the direct appeal from a judgment to present claims of ineffective assistance of appellate counsel within ninety days from issuance of the court's direct-appeal mandate, or later for "good cause." *See* Ohio S. Ct. Prac. R. 11.06(A); *see also State v. Murnahan,* 63 Ohio St. 3d 60 (Ohio 1992). The Ohio Supreme Court summarily denied the application. (*Id*. at 1384.)

As noted above, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Here, *Richter*'s presumption is overcome by Fry's failure to file his reopening application for more than two years after the filing deadline. "Where a state court is entirely silent as to its reasons for denying requested relief, we assume that the state court would have enforced any applicable procedural bar." *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004) (per curiam) (citing *Simpson v. Sparkman*, 94 F.3d 199, 203 (6th Cir. 1996)) (finding Ohio Supreme Court's denial of a motion for delayed appeal presumed to be procedural ruling that bars federal habeas review). Such is the case here. This claim is procedurally defaulted. *See Landrum v. Mitchell*, 625 F.3d 905, 934 (6th Cir. 2010) (holding dismissal of a reopening application on timeliness grounds is an adequate and independent state procedural bar preventing habeas review). Moreover, Fry presents no cause-and-prejudice or actual-innocence arguments excusing the default.

---

to this claim, albeit unartfully. In any event, this claim is easily decided on the merits, and even if Respondent did not properly assert the defense, this procedural issue need not be resolved to dispose of this claim. 28 U.S.C. § 2254(b)(2) (courts may deny unexhausted habeas petitions on the merits); *Lambrix v. Singletary,* 520 U.S. 518, 525 (1997) (courts may skip complicated "procedural-bar issues" if the merits are "easily resolvable against the habeas petitioner").

### B.  Merits Analysis

Nevertheless, Fry's ineffective assistance-of-appellate-counsel claims fail on the merits.

A criminal defendant is entitled to effective assistance of counsel in his or her first appeal as a matter of right.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984), applies to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  Fry, therefore, must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable.  *Strickland*, 466 U.S. at 687.

Appellants have no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome."  *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Here, this Court has found no merit in the claims underlying Fry's ineffective-assistance-of-appellate-counsel claims.[26]  There is no prejudice, therefore, resulting from appellate counsel's failure to raise those claims on direct appeal in state court.  Fry's nineteenth claim for relief is procedurally defaulted and lacks merit.

### XVI.   Twentieth Claim for Relief:  *Unconstitutionality of Death Penalty*

---

[26] *See supra* Sections I.B.1, 8, and 10; X.B; and XI.B.

Fry's twentieth claim for relief challenges Ohio's death penalty scheme as violating the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. No. 21 at 143-55.)  Specifically, he argues that Ohio's statute: (1) imposes arbitrary and unequal sentences; (2) provides unreliable sentencing procedures; (3) contains a provision improperly used to provide the aggravating circumstance for an aggravated-murder charge; and (4) precludes a mercy option in some circumstances, resulting in a mandatory death sentence.  (*Id.*)  Fry raised these claims to the Ohio Supreme Court on direct appeal, which summarily denied them.  *See Fry*, 125 Ohio St. 3d at 199.  The claims, therefore, are preserved for habeas review.

The Supreme Court has "time and again reaffirmed that capital punishment is not *per se* unconstitutional."  *Glossip v. Gross*, 576 U.S. 863, 881 (2015); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976).  Moreover, the Sixth Circuit repeatedly has upheld the constitutionality of Ohio's death penalty scheme in particular, rejecting many of the claims Fry asserts here.  *See Beuke v. Houk*, 537 F.3d 618, 652-53 (6th Cir. 2008) ("Beuke next challenges the constitutionality of Ohio's death penalty scheme.  His arguments are entirely meritless and have been rejected by this court on numerous occasions.  We therefore will afford them minimal attention."); *Cooey v. Strickland*, 604 F.3d 939, 944 (6th Cir. 2010); *Cooey v. Coyle,* 289 F.3d 882, 928 (6th Cir. 2002); *Buell v. Mitchell*, 274 F.3d 337, 367-76 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Jamison v. Collins*, 100 F. Supp. 2d 647, 759-67 (S.D. Ohio 2000).

The Court nonetheless will address each of Fry's claims individually.

## A.  Arbitrary and Unequal Punishment

Fry first claims that Ohio's death penalty scheme violates the Fourteenth Amendment's guarantee of equal protection, because it allows the death penalty to be imposed in an arbitrary and

discriminatory manner. (Doc. No. 21 at 144-46.) The Sixth Circuit repeatedly has rejected this

argument. *See, e.g., Buell,* 274 F.3d at 367; *Byrd*, 209 F.3d at 539. It has explained:

> We note that the Ohio death penalty statute includes a number of capital sentencing
> procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S.
> 153, 188–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), specifically to reduce the
> likelihood of arbitrary and capricious imposition of the death penalty. These
> procedures include: (1) consideration of a pre-sentence report by the sentencing
> authority; (2) jury sentencing where the jury is adequately informed and given
> meaningful standards to guide its use of the information; (3) a bifurcated guilt
> phase/sentencing phase trial; (4) weighing of aggravating circumstances and
> mitigating factors; (5) a sentencing decision based on specific findings; and (6)
> meaningful appellate review. In *Gregg*, the Court stated that the concerns expressed
> in *Furman* could be met by "a carefully drafted statute that ensures that the
> sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S.
> at 195, 96 S.Ct. 2909. By complying with this requirement, the Ohio death penalty
> statute significantly reduces the likelihood of arbitrary and capricious imposition of
> the death penalty and does not run afoul of the Constitution.

*Buell*, 274 F.3d at 367. This claim fails.

### B. Unreliable Sentencing Procedures

Fry next argues that Ohio's death penalty statute violates the Equal Protection and Due

Process Clauses by not requiring the state to prove the absence of any mitigating factors or that

death is the only appropriate penalty. (Doc. No. 21 at 146-50.) He also asserts that it is

unconstitutionally vague in defining the process of weighing aggravating and mitigating

circumstances and in defining mitigating circumstances. (*Id.*) The Sixth Circuit has rejected these

arguments as well, reasoning:

> In *Proffitt v. Florida*, 428 U.S. 242, 258, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), the
> Supreme Court upheld a statutory scheme for weighing aggravating circumstances
> against mitigating factors that is similar to Ohio's, which lays out specific
> aggravating circumstances and mitigating factors that are to be considered at
> sentencing. Ohio Rev.Code § 2929.04. The Court also has approved of a statute that
> did not enunciate specific factors to consider or a specific method of balancing the
> competing considerations. *See Franklin v. Lynaugh*, 487 U.S. 164, 172–73, 108 S.Ct.
> 2320, 101 L.Ed.2d 155 (1988); *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733,
> 77 L.Ed.2d 235 (1983). The Court has held that "it is constitutionally required that
> the sentencing authority have information sufficient to enable it to consider the

130

character and individual circumstances of a defendant prior to imposition of a death sentence." *Sumner v. Shuman,* 483 U.S. 66, 72, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987) (quoting *Gregg*, 428 U.S. at 189–90 n. 38, 96 S.Ct. 2909). The sentence imposed on Buell complies with *Sumner* as well as the Supreme Court's holding in *Blystone*, 494 U.S. at 305, 110 S.Ct. 1078, that a death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." In Buell's case, both the jury at the penalty phase of trial and the reviewing courts specifically considering the aggravating circumstances and mitigating factors presented and determined that capital punishment was appropriate. By weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed on Buell.

*Buell*, 274 F.3d at 368.  These claims, therefore, also are unfounded.

### C.  Improper Aggravating Circumstance

Fry further attacks the so-called felony-murder provision of Ohio's death penalty scheme, Ohio Rev. Code § 2929.04(A)(7), under which a murderer is death-eligible if the murder was committed while committing or attempting to commit certain felonies.  (Doc. No. 21 at 147.)  He contends that the provision fails to "'genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of (aggravated) murder[,]'" because it means that if a defendant commits murder during the commission of a felony, the felony can elevate a murder to aggravated murder *and* serve as an aggravating circumstance, making the defendant eligible for the death penalty without proof of an additional new factor.  (*Id.* (quoting *Zant v. Stephens*, 462 U.S. 862, 877 (1983)).)

The Sixth Circuit has found no such problematic overlap.  It has explained that § 2929.04(A)(7) also requires that the defendant "'either was the principal offender in the commission of the Aggravated Murder or, if not the principal offender, committed the Aggravated Murder with prior calculation or design.'"  *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000) (quoting Ohio Rev. Code § 2929.04(A)(7)).  And the Ohio Supreme Court has held that "this

131

language is distinct from the definition of felony murder, because in addition to causing a death during a felony, the defendant must also be proved to have caused the death personally and directly or in a premeditated manner." *Id.* (citations omitted).  This claim, therefore, also lacks merit.

### D.  Lack of Mercy Option or Appropriateness Analysis

Finally, Fry argues that Ohio's capital punishment scheme is unconstitutional because it precludes "a mercy option" in the absence of mitigation or when aggravating circumstances outweigh the mitigating factors, resulting in a mandatory death penalty in those situations.  (Doc. No. 21 at 150-53.)  But the Supreme Court has never clearly established that any type of "mercy option" in capital sentencing is constitutionally required.  In fact, it has twice declined to find unconstitutional instructions directing jurors not to be influenced by sympathy, mercy, or passion in deciding on the appropriate sentence for the capital defendant.  *See Saffle v. Parks*, 494 U.S. 484, 490 (1990); *California v. Brown*, 479 U.S. 538, 539 (1987); *see also Austin v. Bell*, 927 F. Supp. 1058, 1064–65 (M.D. Tenn. 1996).  This claim, too, lacks merit.

## XVII.  Twenty-First Claim for Relief:  *Cumulative Error*

Fry asserts in his twenty-first claim for relief that cumulative error at his trial violated his constitutional rights.  (Doc. No. 21 at 156-57.)  Respondent argues this claim is procedurally defaulted, not cognizable on habeas, and/or meritless.  (Doc. No. 37 at 31.)

The Sixth Circuit repeatedly has held that a claim of cumulative trial error is not cognizable on federal habeas review.  *See, e.g., Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) ("[T]he law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme Court has not spoken on this issue.").  This ground for relief, therefore, is denied as not cognizable on federal habeas review.

## XVIII.  Motion for Evidentiary Hearing

Finally, Fry has moved for an evidentiary hearing on eleven of his twenty-four claims. (Doc. No. 50.)  Respondent opposes the motion.  (Doc. No. 51.)

AEPDA's  §  2254(e)(2)  governs  when  federal  habeas  courts  may  grant  evidentiary hearings.  Its standard for the expansion of the state-court record is a "stringent one," barring evidentiary hearings "[i]n all but . . . extraordinary cases."  *Shinn v. Ramirez*, – U.S. –, 142 S. Ct. 1718, 1728 (2022).  It provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A)    the claim relies on –
>
> > (i)    a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii)    a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B)    the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The Supreme Court has interpreted § 2254(e)(2)'s opening clause to require some degree of fault on the part of the applicant, holding that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *(Michael) Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The required diligence is "a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court . . . ."  *Id*. at 435.

Under AEDPA, therefore, district courts may conduct a hearing to introduce new evidence in support of a claim "only if [the prisoner] was not at fault in failing to develop that evidence in

state court, or (if he was at fault) if the conditions prescribed in § 2254(e)(2) were met." *Holland v. Jackson*, 542 U.S. 649, 652-53 (2004).  In cases where a habeas petitioner is not barred from obtaining an evidentiary hearing by § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court.  *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007).

The Supreme Court announced a further limitation on evidentiary hearings in federal habeas proceedings in *Cullen v. Pinholster*, 563 U.S. 170 (2011), holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 181.  District courts, therefore, "are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013); *see also Bourne v. Curtin*, 666 F.3d 411, 415 (6th Cir. 2012) (finding petitioner was not entitled to an evidentiary hearing because the state courts had adjudicated his claim on the merits and, under *Pinholster*, petitioner was "stuck with 'the record that was before the state court'"); *Sheppard v. Bagley*, 657 F.3d 338, 344 (6th Cir. 2011) (refusing to consider evidence adduced at federal evidentiary hearing in light of *Pinholster*).

Here, the majority of claims on which Fry seeks a hearing were adjudicated on the merits in state courts, as this Court has previously established.  They are:  Claim One, excluding sub-claim (5) (various claims of ineffective assistance of trial counsel); Claim Two (ineffective assistance of counsel relating to mitigation waiver); Claim Three (ineffective assistance of counsel relating to family mitigation testimony); Claim Four (ineffective assistance of counsel relating to alleged juror bias); Claim Five (competency of child witness); Claim Seven (admission of victim statements); and Claim Twelve (counsel of choice).  (*See* Doc. No. 50 at 12-13.)  An evidentiary hearing on these claims is barred under *Pinholster*.

As to the remaining claims he seeks to develop in a hearing, Fry contends that, as a general matter, he does not have to satisfy § 2254(e)(2)'s strict requirements, because he "was as diligent in pursuing his federal constitutional claims for relief in state court as the governing rules and the state courts themselves permitted him to be."  (*Id*. at 10.)  It was the state courts, he claims, and their "rules that limited his ability to fully develop the factual record before the state court."  (*Id*.)  Fry does not, however, specifically address the issue of his diligence in developing each of the claims at issue in state court.  And his diligence in this regard is far from clear.

Indeed, these claims are procedurally defaulted, as the Court already has explained, and for reasons that suggest a lack of diligence.  Briefly, Fry failed to raise on direct appeal Claims One, sub-claim (5), and Thirteen, relating to the number of African Americans on the jury panel, and Claim Fourteen, regarding alleged juror bias, resulting in their default under Ohio's *res judicata* doctrine because the trial court conducted hearings on these matters.[27]  Fry failed to raise in his post-conviction petition Claim Three, asserting ineffective assistance of counsel relating to mitigation evidence of Fry's family history of domestic violence and his drug abuse, and Claim Fourteen, the juror-bias claim, and the trial court did not grant his motions for leave to amend his petition to add the claims, so the claims were not reviewed.[28]  Fry failed to fairly present Claim Six, challenging the admission of "other acts" evidence, to the Ohio Supreme Court on direct review.[29]  And lastly, Fry failed to timely raise Claim Nineteen, asserting ineffective assistance of

---

[27]  *See supra* Sections I.A.1, XI.A, and X.A.

[28]  *See supra* Sections I.A.3 and XI.A.

[29]  *See supra* Section III.A.

appellate counsel, in an application to reopen his direct appeal, filing his application more than two years after the filing deadline.[30]

Moreover, significantly, Fry either has offered no cause for the various defaults or has advanced ones that are unpersuasive.  He complains about state-court rules, but, as the Supreme Court has explained, diligence for purposes of § 2254(e)(2) "require[s] in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court *in the manner prescribed by state law*."  *(Michael) Williams*, 529 U.S. at 437 (emphasis added).  With these defaulted claims, Fry simply failed to adhere to standard court rules.  He either obtained a hearing at trial on the matter at issue and failed to raise the claim on direct appeal or did not meet filing deadlines to obtain post-conviction review or reopen his direct appeal.

And even if Fry could establish diligence and avoid § 2254(e)(2)'s strict requirements, he has not demonstrated that a hearing on these claims would resolve any factual disputes that could entitle him to relief.  This Court has carefully examined the merits of each of these claims, as explained above, and does not find any of them "extraordinary" enough to warrant a hearing.

Accordingly, Fry's motion for an evidentiary hearing is denied.

## CERTIFICATE OF APPEALABILITY ANALYSIS

The Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Fry's claims for relief.  The Sixth Circuit has held that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see*

---

[30] *See supra* Section XV.A.

*also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).

Habeas courts are guided in their consideration of whether to grant a COA by 28 U.S.C. § 2253, which provides in relevant part:

> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from –
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .
>
> (3) A certificate of appealability may issue under paragraph (12) only if the applicant has made a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional*, rather than federal, right.  *Slack v. McDaniel*, 529 U.S. 473, 483-04 (2000) (interpreting the significance of the revision between the pre- and post-AEDPA versions of that statute).

Furthermore, if a habeas claim is not procedurally defaulted, then the court need only determine whether reasonable jurists would find the district court's decision "debatable or wrong." *Id*. at 484.  A more complicated analysis is required, however, when assessing whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In those instances, a COA should only issue if "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

After taking the above standards into consideration, the Court finds as follows:

137

The Court will not issue a COA for claims for relief:  One, sub-claims (3), (4), and (6); Four; Five; Seven; Nine; Twelve; Nineteen, sub-claims (1) through (3), (5); and Twenty through Twenty-Four.  No jurist of reason would debate the Court's conclusions on these claims.

No COA will issue for claims for relief One, sub-claim (5); Three; Six; and Thirteen through Fifteen, because they are unequivocally procedurally defaulted.

In addition, no COA will issue for claims for relief Eight; Sixteen through Eighteen; and Twenty-One, because they are not cognizable on federal habeas review.

The Court will issue a COA for Fry's claims for relief:  One, sub-claims (1) based on trial counsel's ineffective assistance relating to the plea deal negotiations and (2) his decision not to testify; Two, based on trial counsel's ineffective assistance relating to his waiver of the presentation of mitigation evidence; Ten, based on trial-court error relating to his decision not to testify; Eleven, based on trial-court error relating to his waiver of the presentation of mitigation evidence; and Nineteen, sub-claim (4), based on appellate counsel's ineffective assistance for failing to raise a claim on appeal that trial counsel were ineffective in conducting plea deal negotiations.  A reasonable jurist could debate the Court's conclusions regarding these claims.

## CONCLUSION

For the foregoing reasons, this Court denies Fry's Petition for Writ of Habeas Corpus (Doc. No. 21).  The Court further certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an appeal from this decision could be taken in good faith as to the first (sub-claims (1) and (2)), second, tenth, eleventh, and nineteenth (sub-claim (4)) claims for relief, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only.  As to all remaining claims, the Court certifies that, pursuant to 28 U.S.C. § 1915(a)(3), an

appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.


Dated: March 10, 2023                    *s/Pamela A. Barker*
                                         PAMELA A. BARKER
                                         UNITED STATES DISTRICT JUDGE